# Exhibit 1

```
                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


   Federal Trade Commission,      ) Civil Action
                                  ) No. 20-cv-3590 - JEB
                    Plaintiff,    )
                                  ) JURY TRIAL
   vs.                            ) SEALED
                                  ) Washington, DC
   Meta Platforms, Inc.,          ) May 13, 2025
                                  ) Afternoon Session
                    Defendant.    ) Time:  1:35 p.m.
   _____

                    TRANSCRIPT OF JURY TRIAL
                          HELD BEFORE
               THE HONORABLE JUDGE JAMES E. BOASBERG
                   UNITED STATES DISTRICT JUDGE
   _____

                       A P P E A R A N C E S

   For the Plaintiff:      Daniel J. Matheson, Esquire
                           Krisha Cerilli, Esquire
                           Federal Trade Commission
                           Bureau of Competition
                           400 Seventh Street Southwest
                           Washington, D.C. 20024

   For the Defendant:      Mark C. Hansen, Esquire
                           Kellogg, Hansen, Todd, Figel
                             & Frederick, PLLC
                           1615 M Street Northwest
                           Suite 400
                           Washington, D.C. 20036
   _____

   Court Reporter:         Janice E. Dickman,  RMR, CRR
                           Official Court Reporter
                           United States Courthouse, Room 6523
                           333 Constitution Avenue, NW
                           Washington, DC  20001
                           202-354-3267
```

1       FTC uses multiple social media apps for the same
2  broadcast sharing purposes, doesn't it?
3  A.  I don't know how the FTC uses it.
4  Q.  It makes one to many communications via Facebook,
5  Instagram, X, LinkedIn, and YouTube, correct?
6  A.  I don't know.  Either way, it's not necessary for the
7  opinions I reached in this matter.
8  Q.  Now, you told us that you've served as an expert witness,
9  correct?
10 A.  Yes.  And that was true, yes.
11 Q.  But you've only testified live in one trial, correct?
12 A.  I've testified live in other circumstances, but the one
13 time at trial -- if by trial we mean this, was once, yes.
14 Q.  That was a Section 2 monopolization case?
15 A.  That's correct.  Yeah.
16 Q.  Called -- I think you said yesterday it was *Federal Trade*
17 *Commission versus Vyera*?
18 A.  Yeah, it might be *Vyera*.  But, yes, that's it.
19 Q.  Sorry for the mispronunciation.
20      So from that experience, you're familiar with the
21 requirements for expert witness testimony, correct?
22 A.  I -- I have some understanding of that.  It didn't really
23 come up then.
24 Q.  Well, you know you're supposed to disclose all of your
25 opinions in written reports, correct?

1   there.  But I agree with you that that is one of the
2   understandings of what a lawyer does.
3   Q.  As an expert witness you have different duties, including
4   duties to the Court, correct?
5   A.  Yes, I agree that I have a duty to the Court to be of
6   assistance.
7   Q.  You have a duty to report with objectivity and not to
8   support preconceived notions, correct?
9   A.  Yes.  I would agree with that.
10  Q.  You have a duty not to be an advocate for a cause, correct?
11  A.  I have a duty to be of assistance to the Court.
12  Q.  That's not answering my question.
13      You have a duty not to be an advocate for a cause,
14  correct?
15  A.  Yes, I think that's accurate.
16  Q.  You have a duty not to seek employment as an expert witness
17  on one side of a case, correct?
18  A.  I don't know one way or the other on that, but that's not a
19  troubling understanding.
20  Q.  I'm sorry.  I didn't hear the answer.
21  A.  I don't know one way or the other on that being part of the
22  duty, but I -- I'm not troubled by that idea that you're
23  raising.
24  Q.  An expert with a partisan axe to grind is of no use to the
25  finder of fact and becomes just another advocate for a party.

```
 1              Do you agree with that?
 2    A.   Yes, that seems reasonable.
 3    Q.   Professor Hemphill, you are the very definition of an
 4    expert witness with a partisan axe to grind, aren't you?
 5    A.   No.  I disagree with that.
 6    Q.   You're the very definition of an expert witness who came to
 7    your assignment as an advocate for a cause, aren't you?
 8    A.   No.  I disagree with that.
 9    Q.   You're the very definition of an expert who had
10    preconceived notions about Meta's Section 2 liability before
11    this case even began, true?
12    A.   False.
13    Q.   Well, we'll see about that.
14              You did get hired by the FTC in 2022, correct?
15    A.   I don't remember the exact year.
16    Q.   And you've made millions of dollars in hourly billings,
17    plus a percentage of what Charles River has billed in this
18    case, correct?
19    A.   Yes, that's accurate.
20    Q.   FTC filed this case on December 9, 2020, I believe is
21    stipulated.
22              Do you know that's correct?
23    A.   I don't know the exact date, but that sounds about right.
24    Q.   So isn't it true, sir, that you, a gentleman named Tim Wu,
25    who was present is the courtroom yesterday, another gentleman
```

1  Facebook, now he's working to break it up."
2          So if you go to page 2, there's a paragraph that begins,
3  "In recent weeks."
4          "In recent weeks, Mr. Hughes has joined two leading
5  antitrust academics, Scott Hemphill of NYU and Tim Wu of
6  Columbia University, in meetings with the Federal Trade
7  Commission, the Justice Department, and State Attorneys
8  Generals.  In those meetings, the three have laid out a
9  potential antitrust case against Facebook, Mr. Wu and
10 Mr. Hemphill said."
11         Is that what you told *The New York Times*?
12 A.  No.  I mean, I'm -- you're reading accurately what's on the
13 page.  This is not something that I recall telling *The New York*
14 *Times*, but it's true that there were meetings with the FTC, the
15 Justice Department, and State Attorneys General, as we've
16 discussed.
17 Q.  Well, did -- were you misquoted here by *The New York Times*?
18 A.  I'm not being quoted by *The New York Times* here.
19 Q.  Oh, yes, you are.  "Mr. Hemphill said."
20 A.  Yes, later in the article.  Not in the excerpt that you're
21 showing.  It's true that I'm quoted in *The New York Times*.
22 Q.  Let's not quibble.
23         What it says is, "In those meetings the three have laid
24 out a potential antitrust case against Facebook, Mr. Wu and
25 Mr. Hemphill said."

1     Did you say what's in the first clause of that sentence,
2  Professor Hemphill?
3  A.  No, I don't think so.
4  Q.  So you were just misquoted, is that what you're telling us?
5  A.  Yes, I believe so.  I think I --
6  Q.  Did you write *The Times* to ask to have a retraction?
7  A.  No.
8  Q.  At your meeting with the FTC, you presented a PowerPoint
9  deck that contained your opinions about the antitrust case,
10 correct?
11 A.  I wouldn't characterize it as a deck containing my opinions
12 about the antitrust case, though it's true that there was a
13 deck discussing the prospect of an investigation.
14 Q.  Let's hand you DX-1410 and see whether you recognize it.
15 Does 1410 look familiar to you, Professor Hemphill?
16 A.  Yes, this -- I don't know if it's exactly the same, but it
17 appears to be the presentation that we made.
18 Q.  And you drafted this presentation, didn't you?
19 A.  Yes, together with Professor Wu and, to some degree,
20 Mr. Hughes.
21 Q.  And you're the lead author, according to the title page?
22 A.  I mean, it's alphabetical.  But, yes, my name comes first.
23 Q.  Did you give the FTC a copy of these slides when you made
24 your presentation?
25 A.  We may have.  I don't know either way.

1  Q. Did you maintain a copy --
2  A. It wouldn't surprise me, but we may have.
3  Q. Did you maintain a copy of the slides?
4  A. Yes.
5  Q. But you didn't produce them as part of your expert report,
6  did you?
7  A. No, it's not part of the materials on which I relied.
8  Q. You made no reference to the fact that you prepared written
9  materials about opinions as to a case against Facebook, did
10 you?
11 A. Well, I mean, it's not part of the materials relied on.
12 Q. And the FTC didn't produce these slides to us either.
13    Do you know that?
14 A. I don't have knowledge one way or the other about that.
15 Q. Let's go to Slide 2, PDF page 1. Who we are. You're Scott
16 Hemphill, correct?
17 A. Yep, that's my name.
18 Q. We can agree on that. You don't see anything here about
19 being an economist, do you?
20 A. No. My title is professor of law at NYU. It's law.
21 Q. But your title was not antitrust bureau chief. You wanted
22 to tell the FTC that you were an antitrust lawyer, right?
23 A. In meeting with enforcers, it seems relevant to talk about
24 previous enforcement experience, and that would be a natural
25 thing, I think, to include.

1   Q.   The next author is Professor Tim Wu, a close friend and
2   collaborator of yours?
3   A.   He is a close friend and collaborator.
4   Q.   In fact, he was here in support of your testimony, wasn't
5   he?
6   A.   He was here, I hope, to be of support, I imagine.
7   Q.   And he was tweeting out to his broad audience of followers
8   as to what he thought of your testimony, wasn't he?
9   A.   I have no idea about that.
10  Q.   Do you communicate with him via Facebook or Instagram?
11  A.   No.
12  Q.   He wrote a book in 2018 advocating the breakup of then
13  Facebook, now Meta, correct?
14  A.   He wrote a book in 2018.  I don't remember whether he
15  advocated that or not.
16  Q.   Let's look at DDX-28.10.  Do you recognize the cover of *The
17  Curse of Bigness*?
18  A.   DDX -- I'm just going to -- is this in my --
19  Q.   No, it's on the screen.  It's not --
20  A.   I know, but I don't know where this is going.
21  Q.   It's not in the book.
22  A.   Okay.
23  Q.   Do you recognize the cover page?
24  A.   Yeah.  I mean, in general, if I'm going to take something
25  on, I like to have it in my hands, but I can look on the screen

1  for this.
2  Q.  You were credited as somebody who helped with this book,
3  weren't you?
4  A.  Yeah.  I mean, he's a collaborator.  I probably read
5  everything -- most everything he writes.
6  Q.  You read everything he wrote, including that he thought
7  there was a clear danger to democracy that stemmed from
8  manipulation of the Facebook conglomerate, correct?
9  A.  That's what's on the screen.
10 Q.  He wrote, "The simplest way to break the power of Facebook
11 is breaking up Facebook," correct?
12 A.  Yes, it says that.
13 Q.  Your second coauthor of these slides -- if we could go back
14 to the prior slide -- the "Who We Are" slide, Chris Hughes, he
15 claims to be a cofounder of Facebook, Meta?
16 A.  Yes.  That's true so far as I know.  It says that, yes.
17 Q.  But he left Meta in 2007, correct?
18 A.  He subsequently left.  I don't know when.
19 Q.  And he has a big axe to grind against Meta, too, doesn't
20 he?
21 A.  I don't know if either of them have an axe to grind, but
22 whether that's true for him, for Mr. Hughes, I don't know.
23 Q.  Would you call waging a public campaign to break up Meta an
24 axe to grind?
25 A.  Depends on what you mean by axe to grind.

1     working on a slide deck, which is characterized here as a road
2     show.  And I don't remember whether Professor Wu asked
3     Mr. Hughes or whether Mr. Hughes asked Professor Wu.  So I
4     think that's probably incorrect to some degree.
5     Q.  You had nothing to do with it?
6     A.  I was part of a group that was preparing a presentation.
7     You know, Professor Wu and I thought, as I said, that this was
8     a matter worth investigating.  So I think I said clearly I was
9     involved in this, but asking Hughes to join a road show does
10    not accord with my recollection.
11    Q.  Well, you certainly didn't write *The Washington Post* to ask
12    for a correction or retraction, did you?
13    A.  No.  It seemed kind of meaningless, honestly.  So, no, but
14    I don't -- I don't remember this one way or the other at the
15    time.  But this is sort of par for the course.
16    Q.  So if you go back to PDF page 1 of 1410, you talk about --
17    you're speaking only for yourselves, correct?
18    A.  That's right.
19    Q.  So you're expressing your personal views, correct?
20    A.  Yes, our personal views as academics, trying to understand
21    what's going on and making a suggestion about a potential
22    investigation.
23    Q.  Let's look at what views you expressed and how you worded
24    your views.  Let's go to page 4, Slide 9.  You write in your
25    presentation to this FTC that there is direct evidence of

| | |
|---|---|
| 1 | anticompetitive intent.  Those were your words, correct? |
| 2 | A.  Yes, that's part of our slide deck.  It says that. |
| 3 | Q.  I mean, you could have chosen to use different words, |
| 4 | correct? |
| 5 | A.  It's always true when you put together a presentation.  One |
| 6 | could have chosen different words, yes. |
| 7 | Q.  And just so we're clear, you had no evidence, not one shred |
| 8 | of evidence about anticompetitive intent when you wrote this |
| 9 | and presented it to the FTC; isn't that true? |
| 10 | A.  I don't know.  I don't understand what you're asking. |
| 11 | Q.  You don't understand my question? |
| 12 | A.  That's what I said, yes. |
| 13 | Q.  Okay.  Isn't it true, sir, that you had no evidence of |
| 14 | anticompetitive intent at the time you wrote this to the FTC in |
| 15 | 2019? |
| 16 | A.  I guess I see where you're going.  So, at the time -- |
| 17 | Q.  It's a simple question.  Did you have evidence, or did you |
| 18 | not have evidence? |
| 19 |             MS. CERILLI:  Objection. |
| 20 |             MR. HANSEN:  It's a yes or no question. |
| 21 |             MS. CERILLI:  Objection.  Can he be allowed to |
| 22 | complete his answer? |
| 23 |             THE COURT:  I think it's fair for him to answer, and |
| 24 | if he can't answer yes or no, he can explain, but it seems he |
| 25 | can answer yes or no and then go from there. |

1       THE WITNESS:  I disagree with that.
2  BY MR. HANSEN:
3  Q.  Well, then your answer is no, you did have evidence?
4  A.  I think it's not a question that easily admits of yes or no
5  here.  I'm happy to explain.
6  Q.  Well, let's see what you cited.  Scholars cite sources when
7  they give opinions, correct?
8  A.  To the limits of the available evidence, I think that's
9  fair.
10  Q.  And you cited one single thing in support of your opinion
11  that there was direct evidence of anticompetitive intent,
12  correct?
13  A.  I cited an article from *The New York Post* discussing what
14  appeared to be documentary evidence, if I remember what the
15  article said, along the lines of probably the exchange between
16  Mr. Zuckerberg and the CFO, although that information was not
17  yet, as I recall, in the public domain as it subsequently
18  became.
19  Q.  You didn't have any emails from anyone at this point, did
20  you?
21  A.  I believe that's true.
22  Q.  You were citing a *New York Post* article that was citing
23  unnamed sources purporting to characterize something that you
24  hadn't seen, correct?
25  A.  I was citing a *New York Post* article -- yeah, I think -- I

1  mean, I see what you're saying, yes. I think that's right.
2  Q. Is *The New York Post* a recognized authority used by
3  scholars in your field?
4  A. I mean, this is not a scholarly paper. It's a reasonable
5  citation making the straightforward factual point, which turned
6  out to be correct, that there was evidence, written documentary
7  evidence, that from the standpoint of Mr. Zuckerberg, that the
8  reason it was buying Instagram was to eliminate a potential
9  competitor.
10 Q. My question, sir, is your state of knowledge at the time
11 you urged the FTC to bring this case, and that state of
12 knowledge was you'd read a *New York Post* story, quoting an
13 unnamed source purporting to characterize an e-mail you hadn't
14 seen, correct?
15 A. Incorrect. I disagree that I was urging them to bring a
16 case, as opposed to bring an investigation with whatever
17 information they had that, of course, we would not have. There
18 was a reasonable basis to give this a closer look.
19 Q. *The New York Post* is a scandal sheet, isn't it?
20 A. I don't have a view one way or the other about whether *The*
21 *New York Post* is a scandal sheet.
22 Q. Do you ever read it?
23 A. I read this article. Generally, no, but --
24 Q. Look at DDX-28.13. They're famous for headlines like this;
25 right, "Headless body in a topless bar." Is that a recognized

1   evidence on which we were -- we were pointing.
2   Q.  Let's go to slide 12, page 6, where you give the opinion
3   that, "There is public recognition of the defensive acquisition
4   strategy."
5       Those are your words, correct?
6   A.  Sorry.  So we're not going to do the other slide on this
7   one?
8   Q.  I'm directing you to slide 12, page 6.
9       Are you with me?  It's on the screen.
10  A.  Yes, I'm reading it.
11  Q.  "Public recognition of defensive acquisition strategy."
12      That was your opinion, correct?
13  A.  Let me read the slide.
14          (Pause.)
15      Yes.  The same topic continues on the next page, but
16  this is evidence that we were pointing to that there was some
17  public awareness of the idea that the acquisition of Instagram
18  was defensive.
19  Q.  Evidence consisting of quotes from a couple -- a blogger
20  from a failed blog and a *Vanity Fair* reporter; is that right?
21  A.  I think of Kara Swisher as a lot more than a *Vanity Fair*
22  reporter.
23      But we were citing news, public recognition.  It's
24  just what the title of the slide says.  And then there's more
25  on the next page from *TechCrunch* and from -- from *Wired*.

1  Q.  Om Malik is a failed blogger, correct?  His blog was shut
2  down?
3  A.  I've never heard him referred to as a failed blogger.  I
4  don't know.
5  Q.  Well, he was hardly an objective source, was he?
6  A.  I don't -- I don't know if he's an objective source or not.
7  Q.  He had an axe to grind when it came to Meta, didn't he?
8  A.  Not that I'm aware of.
9  Q.  Well, he wrote in his blog -- if you look at DX-1434, Om
10 Malik blog post, he was, quote, Trapped in Zuck's hell on
11 earth."
12        That's a pretty significant piece of bias evidence,
13 isn't it?
14 A.  I'm seeing this for the first time, so far as I know.
15 Q.  So you didn't check into the reliability of Mr. Malik
16 before you cited him as evidence?
17 A.  I don't believe I read this article before including
18 Mr. Malik's view of the transaction, among others, in my
19 co-opted slide presentation, but I --
20 Q.  In the same blog post, on page 2, he said he had written --
21 quote, Written so much about Facebook and its evil ways that he
22 feels exhausted and tired of repeating himself, right?
23        Do you see that?
24 A.  You've accurately read the sentence and it's also in this
25 larger article.

1   Q.  Ms. Swisher is not a recognized expert in antitrust
2   matters, is she?
3   A.  I think she's a recognized prominent tech journalist, about
4   as prominent as they come.  I don't have a view about her
5   expertise in antitrust.
6   Q.  She had an axe to grind when it came to Meta and Mark
7   Zuckerberg, didn't she?
8   A.  Not so far as I know.
9   Q.  Are you aware she's called Mr. Zuckerberg a, quote, small
10  little creature with a shriveled soul?  DX-28.15.
11      Were you aware of that?
12  A.  I see that on the screen.  It's not something I was aware
13  of before today.
14  Q.  Then you give an opinion that there are high transaction
15  prices -- let's go to slide 14 -- high transaction prices,
16  evidence of defensive acquisition strategy.  1410, PDF page 7,
17  please.  Slide 14.
18      You said -- you express the opinion that Facebook made
19  strikingly large payments to acquire Instagram and WhatsApp.
20  And you get the WhatsApp payment price wrong by a matter of
21  $3 billion, don't you?
22  A.  Yes.  As I said earlier today, I think 19 billion is the
23  right number to use, rather than 22 billion.
24  Q.  And Instagram, the fact of the matter is, the price was too
25  low, wasn't it?