# Exhibit 5

Defendant's Exhibit

**DX-1475**

Case Number:
1:20-cv-03590-JEB

# Investigating Facebook's Acquisitions of Competitors

## Scott Hemphill and Tim Wu

### NYU School of Law and

### Columbia Law School

June 11, 2019

# Who We Are

- Scott Hemphill
  - Professor of Law, NYU School of Law
  - Former Antitrust Bureau Chief, New York Attorney General
- Tim Wu
  - Julius Silver Professor, Columbia Law School
  - Former Senior Advisor, Federal Trade Commission; Enforcement Counsel, NY Attorney General
- Chris Hughes
  - Co-Chair, Economic Security Project
  - Co-Founder, Facebook
- Speaking only for ourselves, not a client

2

# Facebook, Inc.

| | | |
|---|---|---|
| Revenue | $55 billion | 2018 |
| Net income | $22 billion | 2018 |
| | | |
| Market capitalization | $495 billion | June 7, 2019 |
| Cash on hand | $45.2 billion | Mar. 31, 2019 |
| | | |
| Monthly active users | 2.4 billion | Mar. 31, 2019 |
| % revenue from mobile | 93% | Mar. 31, 2019 |
| % ad revenue from Instagram | 15% | Sept. 30, 2018 |

Sources: Facebook Reports Fourth Quarter and Full Year 2018 Results (revenue and net income); Yahoo Finance (market capitalization); Vox (Instagram ad revenue) (citing KeyBanc Capital Markets estimate of $2 billion/$13 billion in Q3 2018); Facebook Reports First Quarter 2019 Results (all other figures)

3

# Facebook's Acquisitions of Nascent Competitors

- Available evidence indicates that as of 2010, Facebook launched a program of serial defensive acquisitions in order to maintain its dominance in the provision of social media services

- Such a program to acquire nascent competitors, if established, violates Sherman Act § 2 and Clayton Act § 7 (via FTC § 5)

- The anticompetitive effects of such a program include

  - Higher prices to advertisers

  - Lower quality to users, in the form of higher ad loads and reduced privacy protection

4

# Facebook's Acquisitions of Nascent Competitors

- Available evidence indicates that as of 2010, Facebook launched a program of serial defensive acquisitions in order to maintain its dominance in the provision of social media services

- Such a program to acquire nascent competitors, if established, violates Sherman Act § 2 and Clayton Act § 7 (via FTC § 5)

- The anticompetitive effects of such a program include

  - Higher prices to advertisers

  - Lower quality to users, in the form of higher ad loads and reduced privacy protection

5

# Acquisitions



Source: Tim Wu and Stuart Thompson, *New York Times* (June 8, 2019)

6

# Acquisition of Competitive Threats

| Year | Target | Type | Acquired? |
|------|--------|------|-----------|
| 2010 | Nextstop | Location | Yes |
| 2010 | 4Square | Location | No |
| 2011 | Beluga | Messaging | Yes |
| 2012 | Glancee | Location | Yes |
| 2012 | Instagram | Sharing photos | Yes |
| 2012 | Lightbox | Sharing photos | Yes |
| 2013 | Snapchat | Social | No |
| 2014 | WhatsApp | Messaging | Yes |
| 2017 | TBH | Messaging | Yes |

7

# Instagram: Early Growth

## Registered Users (MM)



Sources: Quora; New York Times; Instagram; CNN; TechCrunch

8

# Direct Evidence of
# Anticompetitive Intent

- While the Instagram acquisition was pending in summer 2012, the FTC uncovered an email authored by CEO Mark Zuckerberg, concerning the reasons for and purposes of the acquisition

- The reported content of the email was that "the reason the company was buying Instagram was to eliminate a potential competitor" (*New York Post*, February 26, 2019)

9

# Public Recognition of a Defensive Acquisition Strategy

Facebook was scared shitless [by Instagram] and knew that for first time in its life it arguably had a competitor that could not only eat its lunch, but also destroy its future prospects. Why? Because Facebook is essentially about photos, and Instagram had found and attacked Facebook's [A]chilles heel — mobile photo sharing.

*Om Malik, GigaOM, April 12, 2012*

"They [Instagram] got a lot of traffic from Facebook," Zuckerberg says. "And it occurred to me we could be one company." Presumably, it also occurred to him that the then little Instagram could pose a very real threat to Facebook. It was not an idle worry: Instagram was hip, elegant, fun, and "mobile-first," and moving to mobile was a burgeoning problem for the largely desktop-bound Facebook.

Most of all, Instagram represented the constant fear that even the greatest of Internet giants fret about daily: in Silicon Valley, the young can sometimes eat the old, instead of the other way around.

*Kara Swisher, Vanity Fair, June 2013*

10

# Public Recognition of a Defensive Acquisition Strategy

Mark Zuckerberg was quick to realize that Facebook, the largest social network in the world, [cannot] bank on holding its position as top dog forever. Thus he instituted a policy of buying up promising rivals and integrating them into the Facebook "group" in a strategy designed to be a win-win for all.

*Jon Russell, TechCrunch, September 25, 2018*

I've often joked that the secret to making a billion dollars in Silicon Valley is very simple: merely show Mark Zuckerberg a user growth chart that resembles Facebook's in its early years. That's precisely what the founders of Instagram and WhatsApp did, and it would be naïve indeed to claim Facebook bought the companies as anything other than an anticompetitive bid to head off future rivals.

*Antonio Garcia Martinez, Wired, May 10, 2019*
*(former Facebook Product Manager)*

11

# Known Misrepresentations to Support Acquisitions

WhatsApp
(2014)

- Facebook and WhatsApp founder Brian Acton misrepresented facts material to future relationship, promising that (1) WhatsApp would remain independent, and (2) Facebook could not and would not harvest WhatsApp subscriber data

12

# Exclusive: WhatsApp Cofounder Brian Acton Gives The Inside Story On #DeleteFacebook And Why He Left $850 Million Behind



**Parmy Olson**

f  𝕏  in

The warning signs emerged before the deal even closed that November. The deal needed to get past Europe's famously strict antitrust officials, and Facebook prepared Acton to meet with around a dozen representatives of the European Competition Commission in a teleconference. "I was coached to explain that it would be really difficult to merge or blend data between the two systems," Acton says. He told the regulators as much, adding that he and Koum had no desire to do so.

Later he learned that elsewhere in Facebook, there were "plans and technologies to blend data." Specifically, Facebook could use the 128-bit string of numbers assigned to each phone as a kind of bridge between accounts. The other method was phone-number matching, or pinpointing Facebook accounts with phone numbers and matching them to WhatsApp accounts with the same phone number.

13

# Known Misrepresentations to Support Acquisitions

**WhatsApp (2014)**

- Facebook and WhatsApp founder Brian Acton misrepresented facts material to future relationship, promising that (1) WhatsApp would remain independent, and (2) Facebook could not and would not harvest WhatsApp subscriber data

- In 2017, the European Commission fined Facebook €110 million for providing misleading information

**Instagram (2012)**

- Facebook and Instagram founder Kevin Systrom misrepresented Twitter's competing offers for and interest in acquiring Instagram, in proceeding before the California Department of Corporations

Source: Nick Bilton, Disruptions: Instagram Testimony Doesn't Add Up, *New York Times*, Dec. 16, 2012

14

# Relevance of Facebook's Misrepresentations

- Facebook's misrepresentations may have concealed an anticompetitive intent in acquiring WhatsApp and Instagram

- If FTC clearance was obtained deceptively, the need for reexamination is heightened

- The WhatsApp misrepresentation may have precluded a Section 7 challenge premised on anticompetitive data aggregation

- The Instagram misrepresentation may have precluded public knowledge that Facebook thwarted the emergence of a well-funded rival (and intended this result)

15

# Developing the Facts:
# The FTC's Ongoing Investigation

- Under its hybrid § 5 authority, the FTC can incorporate competition concerns as part of its ongoing (March 2018) investigation of Facebook

- The competition concerns raised by Facebook's conduct overlap with the privacy concerns

- Reduced privacy protection—not only in Facebook's announced product offering, but also in its ability to violate user expectations without competitive discipline—would be an anticompetitive consequence of the acquisition of nascent competitors

- Any settlement of this investigation should exempt competition concerns for further investigation

16

# Developing the Facts: Proposed Next Steps

- Interview founders of acquisition targets and rival acquirers
    - Kevin Systrom (Instagram)
    - Mike Krieger (Instagram)
    - Twitter executives (rival acquirer of Instagram)
    - Brian Acton (WhatsApp, declined to sign NDA)
    - Jan Koum (WhatsApp)
    - Snap (on request)
    - Consider friendly subpoena
    - Goal: what is their understanding of the intent and effects of Facebook's acquisition proposal? As articulated/understood at the time; as articulated/understood later

17

# Developing the Facts: Proposed Next Steps

- Interview former Facebook employees
  - Chris Cox, chief product officer
  - Antonio Garcia Martinez, product manager
  - Tavis McGinn, Zuckerberg's pollster
  - Sandy Parakilas, operations manager
  - Dan Rose, head of business development
  - Justin Rosenstein, engineer and inventor of "Like" button
  - Alex Stamos, chief security officer
  - Consider friendly subpoena
  - Goal: validate or rule out the existence of a defensive acquisition program, and understand its details
- Interview current Facebook employee
  - Amin Zoufonoun, vice president, corporate development

18

# Preliminary Injunction

- In January 2019, Facebook announced a plan to integrate the messaging services of Instagram, WhatsApp, and Facebook (Messenger)

- One anticipated (and possibly intended) effect of the integration is to make divestiture more difficult

- A preliminary injunction may be necessary or desirable to prevent this merger and maintain the status quo

- There may be a strong argument that allowing the integration would result in irreparable harm and that issuance of an injunction would serve the public interest

- A PI posture may be attractive for litigating the merits of the acquisitions

19

# Facebook's Acquisitions of Nascent Competitors

- Available evidence indicates that as of 2010, Facebook launched a program of serial defensive acquisitions in order to maintain its dominance in the provision of social media services

- Such a program to acquire nascent competitors, if established, violates Sherman Act § 2 and Clayton Act § 7 (via FTC § 5)

- The anticompetitive effects of such a program include

    - Higher prices to advertisers

    - Lower quality to users, in the form of higher ad loads and reduced privacy protection

20

# Acquiring Nascent Competitors Is a Form of Monopoly Maintenance

- A monopolist's acquisition of its closest rival is a paradigmatic form of monopoly maintenance prohibited by Section 2.

- The rival need not operate in the same market as the monopolist. For example, Netscape was not a current competitor in the market for Intel-compatible PC operating systems.

- As the D.C. Circuit explained in *Microsoft* (2001), the relevant question is whether the targets "reasonably constitut[e] nascent threats." Further:

> [I]t would be inimical to the purpose of the Sherman Act to allow monopolists free rei[n] to squash nascent, albeit unproven, competitors at will—particularly in industries marked by rapid technological advance and frequent paradigm shifts.

21

# Acquiring Nascent Competitors Is a Form of Monopoly Maintenance

- Acquisition is a form of exclusionary conduct within the scope of Section 2.

- A classic example is the campaign of acquisitions in *Standard Oil*.

- A modern example is Questcor's acquisition of U.S. rights to Synacthen, challenged by the FTC and states in 2017.

Notes: See Standard Oil v. United States, 221 U.S. 1, 32–33 (1911) (noting that thanks to acquisition of competing refineries, Standard Oil acquired the power to "obtai[n] large preferential rates and rebates"); Areeda & Hovenkamp, § 912b .

22

# Acquiring Nascent Competitors Is a Form of Monopoly Maintenance

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

## V. Questcor Engaged in Anticompetitive Conduct By Acquiring Synacthen

33. Synacthen posed a threat to Questcor's ACTH drug monopoly, so Questcor intervened when other firms attempted to acquire the U.S. rights to Synacthen from Novartis. Questcor submitted a bid that included substantially more guaranteed money than the other bidders had offered, effectively ending the bidding process. By acquiring Synacthen, Questcor eliminated the possibility that another firm would develop it and compete against Acthar.

300 W. 15th Street, 7th Floor

### A. Synacthen Posed a Nascent Competitive Threat to Acthar

34. Synacthen constituted a nascent competitive threat to Questcor's ACTH drug monopoly, notwithstanding the significant uncertainty that Synacthen, a preclinical drug, would be approved by the FDA.

MALLINCKRODT ARD INC.,
formerly known as QUESTCOR
PHARMACEUTICALS, INC.
675 McDonnell Blvd.
Hazelwood, MO 63042

23

# Acquiring Nascent Competitors Is a Form of Monopoly Maintenance

- Acquisition is a form of exclusionary conduct within the scope of Section 2.

- A classic example is the campaign of acquisitions in *Standard Oil*.

- A modern example is Questcor's acquisition of U.S. rights to Synacthen, challenged by the FTC and states in 2017.

- As Areeda and Hovenkamp explain, acquisition of nascent rival "tends to maintain a monopoly by cutting off an avenue of future competition before it has a chance to develop.  As a result, condemnation under § 2 is appropriate."

- Analogy: if Microsoft had acquired Netscape or divided markets, rather than suppressing browser distribution, Section 2 liability would still be appropriate.

Notes: See Standard Oil v. United States, 221 U.S. 1, 32–33 (1911) (noting that thanks to acquisition of competing refineries, Standard Oil acquired the power to "obtai[n] large preferential rates and rebates"); Areeda & Hovenkamp, § 912b .

24

# Challenging a Consummated Merger Under Section 7

- Statute of limitations: does not apply to injunctive relief

- Laches: does not apply to a government enforcer

- Repose: is not a legal barrier, and does not even arguably apply where the anticompetitive effect was disguised or suppressed by the merging parties

Notes: See 15 U.S.C. § 15b (SOL for suits seeking monetary damages); United States v. du Pont, 353 U.S. 586, 588 (1957) (holding that government may challenge mergers under § 7 "at any time"); Steves & Sons, Inc. v. JELD-WEN, Inc., 345 F. Supp. 3d 614, 670–82 (E.D. Va. 2018) (discussing applicability of laches in a private suit).

# Challenging a Consummated Merger Under Section 7

- Example from private litigation: *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 345 F. Supp. 3d 614 (E.D. Va. 2018)

- JELD-WEN and CMI supplied "doorskins" used in the manufacturing of finished doors, acquired CMI

- DOJ declined to challenge merger of JELD-WEN and CMI, likely due to long term contracts expected to protect purchasers from price rises

- Post-acquisition, JELD-WEN raised prices and threatened to refuse to deal with Steves

- District court ordered divestiture of CMI

26

# The Instagram Acquisition
# May Violate Section 7

- In 2012, Instagram competed with Facebook on the user side for attention and data*

- Instagram was also a nascent competitor on the advertising side

- The merger therefore effected a "substantial reduction in competition" in markets for social networking attention and advertising

* Tim Wu, Blind Spot, Attention Markets & the Law (2017); David Evans, The Economics of Attention Markets (2017)

27

**DX-1475, Page 27 of 34**

# Acquiring Nascent Competitors Violates Section 7

- Even if the acquirer and target are not in the same relevant market, maintenance of market power through acquisition violates Section 7

  - Section 7 prohibits mergers whose effect "may be substantially to lessen competition, or to tend to create a monopoly"

  - The requisite effect may be established without showing increased concentration in a relevant market

  - For example, in *du Pont* and other vertical merger cases, the target was not in the same market

28

# Facebook's Acquisitions of Nascent Competitors

- Available evidence indicates that as of 2010, Facebook launched a program of serial defensive acquisitions in order to maintain its dominance in the provision of social media services

- Such a program to acquire nascent competitors, if established, violates Sherman Act § 2 and Clayton Act § 7 (via FTC § 5)

- The anticompetitive effects of such a program include

  - Higher prices to advertisers

  - Lower quality to users, in the form of higher ad loads and reduced privacy protection

29

# Harm #1: Higher Prices to Advertisers

## Average Cost Per 1,000 Impressions



Source: J.P. Morgan calculations of eCPM (effective cost per mille)

30

# Harm #2: Higher Ad Loads for Users

- Theory: WhatsApp acquisition removed its paid offering as a competitive alternative to Facebook's ad supported product

    o Reduced product variety is a cognizable anticompetitive harm, see *Horizontal Merger Guidelines* § 6.4

- Theory: Starting in 2014, Facebook increased its ad load, particularly in the mobile newsfeed*

\* Preliminary; overall ad impression dropped between 2012 and 2014 after redesign reduced ads along the right rail

31

# Harm #3: Reduced Privacy for Users

- Theory: Without competition, Facebook was free to offer a service with minimal privacy protections*

    ○ Before 2008, Facebook attracted users in part by offering strong privacy protections, including (1) a promise not to track, (2) a promise not to sell data, and (3) the right to remove data

    ○ Starting in 2012, Facebook voided these promises and otherwise reduced privacy protections

- Theory: WhatsApp acquisition reduced product variety (see HMG § 6.4), which is itself anticompetitive

---

* Discussed in Dina Srinavasan, *The Antitrust Case Against Facebook*, 16 Berkeley Bus. L. Rev. (2019)

32

# Monopoly Power

- Relevant markets
  - Social network services to users
  - Advertising on social networks
- Barriers to entry
  - Network effects
  - User data accumulated over time
- Durability
  - Failed entry by sophisticated, well-funded challengers (e.g. Google Plus)

33

# Monopoly Power

- High market share

  - Share of ad spending: 79% of U.S. spending on social network advertising

  - Share of attention: 86% share of minutes spent on social networks

  - Share of referral traffic to other sites: 72%-83% share of referral traffic from social

- Direct evidence

  - Quality shock (e.g. Cambridge Analytica) without user defections

  - Increased ad load without user defections ("SSNDQ")

  - Increased ad prices without advertiser defections

Sources: statistica.com (ad spend); Comscore (attention); Shareaholic (referral traffic)

34