# Exhibit 10

```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3   * * * * * * * * * * * * * * *    )
     FEDERAL TRADE COMMISSION,        )   Civil Action
 4                                    )   No. 20-03590-JEB
                  Plaintiff,          )
 5                                    )
        vs.                           )
 6                                    )
     META PLATFORMS, INC.,            )   Washington, D.C.
 7                                    )   May 27, 2025
                  Defendant.          )   1:34 p.m.
 8                                    )   **AFTERNOON SESSION**
     * * * * * * * * * * * * * * *    )
 9

10
                      TRANSCRIPT OF BENCH TRIAL
11             BEFORE THE HONORABLE JAMES E. BOASBERG
                  UNITED STATES DISTRICT CHIEF JUDGE
12

13
     APPEARANCES:
14
     FOR THE PLAINTIFF:      DANIEL J. MATHESON, ESQ.
15                           KRISHA A. CERILLI, ESQ.
                             FEDERAL TRADE COMMISSION
16                           BUREAU OF COMPETITION
                             400 Seventh Street, Southwest
17                           Washington, D.C. 20024

18
     FOR THE DEFENDANT:      MARC C. HANSEN, ESQ.
19                           KEVIN HUFF, ESQ.
                             LILLIAN SMITH, ESQ.
20                           KELLOGG, HANSEN, TODD, FIGEL &
                               FREDERICK, PLLC
21                           1615 M Street, Northwest
                             Suite 400
22                           Washington, D.C. 20036

23

24

25
```

1       THE COURT:  Okay.  Good afternoon.
2           Ready to proceed, Mr. Huff?
3       MR. HUFF:  Yes.  May I proceed, your Honor?
4       THE COURT:  Please.
5   (SCOTT HEMPHILL, Ph.D., PLAINTIFF WITNESS, PREVIOUSLY
6                       SWORN.)
7                   CROSS-EXAMINATION
8   BY MR. HUFF:
9   Q.  Good afternoon, Professor Hemphill.
10  A.  Good afternoon.
11  Q.  I'd like to start by turning to Slide 13 of your
12  demonstratives.
13      MR. HUFF:  If we can pull that up.
14  BY MR. HUFF:
15  Q.  We've heard a lot of testimony at this trial about
16  actual consumer substitution in response to outages.  Right?
17  A.  I wouldn't characterize it as actual consumer
18  substitution in the way that I mean it, no.
19  Q.  Okay.  But you'll agree that we've heard testimony about
20  outages and responses to outages.  Right?
21  A.  Yes.  I discussed that in my rebuttal testimony.
22  Q.  Your slide quotes some testimony from Adam Mosseri about
23  those outages.  Is that right?
24  A.  Yes.  There's a quotation from Adam Mosseri on Page 13.
25  Q.  And you've read his testimony, I take it?

Hemphill - CROSS - By Mr. Huff

1   A.   Yes.  That's correct.
2   Q.   You quote Mr. Mosseri as saying that Susan Li said that
3   the TikTok outage was not material to Meta's revenue or
4   engagement metrics in the first quarter of 2025.  Right?
5   A.   Yes.  That's accurate.
6   Q.   And based on that statement, you assert at the top here
7   that outages do not meaningfully inform business decisions.
8   Am I right?
9   A.   What I said was that we should take these outages with a
10  grain of salt, given some evidence that they aren't taken
11  quite so seriously as one might otherwise imagine.  And this
12  is one of those pieces of evidence.
13  Q.   Well, I just want to be clear.  What your slide says is
14  outages do not meaningfully inform business decisions.
15  Correct?
16  A.   Well, in some respects, that's true.  I'm not making the
17  claim that they have no relevance at all for thinking about
18  business decisions.
19  Q.   So is that statement on your slide true or false?
20  A.   I think in context it's true, but I don't want to be
21  heard to think that it has no role at all in helping
22  businesses think about their activities.  I don't mean it as
23  strongly as that.
24  Q.   Not as strongly as it's written?
25  A.   Not as strongly as it sounds like you're taking it.  I

Hemphill - CROSS - By Mr. Huff

1  don't mean to suggest that it never, ever has any role at
2  all on business decisions, but that there's some evidence
3  here suggesting it's of lesser importance.
4  Q.  Isn't it true that it's just wrong that outages do not
5  meaningfully inform business decisions at Meta?
6  A.  It depends on what you mean by "meaningfully inform."
7  Q.  Okay.  Well, let's look at what Mr. Mosseri actually
8  testified.  You're aware that Mr. Mosseri testified that
9  YouTube is one of Instagram's most significant competitors.
10 Right?
11 A.  You'll have to direct me to where in Mr. Mosseri's
12 testimony you have in mind.
13 Q.  Well, I'm just asking you, are you aware that
14 Mr. Mosseri gave that testimony?
15 A.  I've read a lot of testimony, including from
16 Mr. Mosseri.  There has been a discussion of a number of
17 competitors in a number of contexts.  I don't know the exact
18 testimony that you're referring to.  But if you're
19 interested in discussing it, we can take a look.
20         MR. HUFF:  Let's pull up DDX-37.1.
21 BY MR. HUFF:
22 Q.  The testimony is on the screen here.
23         Question:  When did you first start focusing on
24 YouTube as a competitor?
25         Answer:  I believe around 2014, maybe even 2013.

1   We saw some competitive dynamics where, when YouTube had an
2   outage, our time spent would go up, and it looked like vice
3   versa was happening.  So we started to focus a lot more on
4   videos.  We built Facebook Live.  We invested, I think, for
5   many years, over a billion dollars a year in content.
6            Do you remember that testimony by Mr. Mosseri?
7   A.   I don't know if I recall this exact testimony.  What I
8   had in mind by seeing the testimony would be a deposition --
9   I'm sorry -- a trial transcript rather than a snippet from a
10  demonstrative.  So it's hard for me to react without
11  actually seeing the context in which this quotation is
12  drawn.
13  Q.   Well, you put snippets of testimony in your
14  demonstratives, didn't you?
15  A.   Yes.  I don't think that's the same thing at all.
16  Q.   Oh, okay.  Mr. Mosseri saw customers switching between
17  Meta and YouTube during the outages and concluded that Meta
18  and YouTube were competitors.  Isn't that what he's saying
19  here?
20  A.   I'm not sure what he's saying here.  I'm sure there was
21  some shifting in response to an outage.  That would not be
22  surprising, and not necessarily highly relevant for the
23  reasons that I've discussed --
24  Q.   He also --
25  A.   -- for the purpose of rendering my opinions in this

Hemphill - CROSS - By Mr. Huff

1    matter.
2    Q.  He also testified that after seeing this competition
3    from YouTube, Meta invested in videos, including over a
4    billion dollars a year in content, to compete with YouTube.
5    Isn't that what he says in that snippet?
6    A.  I mean, you're literally, I think, reading these words
7    correctly with respect to an outage from more than a decade
8    ago.
9    Q.  A billion dollars a year is a massive investment, isn't
10   it?
11   A.  I would agree that a billion dollars is a lot of money.
12   Q.  Would you also agree that if Meta weren't really
13   competing with YouTube, it wouldn't have wasted billions of
14   dollars in investments?
15   A.  For purposes of understanding whether Meta was
16   exercising monopoly power and sheltered from competition to
17   a sufficient degree to be able to exercise monopoly power,
18   the fact of an investment here would not unsettle the
19   conclusion that my market definition is correct.
20   Q.  Mr. Mosseri relied on actual evidence of customer
21   substitution to make an important business decision here.
22   Right?  That's what this testimony says.
23   A.  I disagree with the idea that a temporary outage is
24   evidence of actual customer substitution in the sense
25   relevant to an economic analysis of monopoly power.

Hemphill - CROSS - By Mr. Huff

1   Q.  But you'll agree that it was relevant to Mr. Mosseri's
2   decision to invest a billion dollars a year in video to
3   compete with YouTube.  Correct?
4   A.  Again, I would want to see the fuller testimony before
5   endorsing your interpretation of what Mr. Mosseri has said.
6   But I agree that he's discussing here a billion-dollar
7   investment.
8   Q.  When Mr. Mosseri saw customers switching between Meta
9   and YouTube during outages, he didn't dismiss this evidence
10  as irrelevant under the cellophane fallacy, did he?
11  A.  No.  Given that his purpose was different from mine, I'd
12  be surprised if he thought about the cellophane fallacy at
13  all.
14  Q.  In fact, he didn't reject the substitution evidence
15  because it wasn't a SSNIP, did he?
16  A.  Again, I think his project is not to offer an economic
17  opinion about monopoly power in this matter or -- in 2013.
18  Q.  In fact, he didn't wring his hands over the possibility
19  that some customers were switching to off-device time, did
20  he?
21  A.  I don't think this says either way whether he was
22  focused on off-device time.
23  Q.  Well, you read his testimony.  Did you see him worrying
24  about off-device time anywhere in his testimony?
25  A.  I don't recall such testimony.  But neither would I

Hemphill - CROSS - By Mr. Huff

```
 1    expect his testimony to offer a complete account of
 2    everything he was thinking about at the time of this outage.
 3    Q.  Mr. Mosseri also testified about how Meta viewed the
 4    2025 TikTok outage.  Do you remember that?
 5    A.  I believe there was some discussion of the outage, yes.
 6    Q.  Let's look at DDX-37.2.
 7            He testified that the 2025 outage left him with no
 8    question about whether or not we compete with TikTok.
 9    Right?
10    A.  That's what this says, yes.
11    Q.  And he testified that his main takeaway from that outage
12    was how much room Instagram had to improve.  Right?
13    A.  I believe you've read that bolded text accurately.
14    Q.  So Mr. Mosseri is using evidence of the 2025 TikTok
15    outage to make business decisions about the need to improve
16    Instagram.  Right?
17    A.  I mean, he's describing the TikTok outage as a source of
18    learning for him about competition with TikTok.  The degree
19    to which it provided incremental information to him I don't
20    know.
21    Q.  Did you see any testimony from Mr. Mosseri where he
22    rejected the evidence of substitution because it was going
23    in the wrong direction, from TikTok to Meta?
24    A.  I don't recall such evidence, nor would I expect it,
25    given that his project is different from mine, mine being to
```

Hemphill - CROSS - By Mr. Huff

```
 1    evaluate monopoly power in this matter.
 2    Q.  Mr. Mosseri is the executive you cited for the
 3    proposition that outages don't meaningfully impact business
 4    decisions.  But that assertion is just not right, is it?
 5    A.  I believe the quotation was accurate for the purpose for
 6    which it was intended, which was to explain the
 7    nonmateriality from the standpoint of the impact in the
 8    moment.
 9    Q.  Were all of your slides equally accurate?
10    A.  All of my slides are accurate to the best of my
11    knowledge and ability.
12    Q.  Mr. Mosseri isn't the only Meta executive who views
13    outages as compelling indications of competition with
14    YouTube and TikTok.  Right?
15    A.  I'm not sure what you have in mind.
16    Q.  Okay.  Former head of Facebook Fidji Simo had the same
17    views.  Do you remember seeing documents showing that?
18    A.  I've seen a lot of documents.  I'm not sure what
19    document you have in mind.
20    Q.  Are you aware that there was an outage at YouTube in
21    2018?
22    A.  Yes.  I believe that's correct.
23    Q.  And are you aware that Meta used this outage to justify
24    further investments in video?
25    A.  I'm not sure when you have in mind there.
```

Hemphill - CROSS - By Mr. Huff

1           Do you remember saying that?
2   A.   You know, it was the middle of cross.  I don't remember
3   my exact language.  We can take a look, I guess.
4   Q.   Isn't it fair to say that you did much more than draw
5   attention to an investigation that might be appropriate?
6   You not only advised the FTC on what claims to bring; you
7   also advised the FTC on litigation strategy.  Right?
8   A.   I don't think of it as advice on litigation strategy.
9   There was some discussion in the -- in the deck that I don't
10  think bears that interpretation.
11  Q.   Are you aware that after your earlier testimony at
12  trial, the FTC produced to Meta a full copy of your 2019
13  presentation?
14  A.   What we reviewed on my direct was a full copy of a
15  presentation.  I'm aware that, upon being asked, the FTC
16  shared the deck that they had received from our
17  presentation.
18  Q.   Did you give that copy to the FTC?
19  A.   I guess in 2019, perhaps.  But not more recently, if
20  that's the idea.
21  Q.   Okay.  I want to ask you about two new slides that we
22  didn't have last time.  I'm handing you Exhibit DX-1475,
23  which is the version of the deck the FTC provided to us
24  recently.  Do you recognize this document?
25  A.   I recognize it as the presentation that we were making

Hemphill - CROSS - By Mr. Huff

1  Q.  At the bottom of the slide, you say:  A PI posture --
2  preliminary injunction posture -- may be attractive for
3  litigating the merits of the acquisitions.
4       Do you see that?
5  A.  Yes.  You read that correctly.
6  Q.  So you were advising the FTC on the litigation strategy
7  of a preliminary injunction posture for litigating the
8  merits of the acquisitions of Instagram and WhatsApp.
9  Right?
10 A.  Read that again, please.
11 Q.  Well, let me just ask you:  You were giving the FTC
12 litigation strategy advice.  Right?
13 A.  I really don't think so.  No.  I certainly don't think
14 of it that way, no.
15 Q.  Deciding whether to sue for a preliminary injunction and
16 why is a legal question.  Right?
17 A.  Ask that again.
18 Q.  Deciding whether to sue for a preliminary injunction and
19 figuring out what you want to ask for is a legal
20 conclusion -- or a legal question.  Right?
21 A.  I don't know if I think of it as a legal question or
22 not.  It's certainly a -- removed from the economic
23 testimony I'm offering in this case.  Whether I think of it
24 as a legal conclusion or not, I'm not really sure what you
25 mean.

Hemphill - CROSS - By Mr. Huff

```
1    Q.   The FTC acted on your litigation strategy advice.
2    Right?
3    A.   I, again, really don't think so, no.
4    Q.   Are you aware that on July 9th, 2019, just a few weeks
5    after your presentation, the FTC requested detailed
6    information from Meta about Meta's plans for integrating its
7    messaging services?  Were you aware of that?
8    A.   No.
9    Q.   You are aware, though, that, ultimately, the FTC did not
10   seek such a preliminary injunction.  Right?
11   A.   I believe that's correct.
12   Q.   So you recommended a litigation strategy that was too
13   aggressive even for the FTC.  Is that fair?
14   A.   No.  I don't think that that's fair.
15   Q.   You testified last time that the FTC hired you to be its
16   expert witness in 2022.  Right?
17   A.   I did not, I think, recall the timing then.  I think I
18   didn't have a reason to doubt that it was in 2022.
19   Q.   You also testified that, before this case began, you did
20   not have preconceived notions about Meta's liability.
21   Right?
22   A.   I think that's fair.  I had a preliminary view, based on
23   the information that I had at the time, that this was of
24   sufficient concern to merit an investigation.  But I didn't
25   have the information that I would need to reach a
```

Hemphill - CROSS - By Mr. Huff