**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION,

        Plaintiff,

    v.

META PLATFORMS, INC.,

        Defendant.

Case No. 1:20-cv-03590-JEB

**DEFENDANT META PLATFORMS, INC.'S
POST-TRIAL RESPONSE BRIEF**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................... iv

INTRODUCTION ................................................................................................... 1

I.  The Trial Evidence Failed To Establish That Meta Currently Has Monopoly Power ........ 3

    A.  The Direct Evidence Shows That Meta Lacks Monopoly Power ........................... 5

        1.  *Meta does not and cannot charge a supracompetitive price* ..................... 5

        2.  *Meta improved overall quality and reduced quality-adjusted price* ........... 6

            a.  Surging Output Reflects Higher App Quality ................................. 6

            b.  The FTC's Quality Complaints Are Standardless and Unfounded ....................................................................... 7

                i.  Ad Load ............................................................ 8

                ii.  Investment in "Friends-and-Family" ................... 9

                iii.  Privacy and Integrity ........................................ 11

            c.  "Brand Sentiment" Surveys Cannot Prove Power ....................... 11

        3.  *Meta's global advertising profits do not prove monopoly power in the alleged U.S. use market* ................................................. 12

        4.  *There is no evidence that Meta has (or had) "power to exclude" competitors* ............................................................... 13

    B.  The Indirect Evidence Also Proves That Meta Lacks Monopoly Power .............. 14

        1.  *Empirical evidence of substitution – the key inquiry – proves that TikTok and YouTube are closer substitutes for Meta's apps than Snapchat* ..................................................................... 15

            a.  Substitution Evidence ................................................ 16

                i.  Substitution *from* Meta's Apps ......................... 16

                ii.  Substitution *to* Meta's Apps ............................ 17

                iii.  Professor Hemphill's Non-HMT ....................... 18

            b.  The FTC's Attacks on the Empirical Evidence ........................... 19

2.     *Evidence from Meta and competitors proves that the FTC is wrong* ........21

    a.    Meta Evidence as to Competition ....................................21

    b.    Competitor Evidence ......................................................23

          i.    TikTok....................................................................24

          ii.    YouTube ...............................................................25

          iii.    iMessage (and Messaging).................................25

          iv.    Other So-Called PSNS Apps ...............................26

          v.    Other Key Social Apps .......................................27

    c.    Other Industry Participants ..........................................29

3.     *Application of the "Brown Shoe" factors based on the trial record*
*further undermines the FTC's proposed PSNS market*...........................29

    a.    No Peculiar Use or Characteristic ..................................31

    b.    No Industry Recognition..................................................34

    c.    No Other *Brown Shoe* Factors Support the Claimed Market........35

4.     *The FTC has no evidence to support its friend-sharing submarket*
*theories*.................................................................................36

    a.    Meta App Friend Sharing Is Not Insulated from
Competition...................................................................36

    b.    The "Submarket" Theories Do Not Support a Meta
Monopoly.......................................................................38

          i.    No *Whole Foods* Submarket .............................38

          ii.    *Google* Does Not Support the FTC...................43

          iii.    No "Cluster" Market ..........................................44

5.     *In any properly defined market, Meta's low shares and the absence*
*of barriers to entry preclude a finding of monopoly power*......................45

    a.    Low Shares.......................................................................45

    b.    No Significant Entry Barriers ........................................47

II.    Meta's Acquisitions Were Procompetitive – Not Unlawful Exclusionary Conduct .........48

    A.    The Evidence Proved That the *Effect* of Both Acquisitions – the Correct Legal Standard Under Section 2 – Was Not Anticompetitive ...............................48

        1.    *Both acquisitions had procompetitive outcomes – actual effects – which means neither was anticompetitive, as a matter of law*..................49

            a.    Instagram..........................................................................49

            b.    WhatsApp .........................................................................51

        2.    *The FTC should get no presumption of harm to competition from a "nascent competitor" acquisition – on the law or the facts* .....................53

            a.    Instagram..........................................................................54

            b.    WhatsApp .........................................................................56

    B.    The FTC Does Not Even Try To Rebut Undisputed Procompetitive Benefits ...............................................................................................58

III.    The FTC's Proposed "Findings" Based On Material Not Considered At Trial ...............60

CONCLUSION.................................................................................................60

# TABLE OF AUTHORITIES[*]

Page

## CASES

*AMR Corp.*, *In re*, 625 B.R. 215 (Bankr. S.D.N.Y. 2021), *aff'd*, 2023 WL 2563897 (2d Cir. Mar. 20, 2023), *cert. denied*, 144 S. Ct. 102 (2023) ............................. 6

*B.A.T. Indus., Ltd.*, *In re*, 1984 WL 565384 (FTC Dec. 17, 1984) ................................................ 58

\* *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) ..................... 6, 59

\* *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ................................. 15, 29, 30, 32, 35, 36

*CF Indus., Inc. v. Surface Transp. Bd.*, 255 F.3d 816 (D.C. Cir. 2001) ......................................... 13

*Chi. Pro. Sports Ltd. P'ship v. NBA*, 95 F.3d 593 (7th Cir. 1996) .................................................. 6

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435 (4th Cir. 2011) ................... 46

*FTC v. AbbVie Inc.*, 976 F.3d 327 (3d Cir. 2020) ......................................................................... 46

*FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009) ............................................................... 4

*FTC v. Facebook, Inc.*:

    560 F. Supp. 3d 1 (D.D.C. 2021) ........................................................................................ 3, 12

    581 F. Supp. 3d 34 (D.D.C. 2022) ......................................................................................... 46

*FTC v. Kroger Co.*, 2024 WL 5053016 (D. Or. Dec. 10, 2024) ..................................................... 45

*FTC v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16 (D.D.C. 2024) ................................................. 59

*FTC v. Owens-Ill., Inc.*, 681 F. Supp. 27 (D.D.C.), *vacated and remanded*, 850 F.2d 694 (D.C. Cir. 1988) ................................................................................................... 29, 32

*FTC v. R.R. Donnelley & Sons Co.*, 1990 WL 193674 (D.D.C. Aug. 27, 1990) ........................... 34

*FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787 (S.D. Tex. 2025) ...................................... 34

*FTC v. Tenneco, Inc.*, 433 F. Supp. 105 (D.D.C. 1977) ............................................................... 50

\* *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ............. 35, 36, 38, 39, 40, 41, 42

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018) ................................ 15

*IGT v. All. Gaming Corp.*, 702 F.3d 1338 (Fed. Cir. 2012) .......................................................... 30

---

[*] Authorities principally relied upon are marked with an asterisk.

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) ........................46

*Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956 (N.D. Cal. 2025) ..................................5

*Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710 (7th Cir. 2006) ..........................8

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160 (4th Cir. 2014) ...................47

*Lorazepam & Clorazepate Antitrust Litig., In re*, 467 F. Supp. 2d 74 (D.D.C. 2006) .................16

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207 (11th Cir. 2002) ..............................47

*NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984) ...........................................50

*New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179 (S.D.N.Y. 2020) ................................59

*New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) ...............................................14

*New York v. Microsoft Corp.*, 224 F. Supp. 2d 76 (D.D.C. 2002), *aff'd sub nom.*
     *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) .........................53-54

* *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) ...............................8, 54

*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ...........................................................6, 59

*PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243 (S.D.N.Y. 2000),
     *aff'd*, 315 F.3d 101 (2d Cir. 2002) ..................................................................19

*Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072 (11th Cir. 2016) ...............................................49

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008) ...................................................49

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) ...................................5

* *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986)...........15, 21,
     30, 42, 53

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369 (9th Cir. 1989) ........................29

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) .............................................12

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) .........................................19

*United States v. Conn. Nat'l Bank*, 418 U.S. 656 (1974) .................................................45

*United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) ........................................6

*United States v. Eastman Kodak Co.*, 63 F.3d 95 (2d Cir. 1995) ...............................................34

*United States v. Engelhard Corp.*, 126 F.3d 1302 (11th Cir. 1997)..............................................20

*United States v. Gillette Co.*, 828 F. Supp. 78 (D.D.C. 1993) ........................................43

\* *United States v. Google LLC*:

     687 F. Supp. 3d 48 (D.D.C. 2023) ......................................................49

     747 F. Supp. 3d 1 (D.D.C. 2024) ................................7, 9, 11, 33, 35, 36, 43, 44

     --- F. Supp. 3d ---, 2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ....................54

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ....................................45

*United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) ...........................50

\* *United States v. Microsoft Corp.*:

     84 F. Supp. 2d 9 (D.D.C. 1999) ......................................................46

     253 F.3d 34 (D.C. Cir. 2001) ................................3, 30, 31, 49, 53, 59

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ............................54

*United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ....................47, 53

## STATUTES AND RULES

Clayton Act, 15 U.S.C. § 12 *et seq.*:

     § 7, 15 U.S.C. § 18 ................................................................50, 54, 58

Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.*:

     § 13(b), 15 U.S.C. § 53(b) ........................................................4

Sherman Act, 15 U.S.C. § 1 *et seq.*:

     § 2, 15 U.S.C. § 2 ................................................................3, 46, 48, 59

Fed. R. Evid. 107 ....................................................................60

**INTRODUCTION**

The FTC had the burden of proving but failed to prove that Meta has a monopoly over everything people do on Facebook and Instagram (defined by the FTC as "personal social networking services" or "PSNS"). The FTC likewise failed to carry its burden of proving that this alleged monopoly was unlawfully "maintained" by acquisitions in 2012 and 2014 of maybe-someday ("nascent") competitors. The evidence decisively demonstrated that Meta – once an online "Facebook" for connecting students – has evolved into a diverse global provider of entertaining and informative content that competes with increasingly similar social apps including TikTok, YouTube, iMessage, and others. Times, technologies, and norms of use change, and the trial evidence proved that Meta has adapted due to competitive pressure in this fast-moving industry. Today, only a fraction of time spent on Meta's services – 7% on Instagram, 17% on Facebook – involves consuming content from online "friends" ("friend sharing"). A majority of time spent on both apps is watching videos, increasingly short-form videos that are "unconnected" – i.e., not from a friend or followed account – and recommended by AI-powered algorithms Meta developed as a direct competitive response to TikTok's rise, which stalled Meta's growth. The FTC now concedes this development "brings Meta into competition with TikTok and YouTube." FTC Br. 3-4, 31-32. That concession means that there is no valid PSNS market, which is the sole market the FTC asserts.

The direct evidence of price, output, and quality – if quality by itself could suffice to prove monopoly power, which no court has held – not only fails to support the FTC's claim but contradicts it. Meta does not and *cannot* charge a price, any price, for its apps, much less a *supracompetitive* price. Zero is the price for ad-supported social apps that feature user-generated content – like Instagram and TikTok, and unlike Netflix and Hulu. Meta charged zero before it

supposedly gained a monopoly and has charged zero since.  Output has surged, overall and for the limited set of alleged PSNS contestants, proving that consumers have enjoyed *higher-quality* apps since 2012.  While the FTC and its witnesses criticized specific *dimensions* of app quality, the FTC lacks competitive benchmarks for any aspect of quality, did not even attempt to evaluate *total* quality, and cannot claim that overall quality has declined, much less below a competitive level – which is the only way that quality could even theoretically support a claim of monopoly power.  The services that U.S. consumers enjoy today are far better than what they had in 2012, and the FTC has no evidence to claim otherwise.

The FTC's theory that no app other than Snapchat (plus the irrelevant, little-used, and ad-free MeWe) competes for *all* the time users spend on Facebook and Instagram is just dead wrong.  The trial evidence – including multiple empirical studies, scores of contemporaneous documents, and testimony from over a dozen market participants – demonstrated that TikTok and YouTube are far more important (that is, constraining) competitors.  Witnesses unanimously rejected the FTC's attempt to confine the competitive set to Facebook, Instagram, and Snapchat (none had heard of MeWe).  Competition for the marginal minutes that users spend on social apps is dynamic and evolving.  Users have many acceptable substitutes for the many different things they can do on these social apps.  Nor is there an un-pleaded "mini-monopoly" based on one friend-sharing use case.  The FTC did not claim such a submarket and could not support it, as Meta does not and cannot exploit that sliver of usage, including because it competes with non-friend-sharing use cases as well as other friend-sharing options.  Meta FOF ¶¶ 74-79, 175.

Nor did the FTC prove unlawful "maintenance" of any supposed monopoly through two acquisitions that have been a "grand slam homerun" for U.S. consumers.  Meta FOF ¶ 206.  The FTC seeks judicial recognition of a theory that acquisition of any *possible* competitor by a large-

share firm is a *prima facie* violation of Section 2. No court has ever found a violation based on that theory, which if adopted would stifle procompetitive investment and innovation. Acquisitions are a vital and beneficial component of the free-enterprise system, enhancing consumer welfare through efficient resource allocation. That is precisely what happened here. Because the consumer-benefiting *effects* of Meta's two acquisitions are known and beyond serious dispute, the FTC's focus on supposed pre-acquisition intent misses the mark; effects are what matters, as the D.C. Circuit has instructed. But even if intent is relevant, the trial evidence demonstrated that Meta acquired Instagram and WhatsApp to improve and expand them – a procompetitive intent that Meta and its leader (Mr. Zuckerberg) formed and documented prior to the acquisitions. And that is exactly what Meta actually carried out afterwards.

Finally, even if the Court were to accept both the FTC's artificial and underinclusive market as well as the FTC's unbounded theory of exclusionary conduct, the case would still fail under the D.C. Circuit's burden-shifting framework for Section 2. The FTC has *no* evidence that the uncontested, multi-hundred-billion-dollar consumer-welfare benefits that resulted from the acquisitions would have materialized without Meta's acquisitions. Speculation is no substitute for proof, and there is no proof that the "but-for" world without the acquisitions would have brought U.S. consumers the expanded and improved free mobile apps that they enjoy today, much less that U.S. consumers would have gotten something better or more quickly.

## I.     The Trial Evidence Failed To Establish That Meta Currently Has Monopoly Power

Monopoly power is the ability to " 'profitably raise prices substantially above the competitive level.' " *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 12 (D.D.C. 2021) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc)). As this Court has twice ruled, "the FTC must prove that [Meta] is currently violating the antitrust laws." Order (Apr. 2, 2025), ECF No. 503; *accord* Order at 1 (June 3, 2025), ECF No. 610. The FTC all but

acknowledges (at 4-6) that it cannot carry that burden by rearguing – without providing any basis for reconsideration – that past monopolization is sufficient. That is legally incorrect; as the Court has held (repeatedly), Section 13(b) requires the FTC to prove an ongoing or imminent violation – it is not a mere pleading standard. *See*, *e.g.*, Order at 2-3 (June 3, 2025), ECF No. 610. The FTC cannot avoid its burden by citing a smattering of non-13(b) cases about injunctive relief in other contexts. *Cf. FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201-02 (10th Cir. 2009) (the only Section 13(b) case the FTC cites (at 4-6), affirming "danger of recurrent violation").

**<u>Direct evidence</u>** (Point A, *infra*) establishes that Meta has never raised or even charged a price to users – nor can it. The competitive price for all ad-supported social apps with user-generated content is zero; Meta cannot charge more without losing user time to myriad other free services. Meta FOF ¶ 1. Output has surged at this constant price, indicating that quality has improved and that there has been a *decrease* in the "quality-adjusted price" of Meta's apps. Meta FOF ¶¶ 26-27. The FTC's complaints about isolated "*dimensions*" of Facebook and Instagram quality – with no evidence of an overall quality-adjusted price above a competitive benchmark (or any net-quality measure at all) – prove nothing about monopoly power. Meta FOF ¶ 28. And its arguments based on "brand" surveys (which measure sentiment rather than quality, *see* Meta FOF ¶¶ 41-44) or global advertising profits (never connected to supposed monopoly power on the user side or compared to competitors' profits, *see* Meta FOF ¶¶ 21-22) are similarly misguided.

**<u>Indirect evidence</u>** (Point B, *infra*), merely a proxy for direct evidence of pricing power, confirms that Meta faces vigorous competition and does *not* have a dominant share of any properly defined relevant market. *See* Meta Pretrial Br. 8 (Apr. 7, 2025), ECF No. 518 (collecting cases). As the FTC acknowledges (at 31-32), Meta competes for minutes of use

against TikTok and YouTube.  Those apps are closer substitutes for Facebook and Instagram

than Snapchat.  Facebook and Instagram also compete against iMessage, X, Reddit, LinkedIn,

and other social apps (excluding paid apps like Netflix or Hulu that do not feature user-generated

content).  No evidence supports the FTC's market definition consisting of only the Meta apps,

Snapchat, and MeWe.  Competition among social apps for marginal minutes is not limited by use

case:  new technologies, changing norms, and new competitors like TikTok compete for *all* time

spent on Meta's apps – including friend sharing – forcing Meta to evolve or fail.  Meta has

invested billions of dollars and transformed its business to meet the existential competitive threat

posed by short-form videos and AI-powered content-delivery systems, which have proved more

effective at offering users engaging content than social graphs and friend connections.

### A.    The Direct Evidence Shows That Meta Lacks Monopoly Power

1.    ***Meta does not and cannot charge a supracompetitive price.***  Prior to 2011, when

Meta had far less usage than MySpace, Meta charged users the competitive price of zero; after

2011, when Meta supposedly gained a monopoly, it *still* charged that same competitive price of

zero.  Meta FOF ¶¶ 1, 5.  That is not what a monopolist does.  *See Rebel Oil Co. v. Atl. Richfield

Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).  The FTC does not dispute that zero is the competitive

price for social apps, and it does not seriously assert that a lower price (such as Meta paying

users) would prevail in any "but-for" world.  Meta FOF ¶ 3; *cf. Klein v. Meta Platforms, Inc.*,

766 F. Supp. 3d 956, 963 (N.D. Cal. 2025) (dismissing the concept of paying users as "a fanciful

application of economic theory untethered to real-world evidence").

Unlike video-streaming services such as Hulu or Netflix, *see* Meta FOF ¶ 45, Meta

*cannot* charge more than zero because – as Mr. Zuckerberg explained – charging *any* price

would cause Meta to lose user time (and thus advertising revenue) to competitor social apps,

making any price increase unprofitable.  Meta FOF ¶ 1; *see also id.* ¶¶ 4, 13.  In Europe, where Meta began offering all users the option of paying less than a quarter a day for an ad-free Facebook in response to new regulations, approximately 0.007% of users took that deal, which supports the testimony that Meta cannot profitably charge any price.  Meta FOF ¶ 2.  An alleged monopolist that cannot control prices is no monopolist.  *See United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 380-81 (1956) (explaining that the government could not "establish monopoly" without proving that defendant "control[s] the price").

> **2.    *Meta improved overall quality and reduced quality-adjusted price.***

> **a.    Surging Output Reflects Higher App Quality:**  Meta has increased the output of Instagram and Facebook, even to "saturation" in the United States.  Meta FOF ¶¶ 26(a)-(b), 204; *see also id.* ¶ 231.  That is the opposite of what happens in a monopolized market, where output is lower than the competitive level – as a matter of both economics, *see* Meta FOF ¶ 27, and law.  *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993); *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 549 (2018).  The FTC makes *no* assertion that output would be higher in any but-for world.  Meta FOF ¶ 221.  The dramatic increase in output (at a constant zero price) shows that Meta has *improved* its apps – as principles of economics instruct, *see* Meta FOF ¶¶ 26-27, and as antitrust courts have recognized.  *See In re AMR Corp.*, 625 B.R. 215, 254 (Bankr. S.D.N.Y. 2021) (in retrospective merger case, "output expansions" show "reductions in quality-adjusted fares"), *aff'd*, 2023 WL 2563897 (2d Cir. Mar. 20, 2023), *cert. denied*, 144 S. Ct. 102 (2023); *see also Chi. Pro. Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996) (Easterbrook, J.) ("The core question in antitrust is output.").

Meta responded to competition by adding features and a greater variety of content "to grow" engagement, FTC Br. 31, spending tens of billions of dollars annually on R&D – more

than other major technology firms as a percentage of revenue. Meta FOF ¶ 23. Some of that spending is for cutting-edge technologies that will power the next generation of Meta's apps. Meta FOF ¶ 23. Other spending has allowed Meta to innovate and introduce hundreds of new features to Facebook and Instagram (plus WhatsApp) since 2012. Meta FOF ¶¶ 24-25. For example, Meta invested in video as a response to YouTube, and in Reels as well as the Modern Recommendation System as a response to TikTok and YouTube. Meta FOF ¶¶ 40, 66, 82-84, 102. Professor Hemphill conceded these are product improvements. Meta FOF ¶¶ 24, 210.

Unlike a monopolist that can make product changes "without concern that its users might go elsewhere" – *cf. United States v. Google LLC*, 747 F. Supp. 3d 1, 118 (D.D.C. 2024) – Meta must constantly monitor and test every change in its apps to assess the impact on users and usage. Meta FOF ¶¶ 81-82. Meta invests in and releases new features in response to rival offerings and changing consumer demands – which reflect changing norms of use, *see* Meta FOF ¶¶ 5, 24, 46, 149, 151-160, 162 – because its entire business model, like that of competing social apps, is "skating to where the puck is going." Meta FOF ¶ 80. It must compete for marginal minutes of usage that it can monetize by selling ad placements. Meta FOF ¶¶ 45-46, 74, 82, 165.

   **b.**    **The FTC's Quality Complaints Are Standardless and Unfounded:** In its brief, the FTC remarkably asserts (at 9-12) that Meta has increased the "quality-adjusted price" of its apps even though the FTC did not even try to prove that at trial: Professor Hemphill admitted he had not attempted to calculate a quality-adjusted price, no other FTC witness offered such an opinion, and the FTC does not point to one in its brief. Meta FOF ¶ 28. Instead, the FTC claims that poor isolated quality dimensions prove that Meta has a monopoly, but the FTC has no competitive benchmark for quality – either in the aggregate (app-wide quality) or even as to any single dimension. Meta FOF ¶ 28; *see also id.* ¶¶ 31, 34, 37. The FTC's claim based on

quality therefore has no basis in law. *See Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 719 (7th Cir. 2006) (requiring a net-quality metric to support claim of power); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1070 (10th Cir. 2013) (Gorsuch, J.) (requiring benchmarking relative to a competitive level).

In any event, the trial evidence proved that the FTC's complaints about discrete aspects of Meta app quality are not only standardless but also unfounded and contrary to the evidence:

i.    **Ad Load:**  The FTC's primary argument (at 9-10) is that the number of ads has increased.  But Meta's ad load has not increased on Facebook Feed since 2023 and on Instagram Feed since 2019 – if anything, it has decreased – even though the FTC claims that Feed is the primary surface for friend sharing.  Meta FOF ¶ 30.  The FTC's argument is flawed for multiple additional reasons.  To start, the FTC has no benchmark for a competitive ad load.  Meta FOF ¶ 31.  It did not even try to compare the number of ads on Facebook or Instagram to the number of ads on other social apps, including those that the FTC claims are out of the PSNS market and thus subject to competition (like YouTube).  The FTC therefore does not and cannot argue that Meta's ad load exceeds a competitive level.

Further, the FTC has no evidence that an increased number of ads by itself equates to degraded product quality.  Quickly scrolling past an ad – it takes a second – is not equivalent to paying a price, as the FTC's witness admitted.  Meta FOF ¶ 28.  Ads are only one dimension of overall quality, and the *number* of ads is only one aspect of *that* quality dimension.  Meta FOF ¶¶ 28-30.  But the FTC failed to consider or put forth any evidence regarding either ad quality or relevance to users.  *Cf.* Meta FOF ¶¶ 15-16.  The FTC does not and cannot argue that the experience of seeing ads on Meta's apps is worse today than it was before Meta supposedly attained a monopoly – when there were intrusive "punch the monkey" ads – much less that the

8

overall experience is below any relevant competitive level. Meta FOF ¶¶ 18, 20, 31. There was undisputed evidence, contrary to the FTC's passing assertion (at 10), that Meta has improved the quality and relevance of ads. Meta FOF ¶¶ 15-17, 21, 28. The FTC's speculation (at 10) that Meta could have delivered that quality improvement without raising ad load misunderstands the law – it is the FTC's burden to prove price above the competitive level. *Cf. Google*, 747 F. Supp. 3d at 179-80 (where the government proved that prices charged to advertisers were *above the competitive level*, *then* defendant's argument that it had improved ad quality was unavailing).

The FTC insists (at 10) that more ads must be bad because surveys report that users generally do not like ads. But ads are the reason why consumers get these valuable services for free. Meta FOF ¶¶ 1, 4. And ads on Facebook and Instagram are beneficial for users who purchase advertised products or click to learn more. Meta FOF ¶ 17. This positive utility is why Meta makes money on advertising – many users find ads valuable and respond to them. Meta FOF ¶ 21. If they didn't, advertisers would stop spending money to show ads on Meta's apps. Meta FOF ¶ 14. The FTC made no effort to consider these benefits in its blanket condemnation of ads as a "bummer." *See* 5/12 Trial Tr. 262:16-21 (Hemphill); *see also* Meta FOF ¶ 20.

Moreover, users who see *no* ads (the Meta "holdout" group) report "sentiment" levels about ads not significantly different from users who see ads. Meta FOF ¶ 19. The holdout users spend almost the same amount of time on the apps as users who see ads – a 7.1% difference, suggesting ads are not a meaningful "tax" on the user experience. Meta FOF ¶ 19. And, finally, this modest difference in usage results at least in part from the *beneficial* aspects of the ads; people exposed to ads find valuable content that takes them away from Meta's apps to other sites. Meta FOF ¶ 18. The FTC did not consider that either. Meta FOF ¶ 18.

    **ii.**     **<u>Investment in "Friends-and-Family"</u>:** Relying on nothing but a handful of

years-old emails from executives vying for resources, the FTC claims (at 11, 22) that Meta degraded quality by "underinvest[ing]" in "the friends and family experience."  Meta spends billions of dollars on its apps – and the apps, not a single use case, are the product, per the FTC's market definition.  Meta FOF ¶ 178; *see also id.* ¶¶ 4, 23, 25.  These investments benefit every aspect of those free services.  Meta FOF ¶¶ 23-25, 27, 38.  That includes friend sharing:  Meta assigns hundreds of engineers specifically to support friend-sharing features on Facebook.  Meta FOF ¶ 38.  Meta also recently released new features in an attempt to revive declining friend sharing, including the dedicated "Friends" tab on Facebook.  Meta FOF ¶ 38.  Against this evidence, the FTC has nothing to show "underinvestment" by any yardstick or a "competitive" level of investment.  Meta FOF ¶ 37.

The argument makes no sense.  The FTC cannot explain why Meta would deliberately starve its golden goose – the supposed key to its success – and give users a degraded version of what they supposedly want.  *Cf.* Meta FOF ¶ 4; *see also* 5/13 Trial Tr. 103:5-8 ("Wouldn't that sort of be silly?").  Like any business, Meta's incentive is to give consumers what they want.  Meta FOF ¶¶ 4, 23, 45-46.  Meta is competing for marginal minutes to show ads.  Meta FOF ¶¶ 45-46, 74, 81-82, 165; *see also id.* ¶ 4.  And what users want from social apps is best proved by where they choose to spend time.  Today that is predominantly "unconnected" short-form video.  Meta FOF ¶ 40; *see also id.* ¶¶ 6-8, 10-11, 74, 149, 154.  Meta confirmed this shift in consumer preferences in 2023 by running an experiment that boosted "friend-original" content in Feed by 20%.  Meta FOF ¶ 39.  The result was that users *reduced* time on Facebook.  Meta FOF ¶ 39.  By contrast, serving more video content, recommended by Meta's innovative AI-powered algorithms, *increased* usage.  Meta FOF ¶ 39; *see also id.* ¶¶ 84, 149.

Meta has spent billions to develop its AI algorithms, as have its closest competitors

TikTok and YouTube.  Meta FOF ¶¶ 75-76, 80, 84.  Today, Meta's Modern Recommendation System (not a social graph) can best identify the content that each user will find most enjoyable. Meta FOF ¶¶ 40, 84, 159; *cf. id.* ¶ 150.  The suggestion that consumers are forced to take non-friend content because Meta has chosen not to provide it is contrary to the evidence; the algorithms show users what they like to see, and users are choosing to decrease time spent on friend sharing (both in relative and absolute terms).  Meta FOF ¶¶ 40, 46(d), 151-154.  As the FTC argues elsewhere (at 7), Meta values and supports friend sharing as an important *part* of what it offers consumers.  Meta FOF ¶¶ 8, 38, 161; *see also id.* ¶ 46(b).  Frankly, Meta would be delighted if consumers wanted to do more of it.  But the puck is moving elsewhere, as evidence including *de minimis* usage of the new dedicated Friends Tab confirms.  Meta FOF ¶¶ 38-39.

      **iii.**    **Privacy and Integrity:**  The FTC takes potshots (at 11-12, 50) at Meta's privacy (protection of user data) and integrity (protection from policy-violating content), citing stale emails largely from 2016-2018.  But Meta's practices have gotten better, not worse, since Meta supposedly attained a monopoly (e.g., adding end-to-end encryption for privacy; spending $30 billion on integrity-related efforts).  Meta FOF ¶¶ 32-33, 35, 218; *see also id.* ¶ 254.  Meta is a *leader* in integrity, as the FTC's witness conceded.  Meta FOF ¶ 34.  The challenges that Meta faces are concerns for all social apps, as the FTC's expert witnesses also acknowledged.  Meta FOF ¶¶ 34-35.  And, critically, there is no evidence of any competitive standard that Meta has fallen below as to privacy or integrity.  Meta FOF ¶ 34; *see also id.* ¶ 35.  As another court in this District observed, using standardless contentions about such issues – in that case, privacy specifically – does not "demonstrate monopoly."  *Google*, 747 F. Supp. 3d at 118.

      **c.**    **"Brand Sentiment" Surveys Cannot Prove Power:**  The FTC is left to argue (at 11, 50) that "sentiment surveys" prove monopoly power.  But no court has ever agreed – the

FTC cites no remotely comparable case – and no witness with relevant survey expertise gave an opinion supporting such a use of the surveys. *Cf.* 5/14 Trial Tr. 53:1-13 (Hemphill not a survey expert). Meta's surveys do not measure app quality, *see* Meta FOF ¶ 41, let alone objective service quality compared to relevant industry benchmarks. Brand sentiment reflects press cycles and all kinds of factors unrelated to app quality (e.g., Mr. Zuckerberg donates money to charity, Meta's scores go up). Meta FOF ¶ 41. Tellingly, Meta's "Relative Cares About Users" scores vary in countries based on the negative or positive press as to Meta, even though the apps have the same quality everywhere. Meta FOF ¶ 42.

The FTC nonetheless argues that minimally declining sentiment scores for Meta – over a four-year period from 2018 to 2022 – somehow prove monopoly power today. But when the FTC's manipulations of the *relative* scores were unmasked at trial, it became apparent that Meta's absolute "Cares About Users" scores were basically flat over that period. Meta FOF ¶¶ 42-43. The scores then increased from 2022 to 2025. Meta FOF ¶ 43. Throughout the period from 2018 to 2025, consumers reported that they were more satisfied with Meta than with TikTok and that Meta was in line with other social apps. Meta FOF ¶ 43. And the FTC ignores a Snapchat survey that asked users directly about their perception of app quality, which showed that Meta is perceived to have *better* app quality than many of its competitors. Meta FOF ¶ 44.

3.    ***Meta's global advertising profits do not prove monopoly power in the alleged U.S. use market.*** Meta's revenues come almost entirely from global ad sales, a different geographic and product market from the FTC's alleged PSNS user-side market. *See Facebook*, 560 F. Supp. 3d at 6, 19; *see also Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 610 (1953) (proof of power must align with the market alleged). The FTC made no attempt to quantify profits in the relevant geographic market, the United States; no effort to tie them to the

alleged use market; and ventured no opinion about Meta's profitability in the United States in any given year.  Meta FOF ¶ 22.  The only witness with an opinion about the significance of Meta's profits (Professor Hemphill) admitted that risky bets and massive upfront investment, management acumen, innovation, and other factors can account for profitability – yet he made no effort to analyze those factors, let alone rule them out as the source of Meta's profits.  Meta FOF ¶ 21.  Nor did the FTC compare Meta's profits to those of other firms, Meta FOF ¶ 22; it was simply that Meta makes a lot of money in the ad market, *see* 4/24 Trial Tr. 10:10-13 (Hearle).

Such thin evidence cannot prove monopoly power.  *See CF Indus., Inc. v. Surface Transp. Bd.*, 255 F.3d 816, 824 n.13 (D.C. Cir. 2001) (trying to prove monopoly power with ambiguous evidence of profits is misguided).  The trial evidence instead confirmed the excellence of Meta's ad business – it makes a lot of money because the ads are high quality and relevant, and consumers respond to them.  Meta FOF ¶ 21.  Furthermore, and critically given how the FTC litigated this case, the FTC provided *zero* evidence tying Meta's profits to some claimed power over friend sharing.  Meta FOF ¶ 177.  The evidence demonstrated that Meta's ad revenues have been increasing while both the relative and absolute amount of friend-sharing usage has been declining; supposed power in that sliver of usage therefore cannot possibly be driving an increase in overall ad revenues.  Meta FOF ¶¶ 6-7, 10-11; *see also id.* ¶¶ 151-161.

   **4.**  ***There is no evidence that Meta has (or had) "power to exclude" competitors.***
The FTC also theorizes (at 12) that in the past Meta could have excluded competition, but it does not and cannot claim that Meta actually ever *did* exclude any competitor.  *Cf.* Meta FOF ¶ 204.  Instead, the FTC notes (at 12) that, absent the Instagram acquisition, Meta might have stopped free promotion for Instagram in 2012, and that would have impeded its growth.  Meta FOF ¶ 193.  But it was Instagram's choice to grab a free ride on Meta's distribution, with the risks that

entailed; and Meta had every right to end that free ride – as Mr. Systrom (Instagram's then-CEO), this Court, and the D.C. Circuit have all recognized. *See New York v. Meta Platforms, Inc.*, 66 F.4th 288, 305-06 (D.C. Cir. 2023). The possibility that Meta might have exercised a *right* to prevent free-riding is not remotely evidence of monopoly power *today*.

### B.    The Indirect Evidence Also Proves That Meta Lacks Monopoly Power

The evolving norms and structure of this rapidly changing industry provide further evidence that Meta faces broad and effective competition. Meta FOF ¶¶ 46, 151-160. The only market that the FTC claimed is the alleged PSNS market, which the FTC defines to include *all time* spent on Facebook, Instagram, Snapchat, and MeWe – not just friend-sharing time. Meta FOF ¶ 178. But the trial evidence proved that the relevant market cannot be limited to these apps. The FTC now concedes (at 31-32) that TikTok and YouTube *do* compete with Meta's apps for time spent. It could hardly argue otherwise because the evidence demonstrated that TikTok and YouTube – not Snapchat – are Instagram's and Facebook's closest competitors. Meta FOF ¶¶ 45-46, 48, 83-88. Meta's business decisions, such as its multi-billion-dollar pivot to build the Modern Recommendation System and serve consumer preferences with features like Reels, creator content, and AI-powered recommendations, can be understood only by reference to that existential competition from TikTok (plus YouTube and others). Meta FOF ¶¶ 83-84.

The FTC reminds the Court – dozens of times – that Facebook and Instagram still are used for friend sharing, claims that other social apps are less well-suited to that use case, and argues that such differentiation is sufficient to establish a separate antitrust market. But friend sharing is just part of "all-in" competition, where many services compete to provide engaging content to users. Meta FOF ¶¶ 45-46, 70, 74-75, 78-80; *cf. id.* ¶ 178. The evidence proved that friend sharing does not insulate Meta's apps from competition – on the contrary, friend sharing has increasingly shifted to messaging like iMessage, *see* Meta FOF ¶¶ 155-158, while overall

time spent – including time once spent friend sharing – has moved increasingly to public and unconnected content, which is available on social apps including TikTok and YouTube.  Meta FOF ¶¶ 74-79, 124, 157, 159-160, 162-164; *see also* FTC Br. 31-32.

This broad competition was proved by empirical evidence from natural and field experiments showing substitution (*see* Point 1, *infra*) and the actual marketplace conduct, documents, and testimony of multiple competitor social apps (*see* Point 2, *infra*).  The FTC argues almost entirely from subjective *Brown Shoe* factors – which are only "evidentiary proxies for direct proof of substitutability," *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218-19 (D.C. Cir. 1986) – but it finds no support there either (*see* Point 3, *infra*).  So the FTC discards the all-in PSNS market it has pursued throughout, retreating to a *submarket* theory that it did not claim.  But this fares no better because friend-sharing time competes with time spent on other content and features, and there is no evidence that Meta separates out and discriminates against consumers of the diminishing friend sharing (*see* Point 4, *infra*).  Finally, in any relevant antitrust market that includes *any* of Meta's most significant competitors, Meta's market share is far too low to support any inference of market power, and the demonstrated entry by competitors proves that the share Meta has is far from durable (*see* Point 5, *infra*).

**1.**      ***Empirical evidence of substitution – the key inquiry – proves that TikTok and YouTube are closer substitutes for Meta's apps than Snapchat.***  Evidence of actual consumer substitution is "the touchstone" of market definition.  *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 45 (D.D.C. 2018).  "Because the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level, the definition of the 'relevant market' rests on a determination of available substitutes."  *Rothery Storage*, 792 F.2d at 218; *see also* Meta Pretrial Br. 9-14 (collecting cases about substitution).  Accordingly, "[t]he

relevant market is defined as all products reasonably interchangeable by consumers for the same purposes, because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices" – actual or quality-adjusted – "above the competitive level." *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 81 (D.D.C. 2006) (cleaned up).

      **a.**    **Substitution Evidence:**  The trial evidence of substitution – empirical data showing how users actually shift time between social apps – demonstrated that other apps are not only acceptable substitutes but *closer* substitutes for Meta's apps than Snapchat.  The FTC points to *no* empirical evidence of substitution to support its PSNS construct.  Meta FOF ¶ 49.

      **i.**    **Substitution *from* Meta's Apps:**  When Facebook and Instagram are unavailable or become "more expensive" to use (as in Professor List's experiments), consumers readily shift usage to TikTok, YouTube, and messaging – far more than to Snapchat.  Meta FOF ¶¶ 48, 59, 69.  The order of substitution is consistent across field and natural experiments.  Meta FOF ¶¶ 48, 59, 69.  This "*convergent validity*" strengthens the conclusion that TikTok, YouTube, and other social apps (including messaging apps) are closer competitive constraints on Facebook and Instagram than Snapchat (or MeWe).  Meta FOF ¶ 48.  Contrary to the FTC's assertion (at 32), this demonstrates that TikTok and YouTube are constraining substitutes for Facebook and Instagram, not just the other way around.  Meta FOF ¶ 48; *see also id.* ¶¶ 61, 64, 69.

    *List Pricing Experiments*:  When thousands of participants received a small economic stimulus to reduce usage of Facebook (one study) and Instagram (a separate study), substitution went more to TikTok and YouTube than to Snapchat.  Meta FOF ¶¶ 68-69.  Specifically, among social apps, the reduced Facebook time went to YouTube (8.4%), Instagram (5.0%), TikTok (4.7%), and X (1.0%), with less to Snapchat (0.7%).  Meta FOF ¶ 69.  And the reduced Instagram time went to the following social apps:  YouTube (18.9%), Facebook (13.4%), TikTok

(10.5%), X (4.3%), and Reddit (4.1%), again with less to Snapchat (2.2%).  Meta FOF ¶ 69.

*Meta 2021 Outage*:  Meta's apps were unavailable in the United States for six hours in October 2021.  Meta FOF ¶ 59.  During that time, users substituted to TikTok (11%), YouTube (8%), and messengers (7%) – far more than to Snapchat (4%).  Meta FOF ¶ 59.  ███

████████████████████████████████████████████████████

███████████████████████████.  Meta FOF ¶ 62.  ███████████████████

███████████████████████████████████████████████████████████████

████████████████    Meta FOF ¶ 62.

ii.    <u>Substitution *to* Meta's Apps</u>:  There have been multiple "natural experiments" when other social apps became unavailable – in each instance, the same pattern of substitution emerged:  TikTok, YouTube, Facebook, and Instagram are one another's closest competitors.

*TikTok 2025 Ban*:  TikTok went dark in the United States for approximately 16 hours on the eve of a congressionally ordered ban.  Meta FOF ¶ 53.  In the weeks and months before, TikTok advised U.S. courts in sworn declarations that a ban would cause users to migrate to the apps it expressly identified as its main competitors:  Facebook, Instagram, and YouTube.  Meta FOF ¶ 98; *see also id.* ¶ 50.  That is exactly what happened.  Meta FOF ¶¶ 53-57.  Data collected in the ordinary course from consenting Meta users showed that time spent on these other apps spiked in response to the TikTok shutdown, with 20% of the increased usage going to Facebook, 17% to Instagram, 14% to YouTube, 5% to Messenger, and 2% to Snapchat.  Meta FOF ¶ 55.  ████████████████████████████████████████████████████████.  Meta FOF ¶¶ 56-58.  Meta relied on its analysis to make business decisions, determining that it needed to do even more to meet the competition from TikTok.  Meta FOF ¶¶ 52, 55.

*TikTok 2020 India Ban*:  India banned TikTok in June 2020, and it has remained

unavailable there since.  Meta FOF ¶ 63.  In the ordinary course, Meta tracked the effects of this ban to inform business strategy.  Meta FOF ¶ 63.  As a result of the ban, usage of Facebook and Instagram grew much more quickly in India than in the United States.  Meta FOF ¶¶ 63-64. YouTube experienced a similar surge.  Meta FOF ¶ 63.  The ban showed Meta's executives that TikTok was taking away time spent from "friend-to-friend sharing" on Meta's apps, even before Meta had established Reels.  Meta FOF ¶ 63; *see also id.* ¶¶ 75-76.

*YouTube 2018 Outage*:  YouTube was unavailable for approximately 90 minutes in 2018, resulting in a significant increase in time spent on Facebook and Instagram.  Meta FOF ¶ 66. Meta carefully tracked the outage.  Meta FOF ¶ 66.  In response to this event study, Meta concluded that it should invest more than $1 billion to develop additional video features to make its apps more effective in competition with YouTube.  Meta FOF ¶ 66.

iii.  **Professor Hemphill's Non-HMT:**  Lacking actual empirical evidence to support its theories, the FTC touts (at 23-24) Professor Hemphill's assertion that "the HMT is satisfied for PSN services" in the United States.  But this is not based on quantitative data; all that he did was make a subjective assessment of "the use and functionality of different apps" – an evaluation he performed without actually using or even being able to recognize many of the apps.  Meta FOF ¶ 179.  From that he concluded Meta could profitably raise prices even though it has never done so.  That opinion is entitled to no weight and is made even less reliable by the stark evidence of his prejudgments and bias.  Meta FOF ¶¶ 180-182.

Indeed, the FTC's entire case on market definition rests on a witness who joined forces in 2019 with like-minded Meta antagonists whose avowed goal was to break Meta up.  *See generally* Meta Mot. To Strike (May 30, 2025), ECF No. 606.  They went on what they called a "roadshow" to sell the proposed case to federal and state enforcers – with a presentation full of

clearly expressed opinions about Meta's antitrust liability, supported only by a pastiche of newspaper quotes. The witness then claimed at trial to be an objective and unbiased expert who had formed no opinions prior to his retention – truly incredible testimony. There could not be a more dramatic example of a witness with "an axe to grind" or testimony entitled to less weight.

> **b.** __The FTC's Attacks on the Empirical Evidence__: The FTC's various critiques (at 36-37) do nothing to blunt the force of this direct evidence of substitution. The many studies here were done in accordance with best practices, and all consistently support the key conclusion: TikTok and YouTube are closer substitutes for Meta's apps than Snapchat. Meta FOF ¶¶ 48, 52, 67. The consistent *order* of substitution cannot be explained away with quibbles about individual studies. Meta FOF ¶ 48; *see also id.* ¶¶ 60-61. The FTC's argument (at 36) that the studies do not involve a "SSNIP" misses the point: no law or evidence suggests that a study needs to involve a SSNIP to be informative about relative order of substitution. Meta FOF ¶ 49.

Although the FTC references *Cellophane* (at 34-36), it has no proof that Meta *is* a monopolist and, even if Meta were, no evidence to suggest that the substitution *order* would change in a "but-for" world. Meta FOF ¶ 51; *see also PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 258 (S.D.N.Y. 2000) (rejecting *Cellophane* theory where "PepsiCo has not," at the threshold before invoking the theory, "submitted any evidence to show that Coca-Cola's prices are supracompetitive"), *aff'd*, 315 F.3d 101 (2d Cir. 2002). The FTC likewise cannot avoid the force of this substitution evidence by citing *United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017). In that case, the defendants' expert witness attempted to aggregate all possible alternatives to the product of interest and suggest that those aggregated alternatives were a closer substitute. *See id.* at 37-41. That is the opposite of what Meta's expert witnesses have done – they did not treat aggregate shares (as for off-device time, or time on browsers) as a single substitute. Moreover, the defendant in that case sought to use speculation about possible

substitutes as a basis to disregard an empirical analysis based on data that predicted the merger would result in price increases; the FTC has no such quantitative evidence here.  *See id.*

Nor did Professor Carlton "selectively ignore" diversion other than to social apps; rather, he and Professor List observed that substitution to a browser – or off-device time – reflects many *different* activities, and not substitution to a single app, as in the case of diversion to TikTok or YouTube.  Meta FOF ¶ 71.  Professor List also explained why the FTC's critiques based on indexed diversion are uninformative and do not change the conclusion that TikTok and YouTube are closer substitutes to Facebook and Instagram than is Snapchat.  Meta FOF ¶ 72.

Contrary to the FTC's criticism, the experiments are especially informative because they provide insight into the very type of substitution that imposes immediate competitive constraints on Meta, i.e., where monetizable minutes go when a user alters usage of Meta's apps – a pattern further confirmed by Professor List's "wallet share" study, which showed that, when users spend less time on Meta's apps, YouTube and TikTok benefit more than Snapchat.  Meta FOF ¶ 73. That competition for marginal minutes constrains Meta and protects "inframarginal" or "core" customers from exploitation; Meta must innovate to win at the margin, and this innovation benefits all users.  Meta FOF ¶ 165.  Antitrust courts have repeatedly recognized that competition on the margin protects "inframarginal" customers.  *See, e.g.*, *United States v. Engelhard Corp.*, 126 F.3d 1302, 1306 (11th Cir. 1997) ("[I]t is possible for only a few customers who switch to alternatives to make the price increase unprofitable, thereby protecting a larger number of customers who would have acquiesced in higher . . . prices.").

The FTC further sidesteps the proof by arguing (at 37) that substitution order may reflect users' inability to substitute to apps that lack the "social graphs" on Meta's apps.  But if that were the case, then users would maintain usage of Feed and Stories (the supposed friend-sharing

surfaces) and reduce usage of other surfaces.  That did not happen.  Professor List showed that

substitution away from Facebook and Instagram to TikTok, YouTube, and others affects usage

of Feed and Stories no less than usage of the other surfaces.  Meta FOF ¶ 70. ███████████

████████████████████████████████████████████. Meta FOF ¶¶ 77, 117-119.

Moreover, this argument is inconsistent with the FTC's all-in market definition:  there is no

justification for drawing any distinction between a minute spent viewing video on Facebook

Feed, a minute spent sending a direct message to a friend on Instagram, a minute spent watching

Reels, and so on – it is all equally PSNS time.  Meta FOF ¶ 178.

2. ***Evidence from Meta and competitors proves that the FTC is wrong.***  People who

actually work in the industry are in the best position to know their competitors, as the D.C.

Circuit has instructed.  *See Rothery Storage*, 792 F.2d at 218 n.4.  Here, testimony from dozens

of witnesses and scores of ordinary-course documents established that social apps other than just

Snapchat and MeWe can and do compete effectively against Facebook and Instagram for user

time; they constrain Meta as substitutes.  To find for the FTC here on its artificial market

construct, the Court would need to disregard the testimony and contemporaneous documents

from the executives who experience this competition in their daily professional lives as either

untruthful or blind to the reality of their own business.  Plainly neither is the case.

a. __Meta Evidence as to Competition__:  Nearly a dozen senior Meta executives gave

evidence at trial – supported by contemporaneous internal documents – that Meta faces now and

has faced for many years effective competition from many apps.  Meta FOF ¶¶ 80-88, 93-94,

102, 111, 125, 128, 131, 134-136.  Snapchat is only one of those competitors, and it is less

significant than TikTok, YouTube, and iMessage.  Meta FOF ¶ 113.  Mr. Zuckerberg testified

that Meta's strategy is based on meeting competition principally from these other apps,

especially TikTok, YouTube, and iMessage.  Meta FOF ¶ 88.  The head of the Facebook app testified that TikTok is his constant concern and an existential threat to Facebook's business. Meta FOF ¶¶ 83, 86.  The head of the Instagram app wrote in 2020 that Instagram had become primarily a messaging service.  Meta FOF ¶ 156.  He also testified that TikTok is Instagram's closest rival – indeed, TikTok is almost identical to Instagram in features and the users it serves. Meta FOF ¶¶ 93-94; *see also id.* ¶ 83.

The unrefuted evidence of the existential threat that TikTok presents to Meta illustrates how competition works.  Meta FOF ¶¶ 46, 74, 80-87.  Starting in 2018, TikTok emerged with a disruptive innovation.  Its combination of immersive short-form video and AI recommendations made the service compelling to users.  Meta FOF ¶ 75.  Meta saw its usage growth decline, with effects across the board, including on the friend-sharing surfaces Feed and Stories, *before Reels existed*.  Meta FOF ¶ 76.  At the time, TikTok was not focused on friend sharing, and Meta was not offering AI-recommended streams of short-form video.  But TikTok nonetheless proved itself a powerful competitor (and substitute) for *everything* done on Facebook and Instagram, including friend sharing.  Meta FOF ¶ 79; *see also id.* ¶ ███████.

Meta consequently made a major strategic shift to respond to competition.  Meta FOF ¶¶ 83-86, 159.  It invested billions of dollars to develop its own AI-recommendation algorithms to rival TikTok and introduced a new feature (called Reels) to serve the demonstrated consumer demand that was shifting away from friend sharing.  Meta FOF ¶ 84.  This pivot came at a cost in usage of other surfaces as well as in ad dollars.  Meta FOF ¶¶ 78, 85.  But it ultimately produced a recovery in usage growth; today, more than half of the usage on Facebook and Instagram is unconnected content.  Meta FOF ¶ 154; *see also id.* ¶¶ 6, 10.  The record is similar as to YouTube:  Meta invested substantially in its video products and features as a competitive

response.  Meta FOF ¶¶ 66, 82.  The directness of the competition among Meta's apps, TikTok, and YouTube leads them to compete for creator content, as well, with Meta ███████ ██████ paying creators hundreds of millions of dollars to secure preferential access to that content.  Meta FOF ¶ 46(c).  The fact that all of these apps are pursuing the same content further illustrates that they are likewise competing to attract the same user minutes.  Meta FOF ¶ 46(c); *see also id.* ¶ 98.

These are just some of the investments, innovations, and product changes that Meta has undertaken for Facebook and Instagram in response to the threats that other social apps have presented to Meta's share of engagement; these other apps compete with and constrain Meta, not just the other way around.  Meta FOF ¶ 82.  The FTC concedes (at 50) the point as to Snapchat: Meta added Stories to Facebook and Instagram because of competitive pressure from Snapchat.  Yet the FTC ignores that even more intense competitive pressure from TikTok prompted the addition of Reels, just as pressure from YouTube prompted innovations in video features, and pressure from Reddit prompted innovations to Groups.  Meta FOF ¶ 82; *see also id.* ¶¶ 83-84.

      **b.**    **Competitor Evidence:**  The weight of evidence from Meta's competitors – who had no incentive to do Meta any favors – was likewise contrary to the FTC's PSNS construct.  Meta FOF ¶¶ 95-99, 103-107, 111-112, 116-119, 121-123, 126-127, 130-131, 133-136.  While witnesses identified the Meta apps as particularly good for friend sharing, they also testified that they could and did compete effectively with the Meta apps for time spent by U.S. users, regardless of whether they also offered or featured a friend-sharing use case.  Meta FOF ¶ 46(b).  That places them in direct competition with Meta for all the time included within the FTC's claimed market, ███████████.  The evidence also showed that social apps are "converging," offering similar user-generated content that consumers can like, comment on, and

share with audiences large or small.  Meta FOF ¶¶ 46(a), 93, 97.  To the extent there remain variations among the social apps, those differences of degree are evidence of competition by differentiation, not evidence of its absence.  Meta FOF ¶ 46.

   i.    **TikTok:**  ███████████████████████████████████

████████████████████████.  Meta FOF ¶¶ 95-96, 99.  And not merely competitors, as it represented to foreign regulators:  "TikTok, Reels and [YouTube] Shorts are virtually – and deliberately – *indistinguishable in function and user experience*."  Meta FOF ¶ 97 (emphasis added).  TikTok has added social features to mirror Meta's traditional friend sharing.  Meta FOF ¶¶ 89-92.  TikTok has user profiles, messaging (including group messaging), a Stories feature, and even a Friends Tab that features content just from a user's TikTok friends.  Meta FOF ¶¶ 89, 91; *see id.* ¶¶ 93-94.  ████████████████████████████████████

████████████████████.  Meta FOF ¶ 92.  In surveys, half of TikTok users said they use the app for friend sharing.  Meta FOF ¶ 92; *see also id.* ¶ 188.

   The FTC argues (at 24) that TikTok should nevertheless not be considered a substitute for Meta's apps because it supposedly "does not serve the demand for friends and family sharing."  The FTC's argument ignores the evidence TikTok can and does serve that demand.  Meta FOF ¶¶ 92-94.  Just as important, TikTok does not need friend sharing to compete.  Meta FOF ¶¶ 74-79.  ███████████████████████████████████

████████████████████████████████████████████

██████████████████████.  Meta FOF ¶¶ 95, 99.  ████████████████████████

████████████████████████████████████████

████████████████████████.  Meta FOF ¶¶ 89-92, 95-99.  Meta's witnesses and ordinary-course documents are in agreement:  non-friend time on TikTok takes away from all

time, including friend-sharing time on Facebook and Instagram.  Meta FOF ¶¶ 74-79.

  **ii.**  <u>**YouTube:**</u>  YouTube also presented at trial as a powerful competitor to Facebook and Instagram.  Meta FOF ¶¶ 103-105.  ████████████████████████████

████████████████████████.  Meta FOF ¶¶ 104, 106.  It recognizes no limitation on its ability to compete with Facebook, Instagram, and Snapchat for user time, and it considered Snapchat a rival even when Snapchat lacked a video feature directly comparable to what YouTube was then offering.  Meta FOF ¶ 103.  And, like Meta, YouTube has conducted studies confirming that the rise of TikTok reduced engagement on Facebook, Instagram, Snapchat, and YouTube itself.  Meta FOF ¶ 104.  According to YouTube's witnesses, all of these social apps compete for marginal usage to sell advertising.  Meta FOF ¶ 107.  The FTC does not (and could not) point to a single YouTube document that omits Facebook and Instagram as its significant rivals.  *Cf.* Meta FOF ¶ 105.

  Ignoring all this evidence, the FTC protests (at 26-27) that YouTube's "core" use is watching video, not friend sharing.  This argument concedes that YouTube is a strong competitor for more than half of the time spent on the Meta apps, *cf.* Meta FOF ¶ 103, all of which is "personal social networking" according to the FTC, *see* Meta FOF ¶ 178.  And it is beside the point because YouTube can and does effectively compete for all the minutes of use on social apps regardless of the extent to which it is used for friend sharing.  Meta FOF ¶ 105.  The FTC is also wrong to rule out YouTube for friend sharing, because it provides that too via the share sheet.  Meta FOF ¶ 102; *see also id.* ¶¶ 100-101, 175.  YouTube has also invested in other "social features" (like Communities) that bring it closer to the Meta apps' functionality as a direct response to competition from Meta.  Meta FOF ¶ 101.

  **iii.**  <u>**iMessage (and Messaging)**</u>:  Meta sees Apple as its biggest rival for friend

sharing as messaging has become the prevailing norm for that sharing.  Meta FOF ¶¶ 108, 111.

Apple confirmed that iMessage is a leading app for sharing with friends and family.  Meta FOF

¶ 109.  iMessage has added features – including a feed-like stream of pictures and videos shared

in group messages – to make its messaging richer and more engaging, bringing it even closer to

Meta's apps.  Meta FOF ¶ 110.  ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████  Meta FOF ¶ 111.  ██████████████

████████████████████████████████████████████████.  Meta

FOF ¶ 111.  Apple likewise categorizes Meta's apps plus TikTok, Snapchat, X, messengers, and

other social apps (but not Netflix and Hulu) as "Social Networking 101" in presenting apps to

consumers in its iOS app store.  Meta FOF ¶ 138.

      The FTC insists (at 27) that messaging is different from feed-based friend sharing, citing

mostly 2014 documents.  But sharing services have converged since then; as messaging

increasingly substitutes for feed-based sharing, Meta must not only improve its friend-sharing

features but also innovate other features to maintain engagement, as it has done.  Meta FOF

¶¶ 108, 116, 155, 162-163.  The assessment at trial of every industry participant was that friend-

sharing usage is shifting from feed to messaging, both in-app messaging (over Instagram,

TikTok, and other apps) and via the "share sheet" (a feature on every mobile phone) that allows a

user to share content with anyone over any messaging service or app (principally iMessage in the

United States).  Meta FOF ¶¶ 155-158, 162-163; *see also id.* ¶ 175.

      **iv.**    **Other So-Called PSNS Apps:**  The other two PSNS apps support Meta's view of

the competition.  The FTC's decision to inject fringe app MeWe into the case as a supposed

PSNS is a mystery:  Professor Hemphill was stumped when presented with it and knew almost

nothing about it. Meta FOF ¶ 112. .

Meta FOF ¶ 112. ███████████████████████████████████████████

███████████████████████. Meta FOF ¶ 112.

As for Snapchat, ████████████████████████████████

██████████████████████████████████████████████

████████████████████████. Meta FOF ¶¶ 115, 162. Snapchat sees the

competition as Meta sees it: TikTok, YouTube, and iMessage (along with Meta's apps) are the

focus. Meta FOF ¶¶ 116-119. ██████████████████████████████

████████████████████████████████████████████

██████████████████████████. Meta FOF ¶¶ 162-164; *see*

*also id.* ¶¶ 117, 119. ██████████████████████████████████

██████████████████████████████████████████████.

Meta FOF ¶¶ 162-165; *see also id.* ¶¶ 58, 77, 117-119. ████████████████

████████████████████████████████████████████

████████████████████████. Meta FOF ¶ 77.

    v.    **Other Key Social Apps:** Other competitors and market participants offered

similar evidence, which the FTC largely ignores in its brief.

    *X (Twitter)*: X competes head-on with Meta's apps. Meta FOF ¶¶ 123-125. Multiple

internal X documents and studies confirm that it has long offered and still offers friend sharing as

an important use case. Meta FOF ¶¶ 120-122. Indeed, its users have reported friend sharing as

one of the main reasons they use the app. Meta FOF ¶ 122. X's documents likewise confirm

that time spent on different services with different features – e.g., watching short-form video on

TikTok – competes for time spent scrolling through X's feed to find posts by friends or interest-

based content.  Meta FOF ¶ 124.  X manages its business with a careful eye toward Facebook and Instagram as major competitors for user engagement.  Meta FOF ¶ 123; *see also id.* ¶ 125.

*Pinterest*:  Pinterest consistently identifies both Facebook and Instagram as "primary competitors," analyzing them in every internal quarterly competitive report, representing to regulators that they are "substitutes" for "user attention," and regularly identifying them as key competitors in securities filings.  Meta FOF ¶ 127; *see also id.* ¶ 128.  Pinterest carefully monitors product updates to Facebook and Instagram to inform its own product and competitive strategy.  Meta FOF ¶ 127.  ███████████████████████████████████████ ███████████████████████████████████.  Meta FOF ¶¶ 62, 127.

*LinkedIn*:  The FTC brushes aside LinkedIn (at 17, 19) as a "professional" network.  But the evidence does not support that frozen-in-time depiction.  Meta FOF ¶¶ 129-131.  LinkedIn itself rejects it, as it has gained more friend-sharing usage in recent years.  Meta FOF ¶ 131; *see also id.* ¶ 175.  Anything a user can do on Facebook, including friend sharing, can be done the same way on LinkedIn.  Meta FOF ¶ 129.  LinkedIn has likewise seen norms shift, which has led it to invest in video features – including short-form video, *see* Meta FOF ¶ 46(a) – ██████ ████████████████████████████████████████████.  Meta FOF ¶ 131. LinkedIn looks to its peers Facebook and Instagram, as well as other social apps, for "learnings" on how to improve and compete in the same "market."  Meta FOF ¶ 130.

*Reddit*:  Reddit has grown rapidly by facilitating sharing based on common interests, with users liking, commenting on, and sharing content – just like Facebook Groups and similar features on other apps.  Meta FOF ¶¶ 132, 134.  The FTC says (at 17-18) that Reddit is different and cannot compete; Reddit says the opposite.  It consistently tracks the apps that it competes against for user time and vice versa:  Meta's apps, TikTok, and others.  Meta FOF ¶ 133.

c.      **Other Industry Participants**:  Other social apps and industry participants – e.g.,

█████, Discord, and Strava – provided corroborating proof; they track Facebook and

Instagram as key rivals.  Meta FOF ¶¶ 135-136.  Even "neutral" industry participant Walmart

Connect – which keeps close tabs on competition for user engagement as it decides how to

allocate ad spend – confirmed that there is no use market limited to Facebook, Instagram, and

Snapchat; that those and many apps (TikTok, YouTube, and others) compete without limitation

for user time; and that all can reach the nationwide advertising audience Walmart seeks.  Meta

FOF ¶ 137; *see also* ████████████████████████████████

████████████████████.

3.      *Application of the "Brown Shoe" factors based on the trial record further*

*undermines the FTC's proposed PSNS market.*  The FTC's constant refrain that "friends-and-

family sharing" makes a market is not supported by empirical evidence, by competitor evidence,

or – properly viewed – by the subordinate qualitative factors enumerated in *Brown Shoe Co. v.*

*United States*, 370 U.S. 294 (1962).  The question is not whether something looks different, as

many if not all products look different from competing products.  *See, e.g., Thurman Indus., Inc.*

*v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1376 (9th Cir. 1989); *see also FTC v. Owens-Ill., Inc.*,

681 F. Supp. 27, 36 (D.D.C.) ("The existence of a wide array of containers for products with

equally varying characteristics does not necessarily mean that demand for certain containers is

inelastic or that purchasers and consumers would not accept substitute packaging.  If product

differentiation were a controlling variable in the relevant product market analysis, then one can

theorize that we have monopolistic competition in every nonstandardized commodity . . . .

However, this power is not the power that makes an illegal monopoly.") (cleaned up; citation

omitted), *vacated and remanded on other grounds*, 850 F.2d 694 (D.C. Cir. 1988) (stipulated

dismissal as moot because acquisition closed). Even the supposed PSNS apps are differentiated – Facebook is easily distinguished from Snapchat, Snapchat does not look much like Instagram, and Instagram is not like MeWe. Such differentiation is the essence of competition rather than its absence. *See*, *e.g.*, *IGT v. All. Gaming Corp.*, 702 F.3d 1338, 1347 (Fed. Cir. 2012).

The question is whether consumers will substitute to such other products if the "quality-adjusted price" of a product increases. *See Microsoft*, 253 F.3d at 51-52. Where, as here, there is direct evidence of substitutability, the *Brown Shoe* inquiry can incorporate and supplement that evidence. *See Rothery Storage*, 792 F.2d at 218 & n.4. But it cannot displace it. The standard in *Microsoft* – whether products are reasonably interchangeable "for the same purposes," *Microsoft*, 253 F.3d at 51-52 (citing *Rothery Storage*) – turns on "consumer[s]" and their ability "to obtain substitutes for a product." *Rothery Storage*, 792 F.2d at 218 n.4; *see also Microsoft*, 253 F.3d at 51-52 (the "same purposes" question turns on "the ability of consumers to turn to other suppliers" and thus "restrain[ ] a firm from raising prices above the competitive level"). The "purpose" inquiry here relates to how users allocate their minutes of usage among different types of engaging content (to view, like, comment, share) – connected and unconnected – on their mobile devices. Meta FOF ¶¶ 45-46; *see also id.* ¶¶ 40, 156-159.

The FTC's insistence that the relevant "purpose" here is limited to "friend sharing" flies in the face of the trial evidence, which demonstrated that users treat friend content as readily replaceable on the margin. Meta FOF ¶¶ 74-79, 117-119, 151-164; *see also id.* ¶ 70. The FTC, despite having the burden to prove the relevant market, never even attempts to relate its description of supposed differences in "core uses" to the empirical evidence of how consumers actually spend time – and *change* how they spend time – or how competitors operate their businesses to compete for that time. Meta FOF ¶¶ 48-50. On a given day, few users of Meta's

30

apps actually broadcast share – the FTC, when it talks about billions of pieces of content, is talking about what users *see*, not what they post.  Meta FOF ¶ 160; *cf. id.* ¶¶ 151-154.  The FTC's refrain that apps are different, untethered to proof that such differences make them unacceptable as substitutes, is no more probative than claiming that Almond Joy candy bars have almonds while Hershey milk chocolate bars do not.  That is true, but so what?  It is not proof of an antitrust market bounded by the presence of almonds in the candy.  The FTC thus cannot carry its burden to properly define a relevant antitrust market.

a.    __No Peculiar Use or Characteristic:__  The FTC rests its market case almost entirely (*see* FTC Br. 14) on the testimony of a partisan witness who purported to rely on functional differences between apps and then flunked virtually every test when asked about those apps on the stand.  Meta FOF ¶ 179.  Identifying differences and then calling a friend-sharing use case "core" adds nothing but a label, which is essentially all that the FTC incants.  *Cf.*, *e.g.*, FTC Br. 1, 3, 13-14, 17, 24, 31.  The question is whether other social apps are acceptable substitutes for consumers.  *See* Meta Pretrial Br. 9-14 (collecting cases).  The evidence proves that they are.

For starters, it is undisputed that the lion's share of what users do on Facebook and Instagram is not "peculiar" to these apps at all.  Meta FOF ¶¶ 6-7, 10-11; *see also id.* ¶¶ 151-161.  It follows that Meta cannot raise price or degrade quality without jeopardizing *83%* of time spent on Facebook and *93%* of time on Instagram.  Meta FOF ¶¶ 6-7, 10-11.  Indeed, the FTC now admits (at 31-32) that YouTube and TikTok are reasonably interchangeable with Facebook and Instagram *at least* for watching video.  *See Microsoft*, 253 F.3d at 51-52.  That means more than half of the usage on the Meta apps is subject to intense competition from just these substitutes.  *Cf.* Meta FOF ¶ 178; *see also id.* ¶¶ 103, 154.  The FTC also admits (at 29) that iMessage and other messaging apps are reasonably interchangeable with PSNS apps *at least* for sharing with

friends and family.  As the trial demonstrated, messaging is now the predominant way U.S. consumers share with friends and family.  Meta FOF ¶¶ 155, █.  By the same token, Reddit is reasonably interchangeable with Facebook *at least* for sharing with interest groups, *see* Meta FOF ¶¶ 132-134; X is reasonably interchangeable with Meta's apps *at least* for keeping up with current events, celebrities, and commentary, *see* Meta FOF ¶¶ 123-125; and so on, *see* Meta FOF ¶ 46(a).  There is no feature or "use case" of Facebook and Instagram that does not have acceptable substitutes in many other apps.  *Cf.* Meta FOF ¶ 175.  The "inquiry could end here." *Owens-Ill.*, 681 F. Supp. at 36-37 ("The eleven end use segments presented by the FTC constitute . . . only about 25.8% of the total glass container tonnage.  Thus, in the *vast majority* (at least 75% even by the FTC's own estimate) of end uses for glass containers, other packaging materials, including plastic, metal, and paper, compete directly and vigorously with glass.").

The FTC cites no authority for its assertion that a single purportedly "distinctive" feature that accounts for only a fraction of demand places that product in a separate market from products that serve the vast majority of the demand.  Meta FOF ¶¶ 6-7, 10-11.  In *Brown Shoe* itself, the Court recognized distinct submarkets of men's, women's, and children's shoes only where "each has characteristics peculiar to itself rendering it *generally* noncompetitive with the others." *Brown Shoe*, 370 U.S. at 326 (emphasis added).  Here, other social apps are certainly *generally* competitive.  Meta FOF ¶¶ 74-84.  The FTC's view of use cases as "silos" insulated from competition from other use cases is just more theory contrary to the evidence, which established that all social apps deploy varied features to compete for marginal minutes.  Meta FOF ¶ 46.  To cite just one example, TikTok can win time away from friend sharing with AI-powered short-form video – and it did, prompting a tectonic shift in social apps that has transformed them into "discovery engines" as the Meta CEO explained in his testimony.  Meta

FOF ¶¶ 74-79; *see also id.* ¶¶ 7, 40. ██████████████████████████████████ ████████████████████████████████████████, *see* Meta FOF ¶ 92, ██████████████████████████. The same is true for other social apps that serve the friend-sharing demand: YouTube, X, LinkedIn, and others. Meta FOF ¶¶ 101, 121-123, 131, 135-136.

Both because social apps are converging and because competition for marginal minutes is not segmented by use case, the FTC gains no support from the court's analysis of the market for general search engines in *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024). There, the court relied on evidence that, although consumers carried out certain types of searches using specialized search tools (like Expedia, Yelp, or Wikipedia), consumers could not use them for general searches not limited to a particular website or commercial topic. *See id.* at 110-11 (discussing asymmetrical competition). Here, the evidence is that other social apps have added features that facilitate every use case available on Meta's apps; as just one example, TikTok has added every feature available on Instagram – messaging, stories, dedicated friends content, and more. Meta FOF ¶¶ 89-94. By contrast, Expedia never added general search functions.

By the same token, many users come to Facebook now with no intention of accumulating a "graph" of accepted "friends" – they come to consume unconnected video content or to make purchases on marketplace. Meta FOF ¶¶ 5-8. The data bears this out; the number of new young-adult monthly active users with zero friends after 90 days on Facebook has increased from only 8-10% in 2012 to nearly 50% today. Meta FOF ¶ 153. Moreover, the supposedly distinctive feature of Meta's apps – friend sharing – accounts for less than 20% of time on Facebook and less than 10% on Instagram, *see* Meta FOF ¶¶ 6, 11; by contrast, *80%* of searches on Google were non-commercial general searches, including searches to navigate to other websites – something that specialized search functions could not offer. *See Google*, 747 F. Supp. 3d at 40.

The FTC relies (at 15) on surveys supposedly showing that consumers are more likely to look to Meta's apps than to competing social apps for friend sharing. *Cf. FTC v. R.R. Donnelley & Sons Co.*, 1990 WL 193674, at *2 (D.D.C. Aug. 27, 1990) ("Isolated segments with isolated customers do not make for a separate product market. In particular, pointing out the personal preferences of a distinct group of consumers does not suffice for defining a separate product market."). But some (unrepresentative) group of survey respondents reporting that they like to share with friends on Facebook says nothing about the competition Meta faces. Meta FOF ¶ 187. What consumers *do* on the Meta apps is far more indicative. Meta FOF ¶¶ 39, 183; *see United States v. Eastman Kodak Co.*, 63 F.3d 95, 104-05 (2d Cir. 1995) ("[W]hile many consumers state a preference for the familiar Kodak brand name, the empirical evidence of what consumers actually do indicates that consumers find non-Kodak film to be an acceptable substitute."). In any event, the same surveys not only showed that users primarily use *messaging* apps for friend sharing but also confirmed that consumers use a variety of apps – including TikTok – for that activity. Meta FOF ¶ 187. This is consistent with other surveys in the record. Meta FOF ¶¶ 92, 188. Whatever differences (of degree) between friend sharing and messaging may still exist, every witness to address the question confirmed that messaging has taken usage away from friend sharing. Meta FOF ¶¶ 108, 155-158, ███. This is what happens in fast-moving technology markets, *see* Meta FOF ¶ 46; yet the FTC acts as if the clock stopped a decade ago.

    **b.**    **No Industry Recognition:** The FTC briefly argues (at 20-21) that industry participants "recognize that PSN services are different." But that proves nothing relevant here. The question is whether there is industry recognition of an arena of competition for all time spent on supposed PSNS apps that is limited to those apps only. *See FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 818-19 (S.D. Tex. 2025) (rejecting attempt to define market based on

*Brown Shoe* where there was a mismatch between the market claimed – here, all time spent on just four apps, *see* Meta FOF ¶ 178 – and the evidence).  There is no such recognition in the trial evidence.  Meta FOF ¶ 47.  The evidence instead demonstrates the consensus recognition that Meta's apps face effective competition from many social apps – *at least* TikTok, YouTube, iMessage, X, LinkedIn, and others (but not Netflix and Hulu) – even though there are, of course, differences among them.  Meta FOF ¶¶ 80-82, 87-93, 102-105, 111, 122, 124, 128, 131, 134-136; *see also id.* ¶ 175.  This modern competitive landscape, not the anachronistic idea at the root of the FTC's case, is what the industry recognizes.

  **c.** **No Other *Brown Shoe* Factors Support the Claimed Market**:  The FTC makes no serious claim that the "economic criteria" identified in *Brown Shoe* – which are "primary," *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1039 (D.C. Cir. 2008) – support its claimed PSNS market.  It asserts (at 21) that users are "insensitive to quality-adjusted price increases," but it has no evidence that there have ever *been* any such increases, as its witness admitted at trial.  Meta FOF ¶ 28.  The FTC's argument that sentiment took a hit as a result of negative publicity surrounding Cambridge Analytica, without a large decline in usage, illustrates only that such metrics measure brand sentiment in response to adverse media attention and not users' experience engaging with the apps.  Meta FOF ¶ 36.  Even in a monopolized market, if quality-adjusted price increases, consumption declines.  *See Google*, 747 F. Supp. 3d at 116 n.5.

  The FTC's claim (at 23) that "a network of users" is a "unique production facility" is not supported by any trial evidence.  To the extent customers can be called a "production facility" because some of them share content on the app – a reach – Meta's multi-homing customer base is quite similar to "production facilities" of other social apps like TikTok, YouTube, X, and LinkedIn, among others.  All of these apps have overlapping users, enabled by contact importers

and share sheets.  Meta FOF ¶¶ 147-148, 175; *see also id.* ¶¶ 89-94, 100, 110.

The remaining *Brown Shoe* factors likewise contradict the FTC's claims about a supposedly distinct PSNS market consisting of three apps only.  These apps have the *same* prices – zero – not distinct prices (which sets them apart from paid subscription apps that do not feature user-generated content, like Netflix and Hulu).  Meta FOF ¶¶ 1-3; *cf. id.* ¶ 45.  The FTC's reference (at 21-22) to "price discrimination" (not a *Brown Shoe* factor) does nothing to separate the claimed PSNS from other social apps.  The FTC has no evidence that Meta's dynamic ad load – which varies ad load based on consumer receptiveness to ads – is limited to Meta (or Meta plus Snapchat); varying ad loads is common among ad-supported social apps.  Meta FOF ¶ 167.

**4.    *The FTC has no evidence to support its friend-sharing submarket theories.***
Facing a mountain of evidence that Meta's apps face effective competition from many social apps, the FTC spools out theories as to why Meta still has a monopoly – albeit one that is different from the PSNS market it committed to prove.  *Cf.* Meta FOF ¶ 178.  All are premised on the idea that, whatever competition Meta faces for everything else its apps provide, it faces little competition for friend sharing.  But the premise of the theory is refuted by the evidence (*see* Point (a), *infra*), and the FTC's efforts to shoehorn this case into *Whole Foods* and *Google* based on this purported "captive" group of users are inapt (*see* Point (b), *infra*).

**a.    <u>Meta App Friend Sharing Is Not Insulated from Competition</u>:**  Meta has no monopoly based on friend sharing on Instagram (7% of usage) or Facebook (17% of usage).  Meta FOF ¶¶ 6-7, 10-11.  Many other competitors that the FTC waves off offer acceptable friend sharing, such as iMessage (the dominant messaging service and beneficiary of norms shifting sharing to messaging), TikTok (which is leaning into friend sharing), X (which touts friend sharing), and others.  Meta FOF ¶¶ 91-94, 109, 123-125, 175; *cf. id.* ¶ 184 (Lampe's admissions).

More fundamentally, the evidence disproved the contention that competition is limited to features that look the same. Meta FOF ¶ 46. On the contrary, usage of Meta's apps for friend sharing faces constraining competition from other social apps, regardless of whether the usage on those other apps is characterized as friend sharing. Meta FOF ¶¶ 74-79, 156-164.

For example, in Professor List's experiment, users reduced time spent on Feed and Stories in approximately the same proportion as time spent on other surfaces like Reels. Meta FOF ¶ 70. If there were users who sought friend sharing, and had no alternative, they could and would have reduced their usage of *other* Meta app surfaces and maintained their use of the friend-sharing surfaces – but that is not what happened. Conversely, during the TikTok outage, uses like *messaging* and Stories spiked, not just usage of short-form video. Meta FOF ¶ 53.

███████████████████████████████████████████████████████████

██████████████████████████████████. Meta FOF ¶ 58. Consumers do not place these use cases in silos – on the contrary, these substitution patterns show that users substitute entertaining content that the FTC characterizes as "non-friend" for broadcast sharing on the apps it characterizes as PSNS apps, and vice versa.

Likewise, Meta's witnesses testified without rebuttal or contradiction, supported by a contemporaneous board document, that TikTok was taking significant time and growth from Facebook and Instagram – Feed and Stories in particular – *before* Reels existed. Meta FOF ¶¶ 74-76. Mr. Schultz presented ordinary-course data showing that user cohorts who adopted TikTok early reduced time spent on Facebook by approximately 24% *in* "*just over one year*," a rapid decline he characterized as "existential." Meta FOF ¶ 76. And the Meta app time shifted to TikTok during the October 2021 outage when Reels was in its infancy (it was introduced on Facebook in September), confirming substitution to short-form video (on TikTok) from other

features (on Facebook and Instagram).  Meta FOF ¶¶ 59, 61.

Meta also conducted ordinary-course studies *after* it launched Reels to understand the impact of the new feature.  Meta FOF ¶ 78.  Professor Carlton discussed the results of a Reels "holdout" study – comparing usage for U.S. users for whom Meta reduced the availability of Reels to those with Reels – finding that Reels increased usage in the United States by 24.5%, but at the expense of 14.8% of time spent on Feed.  Meta FOF ¶ 78(a).  Mr. Mosseri testified about the same holdout study's finding that Reels increased usage of Instagram by ███% globally, but at the expense of time spent on Feed and Stories.  Meta FOF ¶ 78(b).  Moreover, the holdout study showed that reducing the availability of Reels cost Instagram *daily users* – "about ██ percent more people . . . stopped using [Instagram] entirely."  Meta FOF ¶ 78(b).  In other words, without Reels, users were less likely to use Instagram *at all* – any feature – on a given day, contrary to the FTC's baseless assertion (at 32) of no "material[ ]" impact.  The FTC's core claim that entertaining content that does not involve friend sharing cannot substitute for friend sharing is directly contrary to this proof.  Meta FOF ¶ 79; *see also id.* ¶ ██.

**b.**  **The "Submarket" Theories Do Not Support a Meta Monopoly:**  In seeking to defend a relevant market based exclusively on the friend-sharing features of Meta's apps, the FTC relies on three related arguments: (i) it analogizes its market to the submarket at issue in *Whole Foods*; (ii) it seeks to rely on the distinction between general search and specialized search in *Google*; and (iii) it alludes to the idea of a "cluster" market in which friend sharing distinguishes Meta's apps from other social apps.  But none of these arguments can overcome evidence that competition from other social apps constrains Meta and protects all users of Meta's apps.

**i.**  **No *Whole Foods* Submarket:**  The FTC seeks post-trial to resort to a friend-sharing "submarket" theory it disclaimed during discovery, in opposition to Meta's pretrial

motion, and even at trial.  *See* Meta Mot. *in Limine* at 2-17 (Feb. 21, 2025), ECF No. 404; FTC

Opp. at 2 (Mar. 12, 2025), ECF No. 419; Meta FOF ¶ 178.  Given the vibrant competition for all

other time on the apps, *see* FTC Br. 31-32, the FTC now asks the Court to find alternatively that

Meta can exploit friend-sharing users by picking them out and discriminating against them.

    This submarket theory – purportedly supported by the submarket claim the FTC

presented in *Whole Foods* – finds no support in that limited ruling.  *See Whole Foods*, 548 F.3d

at 1035, 1037-38 (two judges finding only a "serious question" as to the FTC's claimed

submarket).  The FTC attempts an analogy between friend sharing on Facebook and Instagram

and the sale of organic perishables in natural food stores.  But those sales made up "nearly 70%

of Whole Foods sales"; this "much larger selection of natural and organic products" along with

other characteristics distinguished them in the eyes of "a core group of customers" who did not

consider "conventional supermarkets" to be an adequate alternative.  *Id.* at 1039 (cleaned up).

Furthermore, the submarket in *Whole Foods* was supported by data establishing that Whole

Foods could charge higher prices than nearby conventional stores.  Judge Brown's opinion noted

that "the FTC documented exactly the kind of price discrimination that enables a firm to profit

from core customers for whom it is the sole supplier."  *Id.* at 1039-40 (Whole Foods' margins

higher when no other "PNOS" was nearby).  In addition, Whole Foods price-checked

conventional supermarkets with respect to "'dry grocery,' rather than . . . the perishables that

were 70% of Whole Foods's business" – a recognition that conventional stores offered no

competition for the bulk of Whole Foods sales.  *Id.* at 1040.

    There is no such evidence here; thus, the FTC cannot sustain its burden to prove a

submarket.  Meta FOF ¶¶ 166-171.  The supposedly distinctive friend-sharing feature makes up

only 17% of time on Facebook and 7% of time on Instagram – ███████████ .  Meta FOF

¶¶ 6-7, 10-11; *see also id.* ¶¶ 151-161.  The FTC introduced no evidence – and no longer argues – that there are any characteristics of Facebook and Instagram that make other social apps inadequate as substitutes for anything other than that declining sliver of time.  And, as to that usage, the evidence proved that it faces competition from other apps' friend-sharing features and non-friend-sharing features alike.  Meta FOF ¶¶ 74-79; *see also id.* ¶¶ 156-160, 175.  Had the defendants in *Whole Foods* similarly shown that non-organic produce in conventional grocery stores effectively substituted for organic produce in natural food stores, the FTC's market would have failed.  But here there is no evidence that Meta charges friend sharers a higher price – none.  Meta FOF ¶¶ 166-167, 171.  There might have been a "serious question" whether consumers would accept higher prices to shop at a Whole Foods offering primarily "premium" organic perishables (70% of sales) – particularly where there was empirical evidence that Whole Foods in fact charged such prices absent competition from another premium organic grocer – but there is no such proof here.  Meta FOF ¶ 171; *see also id.* ¶¶ 151-161.

Despite a throw-away disclaimer (at 23), the FTC consistently recognized that, to rely on *Whole Foods*, it needed to support its theory with evidence of price discrimination against friend sharing.  Meta FOF ¶ 165.  But no evidence supports its theory that users engaged in friend sharing – or with a greater demand for friends-and-family content – are treated less favorably than other users, in *any* respect.  Meta FOF ¶¶ 166-167.  Professor Hemphill conceded that there is *no such evidence*.  Meta FOF ¶ 171.  That is for good reason:  Meta's friend sharing is not insulated from competition, either from other means of friend sharing or from non-friend-sharing alternatives on social apps.  Meta FOF ¶¶ 74-79, 175.  As to most aspects of the user experience on Facebook and Instagram, the FTC did not even propose a mechanism for "discriminating" against users with a preference for friends-and-family sharing.  Meta FOF ¶ 166.

The FTC instead attempted to prove discrimination with an argument that friend sharers see more ads than other users. But that fell apart at trial. Meta FOF ¶ 171. To start with, there is little economic logic to relying on ad load as a form of price discrimination. As the FTC's witness conceded, ads are not a price. Meta FOF ¶ 28; *see also id.* ¶ 19. Showing more ads to unresponsive users does not make more money for Meta; its advertising business profit maximization turns on user *direct response*. Meta FOF ¶ 14. Showing more ads to users who respond to and engage with ads is what Meta does and what makes sense. Meta FOF ¶ 167.

In any event, users with a preference for friend sharing do not see more ads, full stop. Meta FOF ¶¶ 167-171. Ironically, the regression done by the FTC showed that users with the most "friends" actually see *fewer* ads, not more. Meta FOF ¶ 169. Not a single witness familiar with the operation of the Meta advertising system was aware of any effort by Meta to serve more ads based on friend-sharing usage or preferences; all were similarly unaware of any reason why it would make commercial sense to do so. Meta FOF ¶¶ 167-168. The fact that Meta *could* identify friend-sharing users (*see* FTC Br. 22) only highlights the significance of the fact that there is no evidence that it treats them differently. Meta FOF ¶ 168. And without that evidence, this case is nothing like *Whole Foods*.

After failing to prove the discrimination that the FTC itself recognized it needed to support its theory, *see* Meta FOF ¶ 165, it resorted to "proxies" that do not purport to show that Meta discriminates against users who share more than others:

*Age / Tenure*: The FTC hypothesized (at 22) that older users prefer friend sharing. But, in fact, younger users spend proportionately more time with friend content on both Facebook and Instagram. Meta FOF ¶ 172. Those younger users have a *lower* ad load, while older users – those over 35 – have a *higher* ad load. Meta FOF ¶ 172. Meta's witnesses explained why older

users see more ads; they have greater purchasing power, and Meta knows more about what those users like (based on tenure or how long they have been on the apps), which makes them more attractive to advertisers. Meta FOF ¶ 172. There is no evidence that any older or longer-tenured users who do have a greater demand for "friend sharing" (holding all else equal) see more ads.

*Surface*:  The FTC asserts (at 22) that ad load is higher on Feed and Stories (but only on Instagram, not Facebook) than on Reels because those surfaces have more friend content. In fact, Meta showed there is not even a correlation between the amount of friend content and ad load on Meta's apps. Meta FOF ¶ 174. On Facebook, surfaces like Photos are mostly friend content, but they have few or no ads, while videos – mostly unconnected or public content (not friend content) – have more ads. Meta FOF ¶ 174. The Feed surface has more ads than Stories but contains proportionately *less* friend content. Meta FOF ¶ 174. Facebook has a specific Friends Tab – consisting of 100% friend content – that has *zero* ads. Meta FOF ¶ 174. There is likewise no correlation for the Instagram surfaces. Meta FOF ¶ 174. And to the extent Reels has a lower ad load, that is because it is a newer surface, to which both Meta and advertisers are still adapting. Meta FOF ¶ 173; *see also id.* ¶ 85.

In sum, the FTC's "proxies" do not support its theory because they provide no evidence that, *holding all else equal*, users with a greater demand for friend sharing see more ads. Meta FOF ¶ 171. The failure to identify any discrimination against supposedly captive users distinguishes *Whole Foods* and every case the FTC cites or could cite. *See*, *e.g.*, *Rothery Storage*, 729 F.2d at 219 (rejecting claimed geographic "submarkets" because there was no evidence "these cities were segregable markets in which [the defendant] could raise prices appreciably without attracting competitors' [products]"); *see also* Meta Pretrial Br. 19 (collecting cases).

The FTC makes a final argument (at 22) that a *discount* as to ads Meta shows to new

users whom Meta is trying to attract is tantamount to discrimination against all the other users who do not get this promotional treatment: Meta singles out a fraction of so-called "needy user[s]" on Facebook – accounting for less than 1% of users on Facebook (there is no "needy user[s]" program on Instagram at all) – for "relatively lower ad load" in an effort to win their patronage. FTC Br. 22 ("[M]ost users [i.e., more than 99% of them] receiv[e] Meta's highest ad load levels."). There has never been a case with such a backwards theory of "discrimination." In any event, this is just another failed proxy. Providing a "discount" for new users who have not yet adopted an app is a sign of an intensely competitive market, not a sign of monopoly power in a narrow submarket restricted to friend-sharing users. 5/13 Trial Tr. 19:10-11 (Hemphill). The simple fact is that if Meta had a captive group that it could profitably discriminate against there would be evidence that it was doing so. But there is no evidence whatsoever of Meta ever doing so, contemplating doing so, or having the power to do so profitably. Meta FOF ¶¶ 167-171.

Finally, the FTC's belated submarket gambit is a bridge to nowhere. Even if it could prove a submarket – and it hasn't come close – it would still be required to prove *monopoly power* in that submarket. *Cf. United States v. Gillette Co.*, 828 F. Supp. 78, 83 (D.D.C. 1993) (rejecting government case asserting "captive" submarket of a minority of consumers for failure to prove high concentration). But it has no such evidence and claims none in its brief. Meta FOF ¶¶ 175, 177. The FTC does not put forward and cannot put forward credible evidence of market shares in such a hypothesized submarket. Meta FOF ¶ 176.

**ii.** *Google* **Does Not Support the FTC:** The FTC's attempt to rely on *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024), is no better supported here than before. As noted above, the court in that case found a relevant market consisting of General Search Engines ("GSEs") offered by Google and Bing and excluding "specialized vertical providers" ("SVPs")

that respond to queries typically directed at the proprietary data available only on that platform. The FTC asks the Court to find that friend sharing corresponds to general search on Google and that all the other use cases on the Meta apps correspond to the particular searches on SVPs. But the court in *Google* found that "80% of queries on Google are non-commercial in nature" and could *not* be served by SVPs. *Id.* at 114; *see id.* at 115 ("[O]nly a GSE can answer *any* query – including, importantly, noncommercial and navigational queries."). SVPs could not compete for the vast majority of Google's usage; they did not provide a reasonably interchangeable alternative for *most* of how consumers use GSEs. Moreover, the record established "that GSEs and SVPs are *complementary goods*," *id.* (emphasis added), with studies showing that users who engaged with SVPs were *more likely* to enter queries on Google, *see id.* at 116.

Nothing remotely similar can be found here. Friend sharing is a small percentage of usage, not 80% of the Meta offerings; this is the *inverse* of *Google*. Meta FOF ¶¶ 6-7, 10-11; *see also id.* ¶¶ 151-161. There is substantial competition for the Meta apps across the board, as to all features. Meta FOF ¶¶ 80-82, 87-93, 102-105, 111, 122, 124, 128, 130-131, 134-136, 175; *see also id.* ¶ 178 (Hemphill admission). The empirical evidence proves that users treat other social apps like TikTok as alternatives for *all* time spent on Meta's apps, including for friend sharing. Meta FOF ¶¶ 74-79; *see also id.* ¶¶ 52-62, 68-70. Notably, the *Google* court also found that there was no market for "general search advertising" precisely because any distinction between ads on a GSE or SVP "is a difference of degree, not kind." *Google*, 747 F. Supp. 3d at 139-40. Here, too, any supposed difference between the social apps (all vying for marginal minutes of engagement to sell ads) is likewise one of degree, not kind. Meta FOF ¶¶ 45-46.

**iii.    No "Cluster" Market:** Similarly far afield is the FTC's 11th-hour allusion (at 33-34) to an un-pleaded "cluster" market in which the presence of the supposedly "core"

friend-sharing feature immunizes Meta from competition from services lacking that feature in their cluster. There is no evidence supporting that theory, and all the trial evidence is to the contrary. Even on the assumption that other social apps lack friend-sharing features – a contention disproved at trial, *see* Meta FOF ¶ 175 – the evidence is that they can and do compete for minutes of usage with Meta. Meta FOF ¶¶ 74-79, 81-83, 87-88, 95-96, 102-105, 111, 124-125, 127-128, 130-131, 134-136. The FTC no longer claims (and could not credibly claim) that watching a Reel is a distinguishable experience – let alone more expensive or lower quality – from watching the same video on TikTok or YouTube because the latter are missing some part of Meta's cluster or bundle of services. *Cf.* Meta FOF ¶ 178; *see also id.* ¶ 97.

The cases the FTC cites thus do not bear on the issues here. *Cf. United States v. Conn. Nat'l Bank*, 418 U.S. 656, 664 (1974) (specialized savings banks could not provide the same "cluster of services" as commercial banks); *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966) ("to compete effectively," central station alarm services "must offer all or nearly all types of service"); *FTC v. Kroger Co.*, 2024 WL 5053016, at *10 (D. Or. Dec. 10, 2024) ("a monthly trip to Costco" was not "a reasonable substitute for a weekly one-stop visit to a supermarket"). There is no evidence indicating that competitors need a cluster similar to Meta's in order to compete effectively. *Cf.* Meta FOF ¶ 46(b). And arguing (at 25-26) that users don't post as much on some apps or post on Facebook and Instagram more (or that usage spikes on select holidays, *see* FTC Br. 15; true for messaging too, *see* 5/21 Trial Tr. 130:23-132:21 (Carlton)) says nothing about consumer substitution or the *threat* of substitution as a competitive constraint.

**5.** ***In any properly defined market, Meta's low shares and the absence of barriers to entry preclude a finding of monopoly power.***

**a.** <u>**Low Shares**</u>**:** Meta's share of any properly defined relevant market is too low to

45

support a presumption of monopoly power.  Meta FOF ¶¶ 140-142.  Relevant competitors measure competitive significance using time spent, which is the only available metric that can distinguish among services based on intensity of use (and therefore a firm's ability to monetize marginal usage through sales of advertising).  Meta FOF ¶ 139.  Trial evidence showed that other common metrics – monthly and daily active users – do not distinguish between users who spend one minute per day (or month) and users who spend many hours per day (or month) on an app and are therefore not similarly indicative of relative market position.  Meta FOF ¶ 142.  By the most probative metric, Meta has nothing close to a dominant share.  Meta FOF ¶¶ 140-141.  And, in any event, the other metrics lead to the same conclusion.  Meta FOF ¶ 142.

When relevant competitors are accounted for, the share numbers shut the door on any effort to claim a presumption.  Meta FOF ¶¶ 140-141.  Courts in other circuits may have found shares of 60% or 65% sufficient to pass a preliminary motion.  *See FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 44 (D.D.C. 2022) (discussing *FTC v. AbbVie Inc.*, 976 F.3d 327, 373-74 (3d Cir. 2020), and *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997)).  But no decision from the Supreme Court or the D.C. Circuit has ever made a *finding* of monopoly power in a Section 2 case based on a market share below 75%.  *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 450 (4th Cir. 2011) (identifying 70-75% market share as the bottom range the Supreme Court has accepted); *cf. United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 19 (D.D.C. 1999) (market share of 80% or more sufficient).

Inclusion of *any* of Meta's most significant competitors shows that its share is too low to support any inference of monopoly power.  Meta FOF ¶¶ 140-141.  Adding only TikTok to the FTC's flawed calculation results in a Meta share below 60% (even to ██% or lower).  Meta FOF ¶¶ 140-141.  If just YouTube (but not TikTok) is included, Meta's share is ██%.  Meta FOF

¶ 140.  When both YouTube and TikTok are included, Meta's share is below ██%.  Meta FOF

¶ 140.  Including other competitive services like iMessage, X, and others drops Meta's share

lower still.  Meta FOF ¶ 140 (citing DX1185).  The FTC's claim (at 39) that Meta has a

"dominant" share of the market even if TikTok is included is specious.  Today, according to the

FTC's own expert witness, that amounts to a ██% market share – wrong, but still too low to

support a plausible inference of monopoly.  Meta FOF ¶ 141.  The actual figure today is even

lower.  Meta FOF ¶ 141.  And the FTC has no credible reason for including TikTok in the share

calculation and leaving out YouTube, which, like Facebook and Instagram, offers an

"indistinguishable" user experience.  Meta FOF ¶ 97.

Abandoning PSNS, the FTC makes a passing suggestion (at 39) that, if the Court finds

the FTC's share calculations wanting, it can rely on concocted shares for the FTC's shadow

submarket, based on time spent "interact[ing] with friends and family."  That afterthought is

unsupported:  the FTC never developed data that would allow any plausible calculation of time

spent specifically on friend sharing, *see* Meta FOF ¶ 176 – although it could have tried.  *See*

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1215 (11th Cir. 2002) ("defendant's

market share in a market other than the alleged relevant market is irrelevant" as a matter of law).

**b.    No Significant Entry Barriers:**  Meta's share of time spent on social apps has

been declining.  Meta FOF ¶¶ 140-141.  The FTC therefore cannot show that Meta's position is

durable.  *See, e.g.*, *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174-75

(4th Cir. 2014).  The FTC's case is further undone by evidence that important new entry not only

is possible; it has happened.  *See United States v. Syufy Enters.*, 903 F.2d 659, 665-66 (9th Cir.

1990).  The rise of Snapchat after 2014, TikTok (Meta's closest rival) after 2018, upstarts like

Discord for messaging, and the announced entry of OpenAI with its upcoming AI social network

demonstrate that competition has been and remains fierce and dynamic.  Meta FOF ¶¶ 46(d),

144-146, 149; *see also id.* ¶ 136.  Although the FTC points in the abstract (at 40) to "network

effects" and "switching costs," Mr. Schultz gave unrefuted testimony that the friend network the

FTC claims as an insurmountable network effect is no barrier given modern technology that

enables social apps to establish a network almost instantly via contact importing.  Meta FOF

¶ 147; *see also id.* ¶¶ 148, 175.  And whatever significance a friend network may once have had

for friend sharing, it is irrelevant for consuming unconnected video, the most consumed content.

Meta FOF ¶ 149.  The other barrier the FTC asserts – "switching costs" – is just more FTC theory

unanchored in evidence.  Users today "multi-home" – that is, switch – effortlessly and without

cost.  *Cf.* Meta FOF ¶¶ 145, 149; *see also id.* ¶ 150 (discussing negative network effects).

## II.    Meta's Acquisitions Were Procompetitive – Not Unlawful Exclusionary Conduct

### A.    The Evidence Proved That the *Effect* of Both Acquisitions – the Correct Legal Standard Under Section 2 – Was Not Anticompetitive

The trial evidence established that Meta's two challenged acquisitions had only

procompetitive effects; both produced dramatically greater output (usage) and many billions of

dollars in consumer-welfare benefits.  Meta FOF ¶¶ 9, 26-27, 219, 252, 257.  The FTC asks the

Court to accept its guesswork that things might be even better for consumers today, in some

unspecified way, if Meta had not acquired Instagram and WhatsApp.  No court has ever

condemned a completed acquisition under Section 2 in remotely similar circumstances.  These

acquisitions were a "grand slam homerun" for consumers.  Meta FOF ¶¶ 205-206, 251-254.  The

FTC provides no authority supporting condemnation on the trial record here – not a single

Section 2 acquisition case in support of the theory it asks the Court to endorse.

In this retrospective Section 2 challenge, the FTC bears the burden of showing that

Meta's acquisitions "harm[ed] the competitive process and thereby harm[ed] consumers,"

*Microsoft*, 253 F.3d at 58-59 (italics omitted) – i.e., by making PSNS consumers worse off compared to the "but-for world" without the acquisitions, *see Rambus Inc. v. FTC*, 522 F.3d 456, 466-67 (D.C. Cir. 2008).  That requires "some empirical evidence of actual *effects*"; mere "[e]xpert testimony" about "the likely effect of removing a competitor cannot take the place of presenting specific and concrete facts."  *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1085-86 (11th Cir. 2016) (emphasis added); *see United States v. Google LLC*, 687 F. Supp. 3d 48, 81 (D.D.C. 2023) (stating that "[s]peculation" "is not evidence of anticompetitive effects").

1.    ***Both acquisitions had procompetitive outcomes – actual effects – which means neither was anticompetitive, as a matter of law.***

a.    <u>**Instagram**</u>:  Pre-acquisition Instagram had 13 employees, 3.9 million U.S. monthly active users, a single photo-sharing feature that was a "complement" to Facebook, no monetization plan, numerous operational challenges, and a dependence on *Meta's* free promotion for growth – its co-founder admitted all of this.  Meta FOF ¶¶ 189-195; *see also id.* ¶ 9.  Meta acquired Instagram to grow it, *see* Meta FOF ¶¶ 196-201, and that is what it did.  Meta invested billions of dollars and thousands of skilled employees, provided extensive promotion, and used its deep expertise to grow the Instagram app from fledgling to "saturation" with more than 230 million U.S. monthly active users today.  Meta FOF ¶¶ 9, 204, 207-210, 215, 217-218; *see also id.* ¶¶ 205, 212.  Those users enjoy scores of new features that Meta innovated and made available in unlimited quantities at no cost.  Meta FOF ¶ 210; *see also id.* ¶ 24.  And the app is faster and better performing than before.  Meta FOF ¶¶ 215, 217; *cf. id.* ¶ 216.

The total consumer-welfare surplus created by the acquisition amounts to hundreds of billions of dollars – a calculation supported by data, *see* Meta FOF ¶ 219, which the FTC did nothing at trial to refute.  There is no record evidence – not even speculation – that Instagram

could have accomplished as much (let alone as fast) on its own or as part of some unidentified alternative acquirer.  Meta FOF ¶ 221.  The percipient witnesses testified that this extraordinary success would not have been possible without Meta.  Meta FOF ¶¶ 204-205.  These acquisition effects were procompetitive benefits, both as a matter of economics – *see* Meta FOF ¶¶ 219-220 – and as a matter of law.  *See*, *e.g.*, *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 103 (1984) (conduct that "increase[s] sellers' aggregate output" is "procompetitive").

    As against these benefits, the FTC's passing suggestions of harmful effects are makeweights insufficient to carry its burden:

    *First*, the FTC argues (at 42-43, 49) that Meta would have developed a different photo-sharing app ("Camera") if it had not made the acquisition.  This claim is self-contradictory because the FTC elsewhere admits (at PF ¶ 225) that Camera was a project to develop and incorporate photo-sharing features *into the Facebook app*.  And work on *Facebook's* mobile photo-sharing features did not stop after Meta acquired Instagram; Meta spent years further innovating photo-sharing on both Facebook and Instagram.  Meta FOF ¶ 228; *cf. id.* ¶ 230.  Camera was never intended to be a standalone app; its deprecation was neither a loss to consumers nor a consequence of the Instagram acquisition.  Meta FOF ¶¶ 226-227.  And even if Meta had been planning its own photo-sharing app, it was not obligated to "build" rather than to "buy," as numerous courts have long recognized.  *See generally*, *e.g.*, *FTC v. Tenneco, Inc.*, 433 F. Supp. 105 (D.D.C. 1977).  There is no evidence of any benefit that consumers lost because of "Camera," *see* Meta FOF ¶ 229, the FTC's refrain that "more competitors are always better" notwithstanding.  *Cf. United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) (rejecting potential-competition claim even under plaintiff-friendly Section 7).

    *Second*, the FTC argues (at 48-50) that Meta held back Instagram to minimize

"cannibalization" of Facebook. But Instagram grew, dramatically, to "saturation" in the United States *because* it had Meta's employees, financial resources, new features, ad technology, promotions, growth bridges, data, and ideas. Meta FOF ¶¶ 204-210, 212-213, 215. No witness for the FTC – including Mr. Systrom – claimed that Instagram *would* or even *could* have grown more or faster in the United States on its own. *Cf.* Meta FOF ¶ 221. Mr. Systrom instead testified that Meta accelerated Instagram's growth by at least several years. Meta FOF ¶ 205. Mr. Schultz – who ran Meta's growth team (the "best in the world" according to Mr. Systrom, *see* Meta FOF ¶ 207) – testified that the corporate skirmishing the FTC tried to highlight was trivial and never hampered Instagram's growth, which is supported by the data. Meta FOF ¶¶ 231-233. At all times, Meta continued growing Instagram, investing in all aspects of the service (including ad quality, integrity, friend connections, and features). Meta FOF ¶¶ 204, 207-210, 212-213, 215, 217-218. And it grew steadily and dramatically. Meta FOF ¶ 205; *see also id.* ¶ 9. The notion that Meta could have grown Instagram more or faster is unsupported and says nothing about what would have happened in the "but-for" world without the acquisition, much less suggests that the acquisition harmed competition or consumers. *Cf.* Meta FOF ¶ 221.

**b.    WhatsApp:** Pre-acquisition WhatsApp was a popular *international* messaging app that charged U.S. users a price. Meta FOF ¶¶ 234, 239. It consequently had a minor U.S. presence because it struggled to attract and retain U.S. consumers in competition with free U.S. messengers. Meta FOF ¶ 240. Nor did it intend to add features similar to Facebook; it was dogmatically opposed. Meta FOF ¶¶ 235-237, 241-242. Meta acquired WhatsApp to grow it, *see* Meta FOF ¶ 247, and again that's what it did, *see* Meta FOF ¶ 252. Meta made WhatsApp free and added features, boosted service quality, and provided extensive promotion and marketing. Meta FOF ¶¶ 251, 253-254. Meta has grown free WhatsApp to more than 100

million U.S. monthly active users (and 3 billion global users), notwithstanding the challenges posed by pre-installed default messengers (especially iMessage). Meta FOF ¶ 252. The acquisition generated many billions in total consumer-welfare surplus in the United States. Meta FOF ¶ 257. The FTC did nothing to contest the calculation or the fact of those benefits.

The FTC therefore resorts, once again, to passing makeweights:

*First*, the FTC speculates (at 47) that another tech firm could have wrested WhatsApp away from the founders and made it into a so-called PSNS in the United States – again, all speculation with no evidence to show that any such outcome was likely. WhatsApp had no other serious offers in 2014. Meta FOF ¶¶ 258-259. The FTC at trial could point only to a *2011* non-binding nibble from Google, at a low price that went nowhere. Meta FOF ¶ 258. Nothing but speculation on speculation can fill out an argument that some unknown firm with unknown interests and resources would have persuaded the resistant founders to sell and depart, let alone that the result would have been a successful PSNS competitor in the United States that would have brought consumers greater benefits than those enjoyed by consumers today.

*Second*, the FTC suggests (at 49-50) that the WhatsApp acquisition – perhaps together with Instagram as part of Meta – created a "moat" that prevented competition and enabled Meta to innovate less, relying on a decade-old email (PX10271 at 2) that is not about either acquisition. That is just more theory. With market-wide output increasing, new firms are emerging and growing. Meta FOF ¶ 27. That includes messaging services that have added stories features (like Telegram and Signal, plus Snapchat itself). Meta FOF ¶¶ 46(a), 94, 114. And no "moat" prevented the rise and explosive growth of Meta's most powerful rival today – TikTok – from zero U.S. users in 2018 to more than 170 million today. Meta FOF ¶¶ 26(d), 144. The "moat" theory concedes (at 50) that Meta "respond[s]" to constraining competition with new features, which Meta has done incessantly following the acquisitions – most dramatically with

Reels and the Modern Recommendation System.  Meta FOF ¶¶ 24, 40, 80, 82, 84, 102, 145.

2.  ***The FTC should get no presumption of harm to competition from a "nascent competitor" acquisition – on the law or the facts.***  To get around these actual effects, the FTC asks the Court to make new (and bad) law – several times over.  To start, the FTC asserts (at 41) that acquisitions are not "competition on the merits."  But acquiring a startup (like Instagram) and investing to grow it and make it great for consumers (or reducing its price to zero in the case of WhatsApp), spurring rounds of competitive responses from rivals (like Snapchat, YouTube, and TikTok) and counterresponses (from Meta), *is* competition on the merits; no court has ever held otherwise.  *See Syufy*, 903 F.2d at 673.  The fact that acquisitions can have procompetitive effects – like the acquisitions here – is why the FTC's request (at 41, 48) for a presumption of harm fails as a matter of law.  *See Microsoft*, 253 F.3d at 58-59 ("[T]he plaintiff, on whom the burden of proof of course rests, *must* demonstrate that the monopolist's conduct *indeed has the requisite anticompetitive effect*.") (emphases added; citations omitted).  Both the Supreme Court and the D.C. Circuit have rejected the theory that acquisitions are *per se* unlawful, regardless of actual effects.  *See Rothery Storage*, 792 F.2d at 223.

The FTC invites compounding error by asking the Court to award an improper presumption based on supposed "intent" evidence relating to Meta's pre-acquisition concerns about Instagram and WhatsApp.  *See* FTC Br. 42-44.  The D.C. Circuit has been clear:  "Evidence of the intent behind the conduct of a monopolist is relevant *only to the extent it helps us understand the likely effect* of the monopolist's conduct."  *Microsoft*, 253 F.3d at 59 (emphasis added).  There is no need to guess about "the likely effect" of the two challenged acquisitions in this case because the *actual effects* are known.  Whatever may have been discussed informally in "preliminary" conversations prior to the acquisitions cannot change those effects.  Meta FOF ¶ 197.  "Intent" evidence has no role to play here.  *See New York v. Microsoft Corp.*, 224 F.

Supp. 2d 76, 138 (D.D.C. 2002), *aff'd sub nom. Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) (en banc); *see also Novell*, 731 F.3d at 1078 (Gorsuch, J.).

The FTC's arguments based on intent, presumptions, and "nascent" competition are addressed to a different context – Section 7 challenges to unconsummated transactions, where effects are not known and where courts must attempt to predict future effects. *Cf. United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963). But there is no such uncertainty here. The prediction that the FTC itself made at the time of the acquisitions – declining, after investigation, to challenge either deal, *see* Meta FOF ¶¶ 203, 250 – was proved correct. *Cf. United States v. Google LLC*, --- F. Supp. 3d ---, 2025 WL 1132012, at *36 n.27 (E.D. Va. Apr. 17, 2025) ("[I]t would be a substantial step to find that an acquisition violated the Sherman Act after it was reviewed and approved by federal antitrust regulators."). Ultimately, the facts about these transactions – what actually happened – should trump FTC theories about nascent competitors and executive mind reading.

a.    **Instagram**: Instagram was a promising mobile-first photo app at a time when Facebook was seeking to improve its own mobile offering but was still largely a desktop service with features Instagram did not offer. Meta FOF ¶ 189. But as Mr. Systrom testified, Instagram was not focused on Facebook as a competitor. Meta FOF ¶¶ 191-192. And for Meta's part, Instagram was not remotely a full-featured social network that Meta considered a likely competitor in *that* regard. Meta FOF ¶ 196; *see also id.* ¶ 193. The FTC claims (at 41-42) that Instagram was "dangerous" and Facebook was "vulnerable," but that confuses what Instagram is today (what Meta made it) with what it was in 2012. The idea that tiny Instagram was an inevitable full-featured PSNS success ignores that app's feature limitations as well as the many challenges that Instagram faced, *see* Meta FOF ¶¶ 194-195 – and the failures of many promising

startups in much the same position (e.g., Path, ███, Tumblr, Vine), *see* Meta FOF ¶¶ 222-224.

Instagram's hazards included a skeleton staff – with no ability to hire the many new engineers it needed – plus spam and infrastructure problems that kept it scrambling to stay online and unable to add new features. Meta FOF ¶ 195. It had no revenue and no concrete plan to monetize. Meta FOF ¶ 194. It had not been able to develop important new features, specifically for video. Meta FOF ¶ 194; *cf. id.* ¶ 218. Its growth was substantially dependent on free promotion via Facebook, which Meta could legitimately end at any time (and could well have ended in the event Instagram ever did become a full-scale rival). Meta FOF ¶ 193. And there is no evidence, contrary to the FTC's speculation (at 42), that a white-knight alternative acquirer was poised to step in and solve all of Instagram's issues. Meta FOF ¶ 225.

The FTC suggests (at 43-44) that the $1 billion purchase price is somehow indicative of how transformational an independent Instagram would have been. That price turned out to be a "screaming deal" after Meta made Instagram what it is today. Meta FOF ¶ 206. Given what Meta has achieved (in contrast to other failed startups contemporaneous to Instagram), the $1 billion price was, if anything, too low. Meta FOF ¶ 202; *cf. id.* ¶¶ 222-224. That Instagram could be acquired for only $1 billion, in comparison with its astronomical value today, is economic proof that the extraordinary success Meta has made of this app was not contemplated by anyone in 2012 and not likely to have been achieved without Meta. Meta FOF ¶¶ 205, 220.

The FTC asks the Court (at 43-44) to find that the loss of an independent Instagram was harmful because Meta – and ultimately Mr. Zuckerberg, the decisionmaker, *see* Meta FOF ¶ 196 – feared Instagram. As noted above, such intent evidence cannot overcome proof of effects. Moreover, the FTC misreads the "intent" evidence on which it places so much weight. Meta FOF ¶¶ 197-198. As the trial evidence proved, Mr. Zuckerberg made a habit of motivating his

team with frequent warnings about many emerging products, not just Instagram. Meta FOF ¶ 196. His subjective concern was not that Instagram would be a game-changing rival. Meta FOF ¶ 196. He was focused instead on its lead over Facebook in the mobile photo-sharing use case. Meta FOF ¶ 191. And whatever Mr. Zuckerberg may have mused months before the acquisition, by the time Meta acquired Instagram, he had settled on the plan to maintain Instagram as a separate app and to improve and expand it with Meta's vast resources, infrastructure, tools, and know-how – to make it Meta's "bet," as he testified. Meta FOF ¶¶ 199-201. That is exactly *what he and Meta did*, *see* Meta FOF ¶ 204, which is the best evidence of his and Meta's intent. The intent evidence is consistent with the controlling *effect* evidence; both support the conclusion that the acquisition was procompetitive. Meta FOF ¶¶ 205, 219-220.

      **b.**    **WhatsApp:** WhatsApp was not even a "nascent" PSNS competitor, was not going to pivot, was not going to chase U.S. growth (let alone be guaranteed to succeed in getting it), and was not going to add more-social features; it was going to continue as a messaging service charging U.S. users. Meta FOF ¶¶ 235-237, 241-242. It even had plans for price increases. Meta FOF ¶ 243. All that evidence notwithstanding, the FTC still claims (at 44-46) that WhatsApp would have become a so-called PSNS in the United States, someway, somehow. But every witness with personal knowledge – including the co-founder and co-controlling shareholder, a business lead, and the venture-capital backer – refuted that theory in unambiguous terms. Meta FOF ¶¶ 235-237, 241-242. Multiple contemporaneous documents (and even otherwise speculative materials from an investment banker that the FTC cites (at 46-47)) confirm that WhatsApp was not going to become a Facebook-like social network. Meta FOF ¶¶ 237, 242. And regarding the United States specifically, Mr. Acton compared spending money on U.S. growth to "flushing money down the toilet." Meta FOF ¶ 240.

Ignoring that evidence, the FTC had a late-breaking idea (at 46-47) that WhatsApp might have decided to launch a second app – a figment of FTC imagination. WhatsApp "quickly shot down and dismissed" that idea before the Meta acquisition. Meta FOF ¶ 238. The FTC's claim (at 46) that WhatsApp-funder Sequoia referenced WhatsApp "iterating" on "new monetization plans in June 2013" omits that the plans were to create more paid-for purchase options. Meta FOF ¶ 243. Similarly farfetched is Professor Rim's speculation that WhatsApp would be forced to pivot for lack of funds. *See* FTC Br. 45-46. Mr. Acton testified that WhatsApp was cashflow positive when Meta acquired it and that accounting line items resulting in a reported loss on financial statements generated for the acquisition did not bear on the reality of operating the business. Meta FOF ¶ 243. To the extent the founders wanted or needed to increase revenue, the plan was to raise prices (whereas Meta *cut prices* for WhatsApp users). Meta FOF ¶¶ 243, 251.

So the FTC returns to the notion (at 44-45) that Meta's supposed fears show WhatsApp was destined to provide great benefits to consumers as a U.S.-based PSNS if left undisturbed. No one at Meta even speculated about that. Meta FOF ¶¶ 245-246. The Meta executive who made the decision to acquire WhatsApp – Mr. Zuckerberg – had no such fears. Meta FOF ¶ 244. He had met with the WhatsApp founders, who had shared their settled view that WhatsApp should remain focused on messaging. Meta FOF ¶ 244; *see also id.* ¶ 235. Mr. Zuckerberg's testimony is corroborated by a contemporaneous email reporting on that meeting. Meta FOF ¶ 244. To the extent Meta executives speculated about WhatsApp as a threat at all, it was only in messaging and internationally. *Cf.* Meta FOF ¶ 246; *see also id.* ¶ 245.

As for a supposed "defensive" aspect to the acquisition, *see* FTC Br. 48, Mr. Zuckerberg explained, without contradiction, that he wanted to make Meta a leader in global messaging, which promised to be the future of sharing (a prescient prediction). Meta FOF ¶ 247; *see also id.*

¶ 108.  That would help defend Meta against Apple and Google de-platforming Meta's apps from smartphone app stores.  Meta FOF ¶ 247.  In all events, the objective evidence – actual plans at WhatsApp and Meta's knowledge of those plans *not* to pivot – trumps the FTC's speculations. *See*, *e.g.*, *In re B.A.T. Indus., Ltd.*, 1984 WL 565384, at *6 (FTC Dec. 17, 1984) (requiring "concrete" planning to support entry theory even in plaintiff-friendly Section 7 case).

The FTC's final salvo (at 47-48) is that Meta must have feared a pivot because it paid too much for WhatsApp.  Meta acquired WhatsApp because Mr. Zuckerberg believed that Meta could scale it to billions of users worldwide.  Meta FOF ¶ 248.  This judgment, which has been proved correct with Instagram and otherwise, was that an app that can achieve that scale can be made profitable.  The valuation methodology that supported his judgment is standard in the industry – according to the FTC's witness Professor Rim, *see* Meta FOF ¶ 248 – and resulted in a price lower than Google's contemporaneous valuation.  Meta FOF ¶ 249.  The FTC did not provide any relevant yardstick to support a claim that the purchase price was excessive or unwarranted.  Both the WhatsApp co-founder and its lead investor testified that Meta did not overpay.  Meta FOF ¶ 249.  Ultimately, Mr. Zuckerberg was right again:  WhatsApp reached and even exceeded the predicted global scale because of Meta's investments.  Meta FOF ¶ 252.  And now it is ███████████████████████████.  Meta FOF ¶¶ 255-257.

## B.    The FTC Does Not Even Try To Rebut Undisputed Procompetitive Benefits

It is undeniable that Meta increased output, added features, and grew both apps *faster* than either could have on its own in the but-for world – while even cutting prices for WhatsApp. Meta FOF ¶¶ 204-205, 210, 251-252, 254.  Meta did so by pouring resources into Instagram and WhatsApp, placing those apps on its hyperscale infrastructure, improving monetization and integrity, and innovating scores of new features.  Meta FOF ¶¶ 207, 210, 212, 215, 253.  This has resulted in hundreds of billions of dollars in consumer-welfare benefits for U.S. consumers.

Meta FOF ¶¶ 219, 257.  Meta even rescued Instagram from a disastrous ad strategy.  *Cf.* FTC Br.

49.  It would have increased ad load on its own and with worse ads.  Meta FOF ¶¶ 211, 214.

Meta's course correction transformed the app into a powerhouse.  Meta FOF ¶¶ 212-213.

Accordingly, even if the FTC had come forward with evidence of anticompetitive effects

(or even if it gets an unwarranted presumption of such effects), these benefits – increasing

output, making the apps more innovative, improving quality, and doing so *faster* – are all

procompetitive justifications and acquisition efficiencies, as a matter of law.  *See*, *e.g.*, *FTC v.*

*Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 67-68 (D.D.C. 2024) (output and innovation are

acquisition benefits); *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 211-12 (S.D.N.Y.

2020) (crediting benefits achieved *faster* as acquisition-specific).

In light of these substantial procompetitive justifications and acquisition benefits, "the

burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be

reasonably achieved through less anticompetitive means."  *Am. Express*, 585 U.S. at 542; *see*

*also* Meta Pretrial Br. 22-25 (collecting cases).  The FTC put forward no such evidence, and so

its Section 2 claim fails.  *See Microsoft*, 253 F.3d at 59 (holding that "the burden shifts back to

the plaintiff" once "the monopolist asserts a procompetitive justification" such as "greater

efficiency or enhanced consumer appeal"); *Meta Platforms*, 775 F. Supp. 3d at 66-68.

Far from carrying its burden to prove that Instagram and WhatsApp would have done at

least as well (and as fast) without Meta, *see* Meta Pretrial Br. 22-25 (collecting cases), the FTC

effectively conceded it cannot:  when the Court asked the sole FTC witness to address the issue

(Professor Hemphill) whether he had an opinion as to Instagram's growth without Meta, he

admitted – remarkably and dispositively – that he did not and could only speculate.  Meta FOF

¶ 221.  That is *game over*.  *See Brooke Grp.*, 509 U.S. at 234 ("One could speculate, for example,

that the rate of segment growth would have tripled, instead of doubled, without [the defendant's]

alleged predation.  But there is no concrete evidence of this.").

The FTC addresses this case-dispositive issue in a single paragraph (at 50) without any argument, explication, or meaningful citation.  Eschewing evidence for buzzwords, it asserts: Meta's justifications are "pretextual," when they are actual (Meta did what it planned), *see* Meta FOF ¶¶ 199-201, 204, 247, 252; that the efficiencies Meta achieved are not "merger specific," when they resulted directly from the mergers and Meta's investments in the acquired apps, *see* Meta FOF ¶¶ 205, 207, 210, 215, 217, 253-254; and that some unspecified benefits are "outside the market," when they are improvements to apps the FTC claims were nascent competitors in that market.  This is not close to evidence that could carry the FTC's heavy burden here.

## III.    The FTC's Proposed "Findings" Based On Material Not Considered At Trial

As Meta predicted, the FTC seeks to conduct a trial outside the courtroom by submitting and relying on hundreds of "exhibits" that were not part of the trial.  The FTC's proposed findings – and even its brief – rely on these phantoms hundreds of times.  *See* Appendix (highlighting in the FTC's proposed findings 137 exhibits (in blue) and 90 supposed "1006" exhibits (in orange) not used at trial, plus more than 250 non-evidence illustrative aids (in yellow) as evidence contrary to Federal Rule of Evidence 107).  While this shadow material is proof of nothing significant, the Court should nonetheless give it no weight in rendering its decision.  *See*, *e.g.*, Hr'g Tr. 19:21-24 (Dec. 9, 2024) (the Court is "certainly not receptive to any kind of backdoor situation where someone tries to put things in after the trial that they didn't want crossed on or something like that"); Hr'g Tr. 7:23-8:4 (Mar. 31, 2025) (the Court:  if "the FTC witnesses only end up talking about a hundred of [its pre-admitted exhibits] or a hundred and fifty, then I won't look at the others").

## CONCLUSION

Meta respectfully requests that the Court enter judgment in Meta's favor.

Dated:  August 6, 2025                    Respectfully submitted,

                                          /s/ *Mark C. Hansen*
                                          ─────────────────────────────
                                          Mark C. Hansen (D.C. Bar No. 425930)
                                          Aaron M. Panner (D.C. Bar No. 453608)
                                          Geoffrey M. Klineberg (D.C. Bar No. 444503)
                                          Leslie V. Pope (D.C. Bar No. 1014920)
                                          Lillian V. Smith (D.C. Bar No. 252516)
                                          Alex A. Parkinson (D.C. Bar No. 166695)
                                          Aaseesh P. Polavarapu (D.C. Bar No. 1740414)
                                          Hilary M. Weaver (D.C. Bar No. 90013222)
                                          Andrew Skaras (D.C. Bar No. 90004011)
                                          KELLOGG, HANSEN, TODD,
                                             FIGEL & FREDERICK, P.L.L.C.
                                          1615 M Street, N.W., Suite 400
                                          Washington, D.C. 20036
                                          Tel: (202) 326-7900
                                          mhansen@kellogghansen.com

                                          *Counsel for Defendant Meta Platforms, Inc.*