# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br>**META PLATFORMS, INC.**<br><br>Defendant. | Civil Action No. 1:20-cv-03590 (JEB)<br><br>**PUBLIC VERSION** |

**Plaintiff Federal Trade Commission's Post-Trial Reply and Opposition Memorandum**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

   I.   Meta Raises Baseless Objections to the FTC's Direct Evidence of Monopoly Power ...... 2

   II.   Meta Fails to Undermine the Relevant Market for PSN Services ..................................... 8

      A.  Meta Fails to Rebut That PSN Apps and Non-PSN Apps Are Distinct ..................... 9

      B.  Meta's Competition for "Marginal Minutes" Arguments Do Not Rebut the PSN Services Market ....................................................................................................... 18

      C.  Meta's "Substitution Order" Inquiry is Legally and Factually Flawed ..................... 25

      D.  Meta Raises Meritless Objections to the FTC's Price Discrimination Evidence ....... 26

   III.  Meta Cannot Dispute Evidence of Its Dominant Market Shares and Entry Barriers ....... 29

   IV.  Meta's Acquisitions Eliminated Nascent Threats ............................................................ 30

   V.   Meta Failed to Prove Valid Procompetitive Justifications ............................................... 32

      A.  Meta's Claimed Benefits Are Pretextual ................................................................ 33

      B.  Meta Did Not Prove That the Acquisitions Were Necessary to Achieve the Proffered Procompetitive Benefits ....................................................................................... 35

      C.  Meta's Proffered Procompetitive Benefits Are Not "Extraordinary" ....................... 39

   VI.  Even If Meta Had Met Its Burden, the Anticompetitive Harms of Its Conduct Outweigh Meta's Claimed Benefits ........................................................................................... 40

CONCLUSION .................................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*Am. Tobacco Co. v. United States*, 328 U.S. 781 (1946) ................................................................ 27

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979) .......................................... 33

*\*Brown Shoe Co. v. United States,* 370 U.S. 294 (1962) ............................................................. 9, 14

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) .................................................................. 39

*FTC v. Kroger*, 2024 WL 5053016 (D. Or. Dec. 10, 2024) ............................................................ 19

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ................................................................. 11

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) .............................................................. 11, 13

*FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386 (S.D.N.Y. 2024) ..................................................... 6, 33

*\*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ..................................... *passim*

*In re Google Play Store Antitrust Litig.*, 2025 WL 2167402 (9th Cir. July 31, 2025) ................ 18

*\*In re NorthShore Univ. HealthSystem Antitrust Litig.*, 657 F. Supp. 3d 1077
  (N.D. Ill. 2023) ...................................................................................................................... 32, 35

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65
  (E.D.N.Y. 2024) ............................................................................................................................ 7

*Kochert v. Greater Lafayette Health Servs.*, 463 F.3d 710 (7th Cir. 2006) .............................. 3, 5

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) .................................................................. 33

*NCAA v. Board of Regents*, 468 U.S. 85 (1984) ..................................................................... 33, 37

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) .............................................. 3, 5

*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ...................................................................... 35, 36

*United States v. Am. Airlines Grp. Inc.*, 675 F. Supp. 3d 65 (D. Mass. 2023) ........................... 29

*United States v. Anthem*, 855 F.3d 345 (D.C. Cir. 2017) ............................................................. 35

*United States v. AT&T*, 524 F. Supp. 1336 (D.D.C. 1981) ........................................................... 38

*United States v. Conn. Nat'l Bank*, 418 U.S. 656 (1974) .......................................... 1, 10, 11, 13

*United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024) ........................................ *passim*

*United States v. Google LLC*, 778 F. Supp. 3d 797 (E.D. Va. 2025) ................................ *passim*

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) .............................................. 1, 10, 11, 13

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ...................................... *passim*

*United States v. Phila. Nat'l Bank,* 374 U.S. 321 (1963) ............................................ 37

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020) ................................... 32, 35, 39

**Statutes**

15 U.S.C. § 1 .............................................................................................. 33, 35, 36

15 U.S.C. § 2 .............................................................................................. *passim*

15 U.S.C. § 7 .............................................................................................. 35

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law:*
   *An Analysis of Antitrust Principles and Their Application* (2022) ................................... *passim*

Richard A. Posner, *Antitrust Law* (2d ed. 2001) ....................................................... 38

## INTRODUCTION

Meta has no answer to trial evidence showing that it maintained its monopoly power by acquiring Instagram and WhatsApp. Start with direct evidence. It is undeniable that Meta has earned enormous economic profits, aided by *tripling* the number of ads imposed on U.S. users of Facebook and Instagram without material reduction in use. That Meta's *lead* response is that it charges a cash entry price of zero—as if zero-priced markets are immune from Section 2—betrays its weakness. Meta's efforts to invent a "competitive benchmark" requirement, ignore the benchmark of zero economic profits, argue that users *like* ads, and ask the Court to ignore its cash engine (ad load) by demanding a "net" quality score fare no better. In any event, these responses elide holistic quality degradations so severe that Meta's own internal industry comparisons identify it as "one of the worst companies in the U.S." FTC Proposed Findings ("PF") 329.

Meta similarly flails in responding to the indirect evidence. American consumers unquestionably demand personal social networking ("PSN") services. That unique demand is what launched "The Facebook" on the path to become a trillion-dollar enterprise, and its resilience today is why Meta's rigorously tested sign-up pages invite users simply to "[s]ign up to see photos and videos from your friends" (Instagram) and "connect with friends [and] family" (Facebook). 4/23 (Lampe) 79:12-80:23 & PDX0026-015-16; PF 29, 20. Only Facebook, Instagram, and Snapchat meaningfully address that demand.

Meta's best effort to respond is to act as if the FTC must show that "Meta has a monopoly over everything people do on Facebook and Instagram." ECF 626-1, Meta Br. ("MBr.") 1. Never mind that *Conn. National Bank*, *Grinnell*, *Whole Foods*, *Google Search*, and other cases clearly show that Meta cannot insulate its PSN services monopoly by adding features competing for "time and attention" in the broadest sense any more than the monopolist supermarket can evade scrutiny

by selling pet food, ECF 622, FTC Br. ("FBr.") 3. Meta's contention that apps as wildly differentiated as YouTube, iMessage, LinkedIn, and X are "converging" and "indistinguishable," MBr. 23-24, 47, shows how far from reality it must stray to avoid the obvious: Meta has monopoly power over a core social media use case for friends and family sharing.

Finally, Meta barely pays lip service to the argument that Instagram and WhatsApp were not nascent threats. Instead, Meta asks for a ruling that antitrust laws should celebrate its monopolistic acquisition of nascent threats because the apps Meta spent billions to acquire are widely used. Gone now are the various other firms capable of running "converging," "indistinguishable," and wildly successful apps; Meta believes only it could have run Instagram and WhatsApp. This dim view of Section 2—in truth, of competition—finds no shelter in the law or facts. Meta fails to carry its burden to show that its proffered justifications were not pretextual, fails to show the acquisitions were necessary to achieve any gains against the but-for world, and ignores that the facts lay bare that any purported benefits pale in comparison to the decade-plus of lost competition. The Court should find Meta liable and set this case for a remedy proceeding.

## ARGUMENT

## I.    Meta Raises Baseless Objections to the FTC's Direct Evidence of Monopoly Power

The FTC proved monopoly power with direct evidence.[1] Among other evidence that answers Meta's request for "economic" evidence of monopoly power and market boundaries, *see* MBr. 35, the FTC showed that Meta: (i) has reaped enormous sustained *economic* profits (PF 151-53)—profits that are materially powered by imposing ad load on U.S. users of Facebook and

---

[1] Meta's objections to the FTC's evidence, MBr. 60, are baseless. The FTC overwhelmingly relied on materials considered at trial, with supplementation from other record materials, consistent with the Court's orders. *See* ECF 527 at 4; Hr'g Tr. 16:11-25 (Mar. 31, 2025). Notably, Meta itself cites to preadmitted exhibits not presented at trial. *See, e.g.*, MF 217 (citing DX465 and DX1369).

Instagram (PF 154-56); and (ii) has profitably *tripled* ad load and imposed other degraded quality on those users, without losing material usage (PF 159-63, 165-66, 333-54). These are well-recognized hallmarks of monopoly power. *See* FBr. 9-11.

    ***Meta invents a "competitive benchmark" requirement.*** The Court should reject Meta's unsupported suggestion that direct evidence must be adjudged against a "competitive benchmark," by which Meta appears to mean proof of what the specific competitive price or quality for PSN services would be. *See* MBr. 7-8, 10-11. This is unprecedented, and it was specifically rejected in *United States v. Google LLC*, 778 F. Supp. 3d 797, 854 (E.D. Va. 2025) ("*AdTech*") (failure to define "what prices would have been in a competitive market" did not "undermine[]" finding of direct evidence). The only two cases Meta cites, MBr. 8, are inapposite. *See Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1071 (10th Cir. 2013) ("questions of market definition and power aren't in play here"); *Kochert v. Greater Lafayette Health Servs.*, 463 F.3d 710, 719 (7th Cir. 2006) (after holding the plaintiff lacked standing, the "unnecessary" discussion of effects noted only that plaintiff lacked "any credible evidence" of changes to prices or quality). Meta's demand is also misguided, as it would immunize monopolies that span years and geographies, and prevent direct observation of a competitive market. *See* ECF 363-2 at ¶¶ 1110(a)-(d) (foreign enforcer findings).

    ***Meta has reaped enduring monopoly profits and profitably reduced quality.*** Regardless, the FTC showed "pric[ing] above a competitive benchmark." MBr. 4. Meta's rate of return is nearly <u>four times</u> its cost of capital. 4/24 (Hearle) 20:16-21:5; PF 151, 154-56. A firm lacking market power could not reap those sustained economic profits. *See* PF 153. Meta's high profits and quality reductions—including raising Instagram's ad load higher than it could if Instagram were independent, PF 334-338—are direct evidence of pricing "above the competitive level." MBr. 9. *See* FBr. 9-11; ECF 363-1 ("SJ Br.") at 36 (citing *Dentsply*, *McWane*, *Microsoft*).

3

***Meta's high profits are tied to monopoly power over U.S. consumers of PSN services.***
Meta's vague suggestions that its high profits may relate to another product or geographic market
fall flat. MBr. 12-13. Meta fails to name what that other relevant market could be, and its high
profits cannot be explained by power in an advertising market, because Meta denies that it has
monopoly power over advertisers. PF 156. Further, there is no dispute that Meta derives nearly all
of its revenues from ad load imposed on Facebook and Instagram users, or that nearly half of its
worldwide profits are derived from the small fraction of each app's users residing in the U.S. *See*
PF 154; ███████████████████████████████████████████████████████
█████████████████████████; PX8128-003 & DX132 at 51 (in 2021 less than 10% of
Facebook's 2.91 billion MAU located in U.S.).

Meta suggests that its profits may not be connected to "friend-sharing usage," MBr. 13, but
this ignores the evidence that U.S. consumers' demand for Facebook and Instagram is anchored in
friends and family sharing—it is the reason millions open the apps. *See, e.g.*, PF 17-22, 26-31
(ordinary course evidence); PF 121 (virtually no Reels-only users); PF 25, 32 (survey results).

***Monopoly power is exercised through increased ad load and other quality reductions.***
Meta's claim, MBr. 5-6, that a supra-competitive price cannot be charged where nominal prices
are zero is frivolous. *See* ECF 384 ("SJ Op.") at 32 ("a monopolist can increase the 'quality-
adjusted price' by degrading the quality of the product while keeping prices constant (at zero)")
(citing *United States v. Google LLC*, 747 F. Supp. 3d 1, 118 (D.D.C. 2024) ("*Google Search*"));
*see also* PF 157-58; 5/21 (Carlton) 218:19-219:20. And ad load is a price, *see* SJ Op. 33-34—it
just happens to be paid with a user's time and attention rather than in dollars and cents.

***Meta's increased ad load reduced quality.*** Meta asserts that increased ad load is not a
quality degradation. *See* MBr. 8-9. Common sense says otherwise. No one would cheer if a

television station more than tripled the number of ads, as Meta more than tripled ad load on Facebook and Instagram Feed. PF 333; PX8104. Indeed, Meta's own expert conceded that, all else equal, "consumers would not want" increased ad load. 5/21 (Carlton) 220:7-16.

Both ordinary course evidence and expert analysis show that users regard increased ad load as a net disutility (i.e., as worse quality). *See* PF 160-62. Meta concedes that users who do not see ads spend at least "7.1% more time on Facebook," compared to users exposed to Meta's ad load, Meta Proposed Findings ("MF") 19, and Prof. List's data showed an even greater impact of 9%. 5/13 (Hemphill) 50:20-51:17 & PDX0090-130 & PX8142. Further, user dissatisfaction has grown as Meta has ramped up ad load, underscoring that users dislike the higher ad load, *see* PF 162, despite Meta's claims of improved ad quality, MBr. 9. Meta claims that users who do not see ads express similar *sentiments* to users overall, *see* MBr. 9; MF 19, but relies on a single document from 2017 assessing a much lower ad load than Meta currently imposes, *see* 5/1 (Hegeman) 190:10-15 & DX342 at 6; PX8103-8105. And contrary to Meta's misleading overstatement of its own self-serving testimony, MF 30, Meta has increased ad load without increases in ad quality, *see* PF 337-38 (Instagram ad load increases in 2015 and 2018 that do not discuss quality).

**No "net quality" score is required, and the record does reflect reduced overall quality.** Meta provides no support for its demand for a "net quality" or "total quality" measure. MBr. 2, 7-8; *see also supra* p. 3 (*Novell* and *Kochert* are inapposite). Even if such a principle were sensible where quality characteristics are inextricably linked and thus tradeoffs are involved (e.g., a product's battery size vs. weight), it does not apply to any of the dimensions of quality Meta references, MBr. 7: users dislike Meta's higher ad load, poor privacy practices, diminished friends and family experience, and egregious integrity failings, *see* PF 160-62, 328-29, 332, 341, 350, 361, and Meta has not shown that reductions in any of these are linked to any specific offsetting quality

improvement. Thus, the observed reductions in each of these quality dimensions, MBr. 7, do reflect reduced "total" or "net" quality for Facebook and Instagram users.

In any event, four separate metrics measuring overall quality on Facebook and Instagram have declined over the last decade, *see* PF 326, demonstrating declining overall quality. PF 325, 331. Another "benchmark" is Meta's "Relative Cares About Users" metric (RCAU), which compares Meta against other firms—it is "about as low as a company can go" (zero) and suitable for one of "the worst companies in the U.S." PF 329 (quoting 5/1 (Cobb) 21:23-25:5), 331. Other "benchmarks" include Meta's largest privacy-violation penalty ($5 billion) in the FTC's history, PF 349, and poor ratings on privacy and innovation compared to other tech firms, PF 332, 350.

***Survey evidence reflects diminished quality.*** Meta attempts to downplay low and declining user sentiment in two ways. First, it claims that its own user surveys "do not measure app quality," MBr. 12 (citing MF 41), but the non-credible notion that users' product experience does not impact sentiment is refuted by both Meta's testimony and ordinary course documents. *See, e.g.*, 5/1 (Cobb) 69:12-72:3 (admitting "product experience" impacts sentiment), 75:1-76:8 (same), 68:1-8 (impact of ads); 4/30 (Cobb) 228:4-14 & PX12968-006 (agreeing that Cambridge Analytica was "most extreme negative shock" to sentiment); 5/14 (Alison) 166:4-10; *see also* 5/1 (Cobb) 28:5-16 (survey results are "very valuable" inputs to product development); PX2526-006-08 (survey results reported to Board of Directors). Indeed, Meta's current 10-K admits that users' views on product quality impact "user sentiment." PX0715-017. The Court should credit the ordinary course record, not Meta's self-serving testimony, which was repeatedly impeached, *e.g.*, 4/30 (Cobb) 197:19-198:7 (impeached with deposition testimony). *See Google Search*, 747 F. Supp. 3d at 77 n.2; *FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 453 (S.D.N.Y. 2024).

Second, Meta attempts to mask user dissatisfaction by distorting graph axes to make the

results appear "basically flat," *see* MBr. 12; MF 42-43, which is both "misleading and completely contrary to the way Meta does this in the ordinary course," obscuring a "clear decline" in sentiment. 5/14 (Hemphill) 58:22-59:3, 59:9-17 (discussing DDX28.44); PF 328. Equally unavailing, Meta asserts that "scores then increased from 2022 to 2025," *see* MBr. 12; MF 43, citing a demonstrative that shows no growth at all during that time period, *see* 5/14 (Hemphill) 59:9-17 & DDX28.44. If Meta intended to cite a different demonstrative (DDX16.2), the RCAU increase (a single metric) was slight and Meta ignores the significant decline since 2016. *See* 5/1 (Cobb) 46:9-47:23 & DDX16.2 (not cited in MF 43). Moreover, Meta's choice to cherry-pick a single survey should carry the negative inference that the other recent surveys Meta chose ***not*** to cherry-pick continue to show significant user dissatisfaction.[2]

 ***Increased output does not signify improved quality.*** Meta claims that, *ipse dixit*, growth in Facebook and Instagram shows that it has not raised quality-adjusted price above a competitive level. MBr. 4 (citing MF 26-27), 6 (same). This is specious. The shift to mobile triggered dramatic increased demand for online services (including but not limited to PSN services), PF 378, and increased demand induces output growth even if quality-adjusted prices increase. 5/14 (Hemphill) 41:7-11; 5/27 (Hemphill) 81:4-82:5 & PDX0149-057; *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 112 (E.D.N.Y. 2024) ("price and output rising in tandem" is "equally consistent with increasing demand").

 ***Meta's claim that it invested in R&D and added features over time, MBr. 6-7, is irrelevant.*** Monopolists commonly spend "on R&D" and improve products over time, but this does not suggest that quality-adjusted prices have not been inflated by "improper use of monopoly

---

[2] The FTC reiterates that Meta's injection of cherry-picked data from after the close of discovery is unreliable and prejudicial. FTC's Bench Br. Regarding Post-Disc. Evid. at 5-10, ECF 589; *see also* 5/14 (Hemphill) 149:16-150:3, 151:3-12; 5/27 (Hemphill) 163:11-15.

power." *Microsoft*, 253 F.3d at 57 (R&D spend "is not inconsistent with the possession of [monopoly] power"); *Google Search*, 747 F. Supp. 3d at 123 (monopoly power despite "numerous innovations that have increased search quality"); PF 422 (Carlton conceding that Standard Oil, AT&T, Microsoft, and Google introduced new features) & PDX0134. Moreover, Meta's R&D spending and innovation has lagged other technology companies. 5/27 (Hemphill) 82:6-20 & PDX0149-058; PF 332 ███████████████████ .

**Underinvestment in friends and family sharing.** Ordinary course evidence—which, contrary to Meta's assertion, is neither isolated nor "years old"—shows that Meta underinvested in friends and family sharing. *Compare* MBr. 9-10, *with* PF 341-43, 405-07. Meta retorts that underinvestment "makes no sense," MBr. 10, but this ignores the fact that investing in the user experience is costly, *see* PX2527-001 (acknowledging that with competition, "[o]ur margins may go down over time"); PF 321; *see also* PF 322, 324. Unchecked by PSN services competition, Meta has avoided such costs and retained high profits, thereby predictably increasing user frustration over friend content. *See* PF 321, 340-45, 405-06, 410(c).

**Privacy and integrity.** Meta's assertions that its privacy and integrity "practices have gotten better," MBr. 11, distort the record and fail to rebut its monopoly power. Meta's privacy-related efforts over the last decade were responses to egregious privacy violations and historic government sanctions, not to competitive discipline, PF 320-21, 349, 351, and they have not abated additional significant user dissatisfaction with its practices, PF 350. Meta's claim that it is a "leader in integrity," MBr. 11, relies on a distortion of the record, PF 439, which does not rebut the extensive evidence of its underinvestment in integrity and significant integrity failures. PF 359-61, 423-30.

## II. Meta Fails to Undermine the Relevant Market for PSN Services

Meta's attacks on the evidence showing a relevant market distort or ignore the evidentiary record, and ask the Court to make several significant legal errors.

### A.  Meta Fails to Rebut That PSN Apps and Non-PSN Apps Are Distinct

Meta fails to unsettle the FTC's robust evidentiary showing that PSN apps are differentiated from other online services because they allow users to maintain relationships and engage in broadcast sharing with a robust network of real-life friends and family ("friends and family sharing"). FBr. 6-8; PF 7-53. The *Brown Shoe* factors show that this differentiation delineates a relevant market for PSN services because consumers cannot satisfy their demand for friends and family sharing by using other services. FBr. 13-24; PF 42-56. Meta's contrary arguments are legally incorrect in light of the unrebutted evidence.

1.  <u>PSN Apps Serve Distinct Demand Despite Having Unconnected Content and Some Similar Features as Non-PSN Apps</u>

As described in the FTC's opening brief, consumers use Meta's applications to satisfy a particular use case for friends and family sharing. FBr. 6-8, 12-23. In industry terms, Facebook, Instagram, and Snapchat serve this "job to be done"; TikTok, YouTube, iMessage, and other non-PSN apps do not. PF 15, 42. Hardly able to contest this, Meta concedes that the use case of friends and family sharing "in a broadcast format" was "once primary . . . on Facebook." MF 6. Meta's executives admitted at trial that both Facebook and Instagram serve the same use case today. PF 17-18, 27. And its brief concedes that third-party "witnesses identified the Meta apps as particularly good for friend sharing." MBr. 23.

Meta makes two claims in response. First, Meta asserts that its "once primary" use case recently became only a "supporting" player, MF 8—relying heavily on a made-for-litigation and overly restrictive calculation of "friend content," which Meta claims represents a "declining share" or decreasing "percentage of time spent." MF 6, 10, 38-39, 151-52; FBr. 30-31; PF 21-22, 24-25, 30-31. Second, Meta claims that each individual "feature" of Facebook and Instagram—such as short-form video ("SFV") or groups sharing—is available on a non-PSN app. MBr. 31-32.

Neither claim, even if accepted, distinguishes controlling precedent because Facebook and Instagram continue to have a core use of friends and family sharing, PF 18-25, 27-32, and the vast majority of U.S. users still use Meta's apps for friends and family sharing, even if they also spend time viewing unconnected content, FBr. 30-31, PF 25, 32, 121. Indeed, unrebutted evidence shows that: (i) to this day, Facebook tells users to log in or sign up to "connect with friends, family, and people that you know," and Instagram's sign-up page encourages users to join so they can see what friends post, *supra* p. 1, PF 20 (citing PX0795, PX0798), 29; (ii) broadcast sharing and "friend" content remain huge, PF 22, 24, 31; (iii) Meta recognizes that it cannot displace friend content, even as it adds unconnected content, PF 122-23; (iv) Meta conceives of unconnected content as forming a part of the friends and family sharing experience, PF 117-18, 123; (v) ██████████ ████████████████████████████████████████████; (vi) virtually no one on Facebook and Instagram has no friends, PF 121, or uses Facebook and Instagram only for Reels, PF 122; and (vii) consumer surveys, including a recent Pew Survey, show that the vast majority of users of Facebook and Instagram come for friends and family sharing, PF 25, 32.

Meta baselessly asserts that the FTC must prove "that Meta has a monopoly over everything people do on Facebook and Instagram," MBr. 1, an astonishing claim flatly contradicted by case law, which Meta tries but fails to distinguish. MBr. 38-44. As the Court recognized at summary judgment, *see* SJ Op. 34-35, numerous cases have held that relevant markets exist for product offerings that serve a distinct purpose for consumers, even if individual pieces of the service are available elsewhere. FBr. 32-34.

Meta merely handwaves at *Conn. National Bank* and *Grinnell*, offering no serious basis for distinguishing them. MBr. 45. And Meta claims that *Whole Foods* and *Google Search* are distinguishable by inventing a requirement that the features that distinguish products within the

relevant market from those outside it must represent a majority of the product's use or sales. *See* MBr. 32-33, 39, 43-44. But neither case suggested any such "majority" requirement, and controlling precedent demonstrates this is not relevant, much less required.

In *Conn. National Bank*, the Supreme Court focused on whether a portion of the "cluster of products and services" offered by commercial banks meant that savings banks could not provide equivalent services to some customers. *See* 418 U.S. 656, 664-65 (1974) (discussing checking account services to commercial customers). It did not require or suggest that the offerings that distinguished commercial banks from savings banks represented a majority of sales or usage. *See id.* at 663-66. And it excluded savings banks from the relevant market despite "fierce" competition for some "identical or essentially fungible services." *Id.* at 662.

Further, any such majority-use requirement would contradict cases that found a relevant market for an overall product offering despite numerous components of the product being available elsewhere. *See United States v. Grinnell Corp.*, 384 U.S. 563, 573-75 (1966) ("accredited central station service" was a distinct "single basic service," despite competition with "all the other forms of property protection," including "unaccredited" stations and "other alarm or watchmen services"); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1074-75 (D.D.C. 1997) ("consumable office products" were "identical whether they are sold by Staples or Office Depot or another seller of office supplies"); *FTC v. Sysco*, 113 F. Supp. 3d 1, 27-28 (D.D.C. 2015) ("most distinguishing feature" of the firms in the relevant market was "product breadth and diversity," but out-of-market firms supplied the same products).

These cases additionally reject the feature-by-feature approach to market definition that Meta demands—instead recognizing a distinct relevant market for a product serving a distinct function or purpose for consumers. *See Grinnell Corp.*, 384 U.S. at 572-75 (rejecting defendant's

"fragmentizing the types of services into lesser units"). *Google Search* is again instructive: specialized vertical providers (SVPs) and social media platforms (e.g., TikTok) were able to compete for virtually all types of queries, yet were excluded from the relevant market because general search engines (GSEs) perform a "unique function" for users, notwithstanding the query overlap with SVPs and social media platforms. *Google Search*, 747 F. Supp. 3d at 112-15; *id.* at 40-41 (only type of query "unique to GSEs" were navigational queries, which constitute 12% of Google's volume), 58 ("Google has assessed the competitive threat posed by [SVPs] and social media platforms . . . 63% of [young adult] users reported that they use TikTok as a search engine").

Just like the GSEs at issue in *Google Search*, PSN apps perform a unique function for users—friends and family sharing—and non-PSN apps cannot "meet user needs in the same way." *Id.* at 112. It would thus be an error to include non-PSN apps within the relevant market based on individual "feature" or "activity" overlap. *See id.* at 113-16 (rejecting "query-by-query approach to defin[ing] the relevant market"). This is especially true given the additional evidence in this case that identical features serve different purposes and take on different characteristics depending on the context, norms, and use of an app, *see* FBr. 18-19; PF 47, 51, 118; PX0545-016-17—a distinction that is confirmed by data analysis and survey evidence showing that PSN and non-PSN apps are used differently, *see* PF 25, 32, 49, 72, 81, 88, 95, 98, 104-05. Indeed, ██ Meta ██ ████████ recognize that unconnected content forms a part of the friends and family sharing experience ████████. *See* PF 117-18, 123; ██████████████████████████ ██████████████████████████████████████

Meta's attempts to distinguish *FTC v. Whole Foods Market* are similarly unavailing. 548 F.3d 1028 (D.C. Cir. 2008). Meta touts that "friend content" represents a declining share of time spent, which Meta inappropriately equates with *Whole Foods'* analysis of share of revenues. MBr.

39-40. This misdirection fails to distinguish the FTC's showing that, as in *Whole Foods*, 548 F.3d at 1049, the vast majority of Meta's revenues are derived from Feed and Stories, PF 155-56, which remain the centerpiece of friends and family sharing on Facebook and Instagram. PF 20, 29.

Meta likewise has no answer for the evidence, detailed above (*supra* p. 10), that the vast majority of users still come to Facebook and Instagram for friends and family sharing, and that this demand is so "resilient" that Meta cannot displace friend content. PX12374-002; PF 121, 123. Indeed, the evidence here exceeds that in *Whole Foods*, where "at least a majority of customers" at premium organic grocery stores wanted to buy "organic and natural" products, and customers could "cross-shop" at out-of-market stores for numerous other items. 548 F.3d at 1040-41. Here, more than 80% of users are on Facebook and Instagram for friend sharing. PF 25, 32, 121 (virtually no "Reels only" users or users with no friends).

Unable to distinguish the foregoing authority, Meta incorrectly asserts that the FTC is "retreating to a *submarket* theory that it did not claim." MBr. 15. But the FTC has been consistent that the relevant market consists of the PSN apps which are able to satisfy a distinct demand. It is irrelevant that PSN apps may address other use cases offered by non-PSN apps. *Whole Foods* found a relevant market for premium organic grocery *stores* (not just certain customers or certain items sold in the store), even though such stores offered many of the same items as conventional grocery stores and "also competed in a broader market of conventional supermarkets." *See* SJ Op. 36-37. So too with other cases: markets were drawn around commercial banks (*Conn. Nat'l Bank*, 418 U.S. at 662-66), central station services (*Grinnell*, 384 U.S. at 571-74), and broadline distributors (*Sysco*, 113 F. Supp. 3d at 30-32), despite competition with out-of-market firms. Just as in those cases, for the millions of U.S. users who demand friends and family sharing, only a PSN service will do. *See Grinnell*, 384 U.S. at 574 ("[F]or many customers, only central station

13

protection will do[.]"). Further, contrary to MBr. 43, Meta would be dominant even if one inappropriately focused only on usage metrics for less than the whole app. FBr. 38-39; PF 141-42.

## 2.  <u>Non-PSN Apps Do Not Serve Demand for Friends and Family Sharing</u>

Industry participants, including Meta, recognize a distinct use case of a friends and family social networking experience. *See* FBr. 6-8, 20-21; PF 15-16, 48-53. Meta's untenable claim, *see, e.g.*, MBr. 24-25, 33, 44-45, that non-PSN apps can serve this use case relies on a transparent ploy: Meta's advocacy re-defines "friend sharing" to encompass any interaction a person could have using "in-app messaging and share sheets." MF 175. This ploy disregards the fact that Meta did not invent friend-to-friend communication: it cracked the nut of personal social networking. Internet messaging, email, and other forms of communication long predated the Facebook app, and yet despite the existence of various ways to interact with friends, "Facebook so dominated the provision of personal social-networking services that a movie charting its rise was entitled simply 'The Social Network.'" SJ Op. 1. And *that use case* remains distinct from other forms of online communication today, just as it did decades ago. Meta's effort to conflate the broadcast sharing experience provided by PSN apps with all other forms of communication ignores the evidence demonstrating that distinct uses and characteristics, and other *Brown Shoe* factors, differentiate PSN apps from non-PSN apps. *See* FBr. 13-23. In addition, Meta's claims distort the facts.

**YouTube.** Meta suggests that YouTube's Communities feature reflects "friend sharing." *See* MBr. 25; MF 101. ███████████████████████████████████████
████████████████████████████ Mr. Filner explained that YouTube lacks a "social graph based on friends and family connections," *id.* 174:7-14, and Meta thus fails to establish that a user can engage in "friend sharing" by claiming that a YouTube user *could* share videos to subscribers, or navigate to a user's channel. *See* MF 100 (citing 4/17 (Filner) 196:3-22); 4/17 (Filner) 164:14-21 (agreeing that "YouTube does not facilitate connection with friends and family"); FBr. 26-27.

14

**TikTok.** Meta's claim that TikTok users engage in "friend sharing," *see* MBr. 24, 33; MF 92, ignores the fact that the app lacks a robust friends and family social graph and has a social norm of anonymity, which renders TikTok incompatible with *personal* (real world) social networking. PF 62-65. Meta cites a single survey result referring to respondents who "watch videos posted by my friends," *see* MF 92 (citing DX584 at 14, 48), but this does not suggest that TikTok has a social graph. Moreover, the very survey Meta relies on states that "[f]or TikTok, public content consumption is the primary use case," DX584 at 45, and recognizes Facebook and Instagram as having "Friends & Family Feed[s]" centered on maintaining relationships, as compared to the "Public Feed[s]" of X and TikTok. *See* DX584 at 37-38; *see also* 5/7 (Malkiewicz) 242:1-244:10. It is thus consistent with the overwhelming weight of the survey evidence, including testimony from the FTC's survey expert and TikTok's former director of user research. PF 25 (citing Vid. (Morrison) 12:3-16, 192:7-193:9), 72.

Meta highlights Mr. Zuckerberg's assertion that TikTok is a "social network," MF 93, which is flatly contradicted by three TikTok executives' testimony as well as TikTok's documents. *See* 4/30 (Presser) 43:21-44:7 & PX13583-007; Vid. (Pappas) 14:8-15:10, 22:4-23:2; Vid. (Chandlee) 19:10-21:16 & PX11521-002. Similarly, Meta relies on Mr. Mosseri's claim that TikTok's "core features . . . that people spend the vast majority of their time on" include "stories." MF 94. Mr. Mosseri's claim is ██████████████████████████████████ ████████████████████████████████

Meta's additional claim that ████████████████████████████████ ███████████, further distorts the evidence. Mr. Mosseri conceded that *every day* on Instagram, one in six users posts a story—and a daily participation rate of 16.7% translates to a monthly posting rate of somewhere between 16.7% and 100%, ████████████████████████████████

███████████████████████████████████████████████████████

████████████ ; 5/8 (Mosseri) 95:4-23, ████████████████████████

Prof. Hemphill showed that total posting participation on TikTok is substantially lower than Instagram. 5/12 (Hemphill) 235:12-19 & PDX0090-041 & PX8089. ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

**iMessage.** Meta describes an iMessage chat as "a feed-like stream of pictures and videos," MBr. 26. This claim is unsupported by the cited testimony, *see* MF 110, and contradicted by the testimony of both Apple and Mr. Zuckerberg. FBr. 27-29; 4/29 (Shah) 219:19-12 (iMessage does not provide ability to "view content that's shared by all of their contacts in a single shared space" and has never offered a "broadcast feature or feed"); 4/15 (MZ) 240:9-10 ("obviously, a feed is different from a messaging inbox").

Indeed, Meta's advocacy elsewhere recognizes the difference between sharing on "broadcast feeds" and on "private channels—such as messaging." MF 184. Consumers view these as different for good reason: few would celebrate the broadcast publication of what they say on "private channels." *See* PF 109. As Apple's Mr. Shah explained, "there are meaningful differences between the form of communication that you would participate in in a Messages app versus an app that's about broadcasting with a feed." 4/29 (Shah) 237:1-10. And attempting to replicate the broadcast sharing experience on a messenger would violate norms and trigger annoying large group messaging threads filled with unrecognized numbers. *See id.* 219:19-220:12, 223:20-225:25 & PDX0060; 4/23 (Lampe) 147:21-148:16 & PDX0026-055; PF 107-10, 113; FBr. 28-29.

Meta's invocation of "share sheets," MBr. 26, cannot obscure the difference between mobile messengers and PSN apps. *See* FBr. 29; PF 113. "Share sheets," which have existed for many years, merely let users copy a link in one app (e.g., X) to share it with someone whose contact information is already known via "a text message or email or other things." 4/28 (Coleman) 17:2-19; *see also* 4/17 (Filner) 190:1-4, 190:11-18, 194:19-25; 5/13 (Hemphill) 208:6-9. This does not transform mobile messaging into a PSN service any more than it transforms email into one. And attempting to replicate the PSN experience through share sheets would not only violate norms and be prohibitively cumbersome, *supra* p. 16, but share sheets critically do not allow email or mobile messengers to transmit the personal content shared by users with their friend networks *within* a PSN app (e.g., a post by a Facebook friend). 5/14 (Alison) 180:20-183:6; PF 113, 149.

At bottom, industry participants view messaging apps and PSN apps as "offering different values for users," 4/29 (Olivan) 27:14-21, and serving a different "use case," PF 112. As Mr. Zuckerberg testified, private messaging and broadcast sharing are "symbiotic"—that is, they are complements rather than substitutes. 4/14 (MZ) 172:1-173:4; *see also* 5/7 (Cathcart) 110:9-25 & DX585 at 9 (broadcast sharing and private messaging contribute to the use of one another—a "flywheel effect"); 5/12 (Hemphill) 250:16-251:12 & PDX0090-056-57; *Google Search*, 747 F. Supp. 3d at 115-16 (products not substitutes when used "in a complementary manner to meet [consumers'] needs"). Thus, while Meta attempts to claim "friend-sharing usage is shifting from feed to messaging," MBr. 26 (notably ignoring stories), this is untrue because use of *both* mobile messaging and PSN apps have increased, consistent with their use for different purposes. PF 115.

**Other Apps.** Meta's distorted definition of "friend sharing" underlies its assertion that "X, LinkedIn, and others[]" "serve the friend-sharing demand." MBr. 33. Meta cites scant evidence that X, LinkedIn, or any of the "other" apps Meta refers to (Nextdoor, Tumblr, Strava, or Discord,

17

*see* MBr. 33; MF 121-23, 131, 135-36) actually serve demand for PSN services. Indeed, witnesses, ordinary course records, surveys, and data confirmed the opposite. *See, e.g.*, 4/28 (Coleman) 35:23-36:6 (X is "not that good for seeing what your friends and family are doing and/or not that many people use it for that purpose"); 4/30 (Presser) 39:17-41:19 & PX13581-010-11 (LinkedIn is a professional social networking service not a PSN service); PF 82-105.

### B. Meta's Competition for "Marginal Minutes" Arguments Do Not Rebut the PSN Services Market

Meta recycles its rejected argument for a "time and attention" market, *see* ECF 324-1 at 18-19; ECF 324-2 ¶¶ 187, 189, 196-97, recasting it as competition for "marginal minutes." *See, e.g.*, MBr. 2, 10, 20, 32; SJ Op. 34-35 (rejecting argument). It should be rejected again.

#### 1. Competition for "Marginal" Time Does Not Refute the PSN Services Market

Meta plainly "competes" with numerous apps in some sense to provide "entertaining and informative content," MBr. 1, but that competition does not undercut a PSN services market. *See* FBr. 6-8, 14-15; *see In re Google Play Store Antitrust Litig.*, 2025 WL 2167402, at *8 (9th Cir. July 31, 2025) ("McDonald's might compete against Chick-fil-A in the fast-food market yet not compete against Chick-fil-A in the *hamburger* fast-food market. . . ."). Meta gives away the game with the untenable assertion that its apps are "increasingly similar" to apps that bear no resemblance to one another, MBr. 1—for example, YouTube does not include messaging functionality, PF 77, which is iMessage's *raison d'etre*, *see* PF 106-07; 4/29 (Shah) 232:8-13. Any "market" in which Facebook, YouTube, and iMessage all compete would be analytically useless, which is why numerous cases hold that markets should be defined to illuminate consumers' reasonable alternatives for particular purposes. FBr. 30; *see also* SJ Op. 20-21, 34-37; *compare* MBr. 30 (claiming without support that the relevant question is "how users allocate their minutes of usage" of online services), 20 (touting Prof. List's "wallet share" analysis), *with FTC v. Kroger*,

2024 WL 5053016, at *10 (D. Or. Dec. 10, 2024) (rejecting "share of wallet" approach).

In line with case law, industry participants—including Meta's executives—uniformly testified that different apps address diverse "use cases" demanded by consumers. *See* FBr. 6-7; PF 15, 42, 48-52. So too, industry participants recognize distinct competition for PSN services: for example, ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████; *see*

*also* FBr. 8, 34 (Meta recognizes that PSN apps can be a "complete replacement" and "real competition" for each other, as distinct from "generic time spent" competition).

Indeed, the very documents that Meta cites to claim vigorous competition, *see, e.g.*, MF 118-19, confirm that consumers use PSN and non-PSN apps for different purposes. ███████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████; DX885 at 2, █

(TikTok is "reliable for entertainment," █████████████████████████; DX1127 at 4 ("[P]eople's experience on Snapchat is different [than on platforms like TikTok.]").

2. <u>Competition for Unconnected Content Does Not Refute the PSN Services Market</u>

Meta's related assertion that "competition for marginal minutes constrains Meta and protects 'inframarginal' or 'core' customers from exploitation" merely rephrases Meta's time and attention argument—and fails for the same reasons. In addition, it is conclusory and unsupported by the evidence. MBr. 20 (citing MF 165); *see also* MBr. 31 (citing MF 6-7, 10-11).

Meta's claim of "protection" cannot be reconciled with the extensive direct evidence, including that Meta has profitably reduced quality even as to the dimensions of quality that it

asserts do not vary by user. *Compare* MF 166 (mentioning privacy, integrity, and service speed), *with* PF 325-26 (app-wide measures RCAU, CAU, GFTW, and "overall satisfaction" all in decline); PF 328, 350 (satisfaction with Meta's privacy practices in decline); PF 329, 361, 428-29 (egregious integrity failings); PF 332, 462, 464-65 (service reliability in decline). Indeed, the evidence shows that Meta radically increased ad load (and reduced quality) before the advent of TikTok and has maintained those monopolistic levels since—despite the launch of TikTok and the other supposed constraints on Meta's power. *See* PF 129, 157, 333. Indeed, *most* users—including older and more-tenured users—receive Meta's *tripled* higher ad load (~20% ad load), confirming that Meta has *many* inelastic users. FBr. 22; PF 173; 5/13 (Hemphill) 25:5-18. The reason is plain: countless millions use Facebook and Instagram for friends and family sharing, and Meta's monopoly power is not disciplined by apps that do not serve this use case. *See* FBr. 30-35; PF 116-30; *Whole Foods*, 548 F.3d at 1037-38 (many core customers confirm the market).

In fact, Meta failed to show that customers are protected from exploitation several times over. As Meta's expert concedes, Meta can exercise monopoly power despite competition for unconnected content if it can engage in price discrimination related to demand for friends and family sharing, MF 165, which the evidence indicates it does. FBr. 21-23, PF 167-73; *see also infra* Section II.D. And even if one assumes away the direct evidence *and* the evidence of price discrimination, Prof. Carlton maintains that Meta would be prevented from exercising market power only if there are many users of Facebook and Instagram who use the apps for reasons unrelated to friends and family sharing—a hypothetical condition for which he fails to provide evidence and that is refuted by the record, as detailed above. PF 121, 127; *supra* pp. 10-11.

Indeed, while Meta baldly claims in its brief that "[m]any users come to Facebook now with no intention of accumulating a 'graph' of accepted 'friends,'" MBr. 33 (citing MF 5-8, 153),

the cited references merely repeat Meta's time spent and impression evidence alongside Mr. Alison's self-serving testimony that Meta recently observed an unspecified number of "new young-adult monthly active users [on Facebook] with zero friends after 90 days."[3] *See* MBr. 33; MF 153. Meta's reliance on this testimony ignores that accounts with zero friends ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████. Moreover, no Meta witnesses testified that a material portion of the *total* Facebook user base (or Instagram user base) have no friends, *see* 4/29 (Olivan) 23:11-14; 5/15 (Alison) 56:14-17, and unrebutted data indicates there are few such users, PF 121.

     3.   <u>Meta Distorts the Record in Claiming "Existential" Competition and Substitution to Unconnected Content</u>

In straining to support its boundless "entertaining content" or "time and attention" market, Meta makes exaggerated, misleading, and incorrect statements about the record.

    (a)  <u>Friend content is not "readily replaceable" with unconnected content.</u>

Meta claims that "users treat friend content as readily replaceable" with unconnected content and that the friend sharing use case is competitively constrained by other use cases. MBr. 21, 30-31, 37. But these assertions find no support in the record.

First, Meta's Instagram Reels "holdout" studies do not support Meta's contention that users meaningfully traded time spent on Reels against Feed and Stories. MBr. 38. Prof. Hemphill showed that the actual effects of Reels on Feed and Stories in the U.S. version of the experiment were limited. 5/27 (Hemphill) 56:11-57:14 & PDX0149-033 (time spent on Feed reduced only a minute per day and on Stories less than 10 seconds). App-level data shows the same: the growth

---

[3] This testimony likewise relies on cherry-picked data that was not produced in discovery and is not in the record. FTC's Bench Br. Regarding Post-Disc. Evid. at 5-9, ECF 589.

of Reels is largely incremental—not a replacement—to time spent on Feed and Stories, just as Meta intended. *See* PF 119 (time spent on Feed and Stories remains high or growing), 123-24. Mr. Mosseri's testimony about the Reels holdout experiment, MBr. 38, is irrelevant to the U.S. market: his assertion is about a global experiment, MF 78(b), and U.S. results showed negligible effects on Instagram's user metrics. 5/27 (Hemphill) 66:10-67:6 & PDX0149-042.

Second, Prof. List's pricing experiment similarly does not support Meta's claim. MBr. 21, 37. Prof. List conceded that his experiment did not test whether more time was diverted from Reels than from Feed and Stories. 5/19 (List) 208:25-210:14. In fact, Prof. Hemphill demonstrated that Prof. List's data showed Reels experienced greater reductions in users and time spent than Feed or Stories did. 5/27 (Hemphill) 58:22-60:14 & PDX0149-036-37.

Third, ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

(b) <u>Time spent does not reveal what Facebook and Instagram users value most.</u>

Meta claims that demand for unconnected content has reduced demand for friends and family sharing, asserting that "what users want from social apps is best proved by where they choose to spend time," MBr. 10; MF 39 ("revealed preference" assertion), 159. Meta's claim is

legally irrelevant because there is no shrinking monopoly defense, FBr. 35-36; factually misguided because demand remains huge by any measure, PF 22-24, 30-31; and disturbingly ironic because Meta—lacking competition in PSN services, PF 344-45—has underinvested in the friend content that users continue to value, reducing output of friend content just as one could expect from a monopolist, PF 342-43, 404-07; *see also* ████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████; 5/14 (Alison) 225:2-8.

     In any event, Meta's position is contradicted by the ordinary course evidence demonstrating that friend content on Facebook and Instagram is ██████ highly valued content, even if it is often not as time-consuming as unconnected content. *See* PF 120, 343; ██████████

█████████████████████████████████████████████████████████

████████████████████████████████; 4/23 (Lampe) 162:7-163:18 (friend content is valuable despite being less time consuming). ████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████

     Meta's touted feed experiment relatedly does not show a shift in consumer preferences, MBr. 10; it instead suggests nothing more remarkable than that videos take longer to consume than photos, Stories, or text. *See* MF 39 (claiming increased "usage"—which was just increased time spent per DAU, *see* 5/21 (Carlton) 107:6-108:9 & DDX36.21 & DX1168); 5/14 (Alison) 250:15-20; ██████████████████████████████████████ As Meta has recognized, "the main reason people visit Instagram" is "to catch up with friends," but Meta can use "entertainment/video" content to increase time spent once users are on the site. *See* DX522 at 3, 17, 20 ("entertainment/video" needed to "break the 20 minute market" or "ceiling" of average

time spent per DAU on "Feed and Stories").

(c) <u>Meta's claims regarding TikTok distort and exaggerate the record.</u>

Meta also cannot sustain its position that TikTok's non-PSN service has posed an "existential" threat. MBr. 5, 14; MF 83. Meta cites a document showing that TikTok reduced Instagram's U.S. usage by a mere 0.4 minutes per daily active person ("min/DAP"). In other words, 53 min/DAP of average TikTok usage shaved 24 <u>seconds</u> off Instagram's 32 min/DAP. *See* DX660 at 6 (cited in MF 75). In fact, the same document shows that TikTok does not serve the job to be done ("JTBD") of Feed or Stories, but instead the same "JTBD as Explore," *id.*—predictably, the 24 second drop in time spent was "due to Explore" while Stories time spent actually grew, *id.* at 21, and remained the "main driver of engagement," *id.* at 4. Meta's other citations, MF 75-76, similarly fall flat. *See, e.g.*, DX535 at 4 (reporting single-digit effects of TikTok on Meta's apps *growth* rates, with signs of slowdown in the U.S.); DX605 (does not mention TikTok at all); *see also* PX12386-008, -015, -028 (slides showing that the growth of TikTok has not had a strong effect on friend content on Instagram, which continues to grow on Stories). Indeed, lost in Meta's hot air is the continuous growth (including for time spent) of Facebook and Instagram over the entire period of TikTok's growth, PF 128; 5/1 (Hegeman) 185:16-24.

Meta likewise exaggerates the claim that TikTok represented a "material risk to Meta's ad revenue." MF 76 (citing DX1018). This evidence refers to a projected slight reduction ($3-6 billion) to a *growth* forecast, which projected Meta's total revenues growing from $82 billion in 2020 to $148-151 billion in 2024. *See* 4/17 (Sandberg) 29:15-34:4; DX1018 at 10. Said otherwise, TikTok's rise would reduce projected revenues about 2-4%: this slight projected reduction, which did not even come to fruition, illustrates that TikTok does not constrain Meta's PSNS monopoly power. PF 128; 5/13 (Hemphill) 33:8-34:15 & PDX0090-104; PX0715-073 (Meta's actual 2024 advertising revenue was over $160 billion—22% above 2023 ad revenue).

24

### C.  Meta's "Substitution Order" Inquiry is Legally and Factually Flawed

Meta insists that TikTok and YouTube must be included in any proposed market because empirical studies show they are "closer substitutes" to Facebook and Instagram than Snapchat. MBr. 14-20. This error-ridden argument is comprehensively flawed. Initially, as a logical matter, Meta disavows that its empirical studies have any bearing on the hypothetical monopolist test, *see* MBr. 19; MF 49, which establishes that they are irrelevant. Simply observing substitution inside and outside a proposed market is meaningless because relevant markets routinely exclude products with some substitution. FBr. 30, 37; SJ Op. 20-21.

And Meta's failure to follow accepted SSNIP conditions fatally undermines any inferences drawn from the resulting order of substitution. PF 177-78, 180; *see also* FBr. 36-37; 5/27 (Hemphill) 16:22-17:5, 29:16-23. Both logic and the evidence in this case underscore that imposing large, transitory increases—which Meta concedes its studies do—rather than a "small but significant non-transitory increase in price," significantly changes the substitution order. PF 177, 180. As Prof. Hemphill explained, if a group of people temporarily lose their cars for service visits (a large, temporary outage), you will likely observe greater switching to other forms of transportation (e.g., the bus) relative to purchasing another car than you would in response to a small non-transitory increase in car pricing. 5/27 (Hemphill) 24:9-25:7; PF 180. Would that show that any market for cars must include buses? Of course not. The same flaw applies to the large, transitory changes in Meta's studies. That flaw is exacerbated because Facebook and Instagram users cannot temporarily recreate their friends and family networks on Snapchat. PF 177, 180.

Meta tries to dodge these problems by asserting "convergent validity," MBr. 16, 19, as if several pieces of flawed evidence amount to something other than a collection of flawed evidence. Moreover, far from showing "convergent validity," Meta's own studies conflict. *Compare*

DX1167 (Carlton's outage study estimating diversion from Meta's apps to Google Chrome that was less than half that of TikTok), *with* DDX31.9 & DX1246 (List's pricing experiment estimating diversion from Facebook to Google Chrome that was more than double that of TikTok).

And Meta has no answer for the absurd results of its method, including that Prof. List's pricing experiment implies that Candy Crush (a game) is a "closer substitute" to Facebook than is Snapchat. FBr. 37; PF 181; DX1246-47. Profs. List and Carlton both testified that they did not analyze the purpose for which people use Facebook, 5/19 (List) 171:5; 5/21 (Carlton) 186:4-9, and thus if they believed in "order of substitution," they would be forced to claim that Candy Crush is a "closer substitute" for Facebook than Snapchat. Meta attempts to avoid this absurd result by brushing off increased use of games and off-device time as not involving "substitution," but merely indicating that users made use of "more time [they had] available" to do "the things they liked to do." MF 71. But this proves the FTC's point: the same could be said about the temporary upticks in usage of TikTok and YouTube—they do not show "substitution," but merely that people temporarily spent more time on those apps (which they use for different purposes) when Meta's apps were unavailable or substantially (and temporarily) more expensive. *See, e.g.*, PF 180.

Finally, Meta's bad economics fails on the law. Defining relevant markets based on "substitution order" has never been the law—multiple courts have expressly rejected it, FBr. 37, and Meta cites no case that supports any such requirement, *see* MBr. 19, 16. It would also be especially misguided in a monopolized market, where it is common to observe high switching to out-of-market products, as the *Cellophane* fallacy teaches. *See* SJ Op. 40; FBr. 34-36.

### D. Meta Raises Meritless Objections to the FTC's Price Discrimination Evidence

Meta's objections to the FTC's price discrimination evidence—one of many types of evidence supporting the relevant market and monopoly power—are meritless. First, Meta raises arbitrary and baseless rules about what qualifies as "relevant" price discrimination. *See, e.g.*, MBr.

40 (demanding evidence of higher ad load when users are physically engaging with friend content), 42 (claiming price discrimination is relevant only "holding all else equal"); MF 171 (same). These arguments are specious, as Meta's own economic expert concedes that price discrimination manifests in varied ways. PF 191.

Second, Meta obfuscates how its ad load system functions. While it is true that "advertisers want to obtain" a "direct response" to their ads, MF 14, this does not mean that Meta "won't make any money" when showing ads to users who do not click on them, *id*. Advertisers generally pay Meta when ad impressions are served (i.e., when a user sees an ad), not just when users click on ads. PX0715-094; *see also* ███████████████████████████. Any suggestion that Meta varies ad load based only on how much users "respond to" or click on ads, MBr. 41; MF 167, or how "attractive" a user is to advertisers, MBr. 42; MF 172, is also inaccurate. Meta's ad load system also varies ad load based on user inelasticity—i.e., how much ad load impacts user engagement on Facebook and Instagram. *See* 5/13 (Hemphill) 18:3-21 & PDX0090-086; PF 168, 171. And contrary to Meta's claim, MBr. 43, both Facebook *and* Instagram have needy user rules that lower ad load not only for new users, but also for any users assessed to have elastic demand— e.g., users considered "stale" or "at risk of going stale." PF Ex. A (PX10295-015); PF 168.

Third, Meta denies that it practices price discrimination related to friends and family sharing. MBr. 41-43. Importantly, Meta concedes the *ability* to price discriminate against "friend-sharers." *See* MBr. 41; MF 168. Standing alone, this concession confirms Meta's ability to exploit these users who lack reasonable alternatives on non-PSN apps. PF 167; 5/12 (Hemphill) 219:22-221:9 & PDX0090-023; 5/13 (Hemphill) 16:9-21; *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946) (monopoly power is a "menace," "regardless of the use made of it").

Meta attempts to deny the FTC's showing that it *practices* friends and family–related price

discrimination based on age, tenure, and app surface by relying on Prof. Carlton's ad load "correlations." MBr. 41-42; MF 172, 174. But these "correlations" rely on unsupported assumptions and do not refute the FTC's evidence. PF 167-73, 189-91. To start, contrary to Meta's artful drafting, MBr. 41 (combining "Age / Tenure"), Prof. Carlton conceded that Meta imposes higher ad load on longer-tenured Facebook and Instagram users, and he did nothing to address— much less refute—the evidence that these longer-tenured users value the apps relatively more for friends and family sharing. PF 172.

With respect to age, Prof. Carlton conceded that Meta imposes higher ad load on "older users" of Facebook than on "younger users." MBr. 41; *see* PF 171. But he then made the unfounded assumption that because younger users have proportionally more time associated with "friend" content than older users, it is not possible that older users have more inelastic demand related to friends and family sharing than younger users. *See* MF 172. This flawed assumption is directly contradicted by Meta's own ordinary course analysis, which shows older age groups have more inelastic demand than younger Facebook users, and also value Facebook relatively more for friends and family sharing. *See* PF 171; 5/27 (Hemphill) 36:20-38:11 & PDX0149-020-21. Prof. Carlton's app surface "correlations," MF 174, make the same unfounded assumption that elasticity of demand for friends and family sharing must vary based on amount of friend content, PF 190.

Prof. Carlton's final "correlation" made the equally flawed and unsupported assumption that price discrimination related to demand for friends and family sharing can exist only if ad load varies based on friend <u>count</u>. MF 169. This assumption is unwarranted, because Prof. Carlton admitted that he has no evidence and no view that elasticity of demand for friends and family sharing varies by friend count. 5/21 (Carlton) 227:9-228:3; *see also id.* 228:4-12. Thus, his claim that he could not find a correlation between ad load and friend count is not relevant to whether

Meta discriminates against inelastic users who value friends and family sharing. PF 189.

Prof. Carlton's correlations—based on "flawed assumptions" and at odds with the evidence—are thus entitled to "no weight." *See United States v. Am. Airlines Grp. Inc.*, 675 F. Supp. 3d 65, 103-04 (D. Mass. 2023) (giving "no weight" to Prof. Carlton's opinions). Indeed, far from undermining the FTC's case, the fact that Prof. Carlton observed proportionally more friend content for younger Facebook users (who received reduced ad load), supports the evidence that Meta's higher ad load suppresses friend content. *See* PF 343, 404; MF 172.

## III. Meta Cannot Dispute Evidence of Its Dominant Market Shares and Entry Barriers

Meta's briefing confirms that it has no basis for disputing its dominant PSN market share except to argue that non-market participants should be included in the shares, *see* MBr. 45-47, which is not the law, *see* FBr. 38. Meta's other points can be rejected quickly. First, Meta seeks to focus exclusively on time spent, MBr. 46, but this is not the only or even the most probative metric. *Supra* Section II.B.1; PF 138; *see* SJ Op. 44 (DAU and MAU are probative and do not present a "double counting" issue, *contra* MF 142). In any event, Meta has a dominant share of time spent. PF 138-41. Second, Meta does not seriously contest Prof. Hemphill's showing that Meta has a monopoly share even when including TikTok, PF 143, which is not a PSN app, PF 58-72, and even when accounting for potential incidental friend-related activity on non-PSN apps, PF 142— offering only Mr. Schultz's non-expert assertions based on undisclosed calculations not in evidence, MF 141. Finally, Meta suggests that the Court must require a share exceeding "60% or 65%," MBr. 46. But this is not the law. *See* FBr. 38-39; *AdTech*, 778 F. Supp. 3d at 855-56 (coupled with "direct evidence," share of 54-65% "provides strong support" for finding of monopoly power). In any event, Meta's shares exceed even the higher threshold. PF 139-42.

Regarding entry barriers, Meta points to a single PSN app (Snapchat) launched long ago, a non-PSN app launched seven years ago (TikTok), "upstarts like Discord for messaging," and

speculation that an AI startup might someday launch a PSN app. MBr. 47-48. Such evidence proves the presence, not the absence, of entry barriers so significant that they have defeated previous well-resourced PSN rivals (e.g., Google) and frustrated non-PSN apps' attempts at social features. PF 147; *see AdTech*, 778 F. Supp. 3d at 850 (failed entry indicated high entry barriers).

## IV.    Meta's Acquisitions Eliminated Nascent Threats

A Section 2 plaintiff establishes its *prima facie* case if the monopolist's conduct had an "anticompetitive effect." *Microsoft*, 253 F.3d at 58. A monopolist's acquisition of a rival—"even a nascent one"—meets this standard. SJ Op. 60; *see also* Areeda & Hovenkamp, *Antitrust Law* ¶ 701a (monopolist's acquisition of an actual or potential rival is a "clear § 2 offense"); *accord Microsoft*, 253 F.3d at 77, 79; *Google Search*, 747 F. Supp. 3d at 165. Instagram and WhatsApp were (at a minimum) nascent threats when Meta acquired them—far beyond the threats that the D.C. Circuit held were sufficient in *Microsoft*.

Overwhelming evidence shows that Instagram was a serious threat to Meta—it was a rapidly growing, high-quality mobile-first provider of PSN services at the time of the acquisition. PF 200-09. Meta recognized it as such, fearing Instagram's "competitive" and "established" network, PX1136-001, rapid growth, and future potential. 4/14 (MZ) 232:3-18 & PX1180-001-02; *see* FBr. 41-44; PF 214-23. This, too, is "highly probative evidence that [Instagram] constituted such a threat," SJ Op. 64, which is not undercut by any "objective evidence" that Instagram "could not reasonably have matured into a real competitor." *Id.* To the contrary, Instagram's "[e]xponential, unstoppable" growth was likely to continue. PF 204, 210-13.

Meta claims Instagram was a "complement," MBr. 49, rather than a threatening rival. But Mr. Zuckerberg conceded that at the time of the acquisition he believed "the Instagram network was competitive with Facebook's," 4/15 (MZ) 13:15-25, and documents and Mr. Systrom's testimony confirm the same, *see* PF 26; *see also* 4/22 (Systrom) 189:13-15. Meta suggests

Instagram was not a threat by emphasizing that it was a small company and claiming "operational challenges." MBr. 49. But in fact Instagram was thriving, *e.g.*, PF 204-13, 379-80, 390, smallness and growing pains are inherent in nascency, and (per *Microsoft*) Meta "is made to suffer the uncertain consequences of its own undesirable conduct," 253 F.3d at 79.

WhatsApp was also a nascent threat. Meta feared it could add a PSN offering, and it was objectively capable of doing so. *See* PF V.A-B. Meta claims that Mr. Zuckerberg's 2012 meeting with Mr. Koum erased Meta's fear of WhatsApp offering PSN services, but the evidence shows this is revisionist history. PF 245-46, 371 (repeated post-meeting fears, including late-2013 concern that WhatsApp could launch a separate PSN app). These were not international messaging fears—they went to the heart of Meta's business: PSN services in the United States. PF 249. Meta acquired WhatsApp so it did not "land[] in the wrong hands," PX1410, i.e., Google's, PF 294.

Ample evidence confirms that WhatsApp had the capabilities to offer PSN services. PF 244, 251, 261-63. It also had the financial need to do so, as Meta's expert conceded, regardless of Mr. Acton's use of nonstandard accounting. PF 276-79. Ultimately, the founders' actions speak for themselves: they fundraised from venture capital firms that expected successful monetization, were considering new monetization plans as their losses mounted, hired Morgan Stanley after receiving a deck touting WhatsApp as a PSN, sold WhatsApp to the world's largest PSN company, and stood aside so that Meta could introduce ads to WhatsApp. PF 281-82, 286, 307.

The evidence here far surpasses that in *Microsoft*. There, the court found "ample" evidence that Java and Netscape were nascent threats even though (1) neither product "could now, or would soon" be able to enter the relevant market; (2) future entry would require innovations by third parties; and (3) they might have failed absent Microsoft's actions. *See Microsoft*, 253 F.3d at 53-54, 79; ECF 519-1 ("Pretrial Br.") at 16-17; *accord* Areeda & Hovenkamp ¶ 701d (monopolist's

acquisition of "any firm that has the economic capabilities for entry and is a more-than-fanciful possible entrant is presumably anticompetitive").

## V.    Meta Failed to Prove Valid Procompetitive Justifications

Meta failed to rebut the FTC's *prima facie* case. Meta briefly reasserts that the FTC must offer "some empirical evidence" of consumer harm, MBr. 49, but the Court already rejected that position, SJ Op. 53-55, 60-62. Next, Meta disguises the same demand for "empirical evidence" by arguing that Instagram and WhatsApp grew after the acquisitions and that the FTC thus bears a "burden" to rebut these "benefits" by showing "harmful effects." MBr. 50. This misstates the *Microsoft* framework. Meta bears the burden to show that its justifications are "a form of competition on the merits," non-pretextual, *and* "could not have been achieved without the acquisition in question." SJ Op. 79-80; *Microsoft*, 253 F.3d at 59. To do so, Meta must provide evidence even more "specific" than that required to establish a *prima facie* case. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 478 n.20 (7th Cir. 2020). Meta has not done so, thus the FTC bears no "burden" at all. *See* Pretrial Br. at 19-24; *see also In re NorthShore Univ. HealthSystem Antitrust Litig.*, 657 F. Supp. 3d 1077, 1102 (N.D. Ill. 2023) (granting summary judgment where the defendant "failed to produce evidence" that quality improvements were merger specific).

Meta's claimed justifications boil down to the assertion that the once-nascent products grew after a monopolist bought them. *See* MBr. 2, 4, 6, 48-49, 51-52, 58-59. This alone should give the Court pause: courts routinely find Section 2 violations where monopolized products have grown. *See, e.g.*, *Google Search*, 747 F. Supp. 3d at 123-24, 173; SJ Br. 37-38 (discussing cases); *accord* PF 397. A defendant cannot simply point to increased output as *proof* that its conduct was procompetitive—particularly here, where there is an obvious explanation for the growth: an explosion in demand for online services driven by the proliferation of smartphones. PF 378.

Indeed, the case Meta cites in support of its attempt to treat raw "output" as a

procompetitive benefit actually contradicts its position. MBr. 50. In *NCAA v. Board of Regents*—a Section 1 case—the Supreme Court did not look to output, but instead considered (and rejected) *specific* claims by the defendant that the conduct made its product more competitive by increasing marketing efficiency and making the product more attractive to buyers. 468 U.S. 85, 114-15 (1984); *see also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 21 (1979) (agreeing with Section 1 defendant that its conduct could be procompetitive if necessary to achieve the identified benefit of procompetitive efficiencies in contracting). Meta's conclusory assertions of benefits and vague descriptions of what it did to achieve them, MBr. 58-59, confirm that it failed to carry its burden to provide specific evidence supporting specific benefits.

## A. Meta's Claimed Benefits Are Pretextual

Meta fails to establish that its asserted procompetitive benefits were a "genuine reason" for the acquisitions. *See* Pretrial Br. at 20-22. Meta's repeated, candid internal communications demonstrate that Mr. Zuckerberg's (thus Meta's) "genuine reason" for the Instagram acquisition was to squash the threat Instagram posed to Facebook, not to advance "competition on the merits." PF IV.A, IV.D, IX.A; *Microsoft*, 253 F.3d at 59. So too for WhatsApp. *See* PF V.A, V.C, IX.B.

Meta attempts to sidestep its contemporaneous documents with just two pieces of evidence: statements made by Mr. Zuckerberg to Mr. Systrom in a single email chain and Mr. Zuckerberg's post-hoc explanations at trial. MF 197, 199-201. The former are statements made as part of Mr. Zuckerberg's "negotiation tactics," 4/22 (Systrom) 198:8-199:10, while the latter represent exactly the sort of self-serving trial testimony that is routinely rejected by courts when contradicted by contemporaneous documents (as is the case here). *See, e.g.*, SJ Op. 80; *McWane, Inc. v. FTC*, 783 F.3d 814, 841-42 (11th Cir. 2015) ("damning internal documents" were "powerful evidence that [claimed] procompetitive justifications are merely pretextual"); *Tapestry*, 755 F. Supp. 3d at 453, 484, 487 n.44 (affording ordinary course documents substantially greater weight than self-

33

interested testimony). For example, Meta claims that Mr. Zuckerberg's "intent" was making Instagram Meta's "bet" in mobile photo-sharing, MBr. 56; MF 199, but contemporaneous emails show instead that "all future development would go towards our core products." PX2888-001; *see* PF 367; PX1136-003. Moreover, Mr. Zuckerberg's testimony was merely about the result of, not the reason for, the acquisition. 4/15 (MZ) 25:23-26:19 ("[I]f you choose to buy something, you are kind of inherently taking someone who would be a competitor . . . and making them your bet[.]").

Meta likewise tries to sidestep the numerous documents establishing its fear of a WhatsApp pivot by claiming that Meta only saw WhatsApp as a threat in messaging and abroad. MBr. 56. That Meta rushed into the deal, paid a premium justified only by WhatsApp's potential as a PSN offering, PF 297, 375-76, articulated no deal synergies to its Board, PF 296, and ████████ ██████████████████████████, further confirms what Meta already admitted to KPMG in 2014: the WhatsApp acquisition was motivated by defensive considerations to further entrench Meta's monopoly position, PF 301. And Meta's only explicit justification for the deal in its brief relies on the already-rejected de-platforming claim. *See* MBr. 57-58; SJ Op. 91-92.

Meta further errs by claiming that its post-acquisition actions provide the best evidence of whether its justifications are non-pretextual. *See* MBr. 56. The Court has already explained that monopolists should not be allowed to "evade liability by advancing post-hoc justifications based on their later actions or events outside their control." SJ Op. 80. It would be particularly unwarranted to accept a monopolist's desire to grow a rival *after acquiring it* as evidence that the acquisition was made for a procompetitive purpose; to the contrary, Mr. Zuckerberg explained that "keep[ing] [Instagram] running" *was part of his plan* to exclude would-be PSN competitors from entering, PF 367, 369, and similarly believed that winning in mobile messaging was the best defense to other messengers growing and springboarding into PSN services, *see* PF 315-17, 374.

34

**B. Meta Did Not Prove That the Acquisitions Were Necessary to Achieve the Proffered Procompetitive Benefits**

Meta asserts that its claimed benefits are merger specific because they occurred after Meta's acquisitions. MBr. 60. That is insufficient. Courts evaluating Section 2 cases hold the defendant to a higher standard—the *defendant* must demonstrate that the challenged conduct "was the result of, or necessary to achieve" the claimed benefits. *Viamedia*, 951 F.3d at 478; *see also Google Search*, 747 F. Supp. 3d at 172 (rejecting Google's claim that exclusive agreements ensure convenience for Safari users for failure to "explain why Apple would lack those same incentives absent exclusivity"); *AdTech*, 778 F. Supp. 3d at 868 (rejecting claimed spam- and fraud-reduction benefits as tying justification because other, non-tied ad exchanges had "acceptable levels" of spam and fraud); *NorthShore*, 657 F. Supp. 3d at 1102 (granting summary judgment against defendant where post-merger "quality improvements" lacked "any kind of but-for causation analysis"). Requiring a defendant to prove the acquisitions were necessary for any asserted benefits (i.e., as against the but-for world) tracks merger review under Section 7, *see United States v. Anthem*, 855 F.3d 345, 356 (D.C. Cir. 2017), ensures an appropriate causal link between the conduct and the purported benefits, *NorthShore*, 657 F. Supp. 3d at 1102, and ensures that "the defendant is made to suffer the uncertain consequences of its own undesirable conduct," *Microsoft*, 253 F.3d at 79.

Meta fails to avoid this burden by citing *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) ("*Amex*"). *Amex* involved rule-of-reason analysis under Section 1 of the Sherman Act, did not involve a merger (much less one by a monopolist), and assessed *whether* the conduct produced an anticompetitive effect, not a monopolist's procompetitive justification to excuse conduct that *necessarily* produced an anticompetitive effect by eliminating a nascent rival. *Compare* Areeda & Hovenkamp ¶ 701h (requiring "overwhelming demonstration that substantial efficiencies are involved and either cannot be achieved in other ways or will inevitably destroy the other firms"),

*with Amex*, 585 U.S. at 541. Indeed, the *Amex* court did not even hold that this burden-shifting was required under Section 1; it merely applied the framework on which "the parties agree[d]." *Id.*

    ***Growth & Consumer Surplus.*** As explained above, *supra* p. 8, an increase in output fails on its own to provide a cognizable justification, particularly without showing that the increase benefitted PSN services competition and that the acquisitions *caused* and were *necessary to achieve* that benefit. Yet Meta fails to provide evidence to validate its growth and consumer surplus claims, simply invoking the *post hoc ergo propter hoc* fallacy to claim credit for all the apps' growth, MBr. 49, 51-52, and then further assuming no consumer harm from the lost competition. This is untenable, as irrefutable evidence shows that (1) both apps were growing rapidly pre-acquisition, FBr. 42-45; PF 200-07, 217, 379, 385, 392, and were poised to continue that growth, PF 210-13; (2) the shift to mobile caused many online platforms to grow rapidly without Meta's help, PF 192-94, 378; (3) any "resources" Meta purportedly "pour[ed]" into Instagram and WhatsApp, MBr. 58, were not unique to Meta, PF 380, 387-88, 393-94, and (4) the apps suffered merger-specific *detriments* to growth post-acquisition, PF 272, 385, 391, 420, 466-67.

    Indeed, Meta itself understood that Instagram did not need Meta's help to grow. Mr. Schultz admitted in 2018 that "[t]he vast majority of IG's growth [was] IG product market fit driven and driven by external factors." PF 382. And Mr. Zuckerberg testified that an independent Instagram would have grown to be at least "around the size of Twitter or Snapchat"—a candid admission that Meta deprived PSN-services consumers of a "meaningful competitor" to Facebook when it acquired Instagram. PF 383, 386. The unimportance of Meta's "help" was laid bare empirically in 2018, when Meta's withdrawal of nearly all cross-promotion support for Instagram had no real effect, causing only a hiccup in Instagram's growth. PF 384; MF 232. Nor should Meta get credit for Instagram's growth because Meta claims it "could have" and "might" have eliminated cross-

posting. *See* MBr. 13; MF 193. Ending this mutually beneficial practice for Facebook and Instagram (and their users), PF 389, is not procompetitive, *see Microsoft*, 253 F.3d at 59, and Instagram's growth did not depend on Facebook distribution, PF 387-88.

Meta simply failed to show how and how much (if at all) Meta increased Instagram's growth. *See* PF 377, 379-91. The same is true of WhatsApp. PF 392-94. Moreover, any WhatsApp growth is non-cognizable because it is out-of-market. *See United States v. Phila. Nat'l Bank,* 374 U.S. 321, 370 (1963) ("[A]nticompetitive effects in one market [cannot] be justified by procompetitive consequences in another[.]"); SJ Op. 81-82; PF 395; *see also Bd. of Regents*, 468 U.S. at 117, 119-20 ("fostering competition among amateur athletic teams" only "legitimate[] . . . as a procompetitive justification" if it increased "demand for the [relevant] product").

Meta's vague and unproven claims of consumer surplus, MBr. 49, fail for similar reasons. PF 396-412. Prof. Carlton admitted that he did not try to determine how much consumer surplus (if any) was merger specific. PF 377, 397. Instead, he doubled down on Meta's growth fallacy, crediting Meta for all post-acquisition growth. MF 219 (so-called "consumer surplus" derived by "multiplying the value consumers get [from Instagram] . . . by the increased number of U.S. users post-acquisition"); *see* MF 257 (same for WhatsApp). That error alone dooms the calculation. Further, he made no effort to account for whether users would receive more value from the apps in the but-for world or to calculate total PSN consumer surplus in the but-for world, in which an independent Instagram competed with Facebook (and both faced a potential WhatsApp pivot).

Equally unavailing is Meta's suggestion that output or consumer surplus could not possibly be higher because Instagram grew to "saturation" in the United States. MBr. 6, 49, 51. Notably, this claim is based solely on MAU, *see* MF 204, ignoring other output measures like DAU, sessions, and the creation of friends and family content that Meta's monopoly power suppresses,

37

PF 399-400, 404-07, and additional PSN output from a potential WhatsApp pivot, PF 412. Further, Meta has no evidence that quality and innovation would not have been higher in the but-for world. PF 399-400, 402-10. Market "saturation" does not indicate that Meta's conduct has not harmed competition and consumer welfare, just as the fact that nearly every household had an AT&T telephone did not preclude a finding that AT&T unlawfully monopolized telephone services. *Cf. United States v. AT&T*, 524 F. Supp. 1336, 1348 n.33 (D.D.C. 1981); Richard A. Posner, *Antitrust Law* 110 (2d ed. 2001) (telecommunication industry's competitiveness increased following AT&T breakup).

Trying to overcome its deficient evidentiary presentation, Meta incorrectly declares that it is "game over" unless the FTC proves that Instagram would have achieved more "growth" without Meta. MBr. 59. This is wrong for multiple reasons. It misstates the law, as the FTC does not need to show "more growth" in the but-for world to establish anticompetitive effects, or even (assuming that Meta could carry its burden to prove justifications) to show that the acquisitions on balance were anticompetitive. *See Microsoft*, 253 F.3d at 58; SJ Op. 61. It also misstates the facts and economics. Consumer welfare in the but-for world does not turn on Instagram being bigger than today. PF 396, 399-400, 411. Mr. Zuckerberg himself recognized that in the but-for world Instagram would have grown significantly (at least to the size of Snapchat or Twitter), PF 383, and that it would have exerted significant competitive pressure even if smaller than today, *see* PF 386.

***Infrastructure and Integrity.*** Meta makes broad, nonspecific claims about how it helped Instagram and WhatsApp improve their infrastructure and integrity. MBr. 58-59. But Meta failed to prove that Instagram and WhatsApp could not have met their infrastructure and integrity needs without the acquisitions. PF XII, XIII. The evidence shows that both apps were successfully managing these needs as independent firms, and could have continued to do so, just as countless

other online platforms have done without Meta. PF 442-47, 450-59. Meta claims that Instagram and WhatsApp achieved infrastructure and integrity benefits "faster" with its help, but even that meager, time-limited benefit claim is contradicted by the record. PF 447-49, 465.

*Features.* Meta likewise makes vague claims about features it allegedly helped Instagram and WhatsApp launch, MBr. 51, without any explanation of how or why those features were not possible absent the mergers. Both apps had a record of adding new features pre-acquisition and were poised to continue to do so going forward, just as many other online apps did. PF 248, 413-19; MF 46(a). Meta claims that "[its] investments accelerated Instagram's feature development," MF 210, but in fact Meta *hindered* Instagram's ability to launch features, PF 415, 419-21, 466-67.

*Monetization.* Meta's Instagram monetization claims are not cognizable justifications because they are not procompetitive benefits for PSN services—increasing ad load reduces product quality. PF 160-63; *cf. Viamedia*, 951 F.3d at 478 (*improved* product quality can be procompetitive benefit). Without the acquisition, Facebook and Instagram would have competed to lower ad load, benefiting users of both apps. PF 333-39. Meta's Instagram monetization claims are also not merger specific, as many online platforms monetize successfully without Meta, PF 471-73, and Instagram was well-positioned to do so, PF 474. Meta's WhatsApp monetization claims are equally meritless: it has not been successful in monetizing WhatsApp, PF 476-77; any benefits are out-of-market, *see* PF 395, 470; and Meta did nothing that WhatsApp could not do on its own, PF 478.

### C.  Meta's Proffered Procompetitive Benefits Are Not "Extraordinary"

To justify the competitive harm from its acquisitions, Meta must provide "overwhelming" evidence of "extraordinary" efficiencies. Areeda & Hovenkamp ¶ 701h; *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720 (D.C. Cir. 2001) (high concentration requires "extraordinary" efficiencies); *see Viamedia*, 951 F.3d at 474, 478 (defendant must prove conduct "was the result of, or necessary to achieve, *much greater* procompetitive benefits") (cleaned up). It has not done so. Permitting a

monopolist to vaguely identify "growth" as a justification after acquiring a *nascent* competitor would blow a gaping hole in Section 2. Notably, Meta claims it lacks monopoly power due to other firms skillfully running vibrant apps (e.g., TikTok, YouTube), but in asserting procompetitive benefits, Meta would have the Court find that *only Meta* could have grown Instagram or WhatsApp. That's fanciful. *See* PF 378, 381 (many other apps grew prodigiously), 413-17 (added features), 450-54 (grew infrastructure), 444 (handled integrity), 471-73, 478 (monetized).

## VI.    Even If Meta Had Met Its Burden, the Anticompetitive Harms of Its Conduct Outweigh Meta's Claimed Benefits

The Court need not engage in balancing the anticompetitive effect of Meta's conduct against its supposed benefits, because Meta failed to rebut the FTC's *prima facie* case. *Supra* Section V. Regardless, "it is hard to imagine an action that better fits the definition of conduct with anticompetitive effects than a monopolist's buying out its rivals." SJ Op. 57. It would be remarkable—indeed, unprecedented—for a Court to excuse that conduct based on the nonspecific procompetitive benefits asserted here. *See* Areeda & Hovenkamp ¶ 912a (monopolist's acquisition of nascent rival "bears a very strong presumption of illegality that should rarely be defeated"). To do so would credit the virtues of monopoly power over the virtues of competition—a choice that Congress has long since foreclosed. *See* 15 U.S.C. § 2. On balance, it is clear that the proven harms of Meta's conduct—higher ad load, lower quality, reduced consumer choice, and over a decade without the benefits that would have accrued to consumers from vigorous ongoing competition in PSN services—outweigh whatever justifications Meta may slip through the pretext, merger-specificity, and extraordinary benefit screens. PF 309-61; *see AdTech*, 778 F. Supp. 3d at 868-72 (balancing claimed benefits against harm of entrenching monopolist and finding against Google).

## CONCLUSION

The Court should issue judgment in favor of the FTC and set the case for a remedies trial.

Dated:    August 27, 2025

Daniel S. Guarnera
*Director*
*Bureau of Competition*

Taylor C. Hoogendoorn
*Deputy Director*
*Bureau of Competition*

Kelse H. Moen
*Deputy Director*
*Bureau of Competition*

Alex Bryson
*Counsel to the Director*
*Bureau of Competition*

Respectfully submitted,

*/s/ Daniel Matheson*
Daniel J. Matheson (D.C. Bar 502490)
Krisha Cerilli (D.C. Bar 983281)
Patricia Galvan
Barrett Anderson
Nathan Brenner
David Brunfeld (D.C. Bar 1672059)
Maria Dimoscato (D.C. Bar 489743)
Ario Fazli (D.C. Bar 1035087)
Erin Frake (D.C. Bar 1023064)
Karen Goff
Christopher Harris
Melissa Ihnat (D.C. Bar 498266)
Alicia Loh (D.C. Bar 1738388)
Mitchell London (D.C. Bar 1029408)
Justin Lorber (D.C. Bar 90005184)
Owen Masters (D.C. Bar 242139)
Thomas Mattes
Noel Miller (D.C. Bar 1026068)
Njeri Mugure
Danica Noble (D.C. Bar 439474)
Stephen Pearson (D.C. Bar 1765192)
Benjamin Rashkovich (D.C. Bar 5972724)
Michael Smith (D.C. Bar 996738)
Jennifer Tarr
Peter Taylor
Oren Vitenson (D.C. Bar 90005750)
Elan Weinberger
Nicholas Widnell (D.C. Bar 439474)
Robert Zuver (D.C. Bar 987216)

Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone.: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorneys for Plaintiff*
*Federal Trade Commission*

41