**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION,

        Plaintiff,

        v.

META PLATFORMS, INC.,

        Defendant.

Case No. 1:20-cv-03590-JEB

**DEFENDANT META PLATFORMS, INC.'S
POST-TRIAL REPLY BRIEF**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

LEGAL STANDARD .......................................................................................................... 3

I.     Meta Proved Overwhelming Procompetitive Justifications For Both
Acquisitions ............................................................................................................ 6

     A.     The Acquisitions Generated Tremendous Consumer-Welfare
Benefits ....................................................................................................... 6

          1.     *The acquisitions led to more output, innovation, and quality
improvements* ................................................................................ 6

               a.     Instagram ............................................................... 6

               b.     WhatsApp ............................................................... 13

          2.     *Meta's growth and improvement of Instagram and
WhatsApp are cognizable procompetitive benefits* ..................... 14

     B.     The FTC Cannot Justify Disregarding the Procompetitive Benefits ................... 17

          1.     *The "pretext" argument contradicts* Microsoft *and the trial
evidence* ........................................................................................ 17

          2.     *Meta showed it caused the benefits, making them merger
specific* ......................................................................................... 20

          3.     *Meta's improvements to WhatsApp – price cuts, output
expansions, and more-social feature innovations – are
legally cognizable acquisition benefits* ....................................... 24

          4.     *There is no support for a standardless "extraordinary"
benefits requirement – which Meta would satisfy anyway* ......... 25

II.     The FTC Failed To Argue – Let Alone Prove – Its Rebuttal Case ................... 27

III.     The FTC's One-Paragraph Attempted Balancing Fails ................................... 28

CONCLUSION .................................................................................................................. 30

# TABLE OF AUTHORITIES*

Page

**CASES**

*Ass'n of Retail Travel Agents, Ltd. v. Air Transp. Ass'n of Am.*, 623 F. Supp. 893
(D.D.C. 1985) ..................................................................................................................28

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).......................3-4

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) .......................................24

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023), *cert. denied*,
144 S. Ct. 681 & 682 (2024)..........................................................................................25, 28

*EpiPen Mktg., Sales Pracs. & Antitrust Litig., In re*, 44 F.4th 959 (10th Cir. 2022) ...................29

*FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004) ......................................................28

*FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1 (D.D.C. 2021) ............................................................28

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ...............................................................26

*FTC v. Lab. Corp. of Am.*, 2011 WL 3100372 (C.D. Cal. Feb. 22, 2011)....................................15

* *FTC v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16 (D.D.C. 2024).................4, 6, 15, 19, 20, 21, 27

*McWane, Inc., In re*, 2014 WL 556261 (F.T.C. Jan. 30, 2014), *aff'd*, 783 F.3d 814
(11th Cir. 2015)................................................................................................................15

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) .............................................................18, 24

*NCAA v. Alston*, 594 U.S. 69 (2021)..............................................................................................6

*NCAA v. Board of Regents*, 468 U.S. 85 (1984) ....................................................................15, 24

*NCTA v. Broad. Music, Inc.*, 772 F. Supp. 614 (D.D.C. 1991) ...................................................15

* *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179 (S.D.N.Y. 2020) ...............................23

*NorthShore Univ. HealthSystem Antitrust Litig., In re*, 657 F. Supp. 3d 1077
(N.D. Ill. 2023)..................................................................................................................21

* *Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ..........................................................5, 6, 27, 28

*Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246 (S.D. Fla. 2015), *aff'd*,
845 F.3d 1072 (11th Cir. 2016) .......................................................................................15

---

* Authorities principally relied upon are marked with an asterisk.

*Sterling Merch., Inc. v. Nestlé, S.A.*, 656 F.3d 112 (1st Cir. 2011) ...............................................28

*Sullivan v. NFL*, 34 F.3d 1091 (1st Cir. 1994)......................................................................24, 25

*United States v. Alcoa*, 148 F.2d 416 (2d Cir. 1945) .......................................................................3

*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) ......................................................23

*United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024)......................................15, 16, 22

*United States v. Google LLC*, 778 F. Supp. 3d 797 (E.D. Va. 2025) .........................21, 22, 29, 30

\* *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) .............................2, 3, 4, 5, 6, 17,
18, 23, 24, 26, 27, 28

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) ...................................................24

*United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) .......................................................18

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020)................................15, 21, 24, 26


**STATUTES**

Clayton Act, 15 U.S.C. § 12 *et seq.* ...............................................................................................2

§ 7, 15 U.S.C. § 18................................................................2, 3, 5, 6, 21, 24, 26

Sherman Act, 15 U.S.C. § 1 *et seq.* ........................................................................................2, 3, 6

§ 1, 15 U.S.C. § 1..............................................................................................5

§ 2, 15 U.S.C. § 2.................................................2, 3, 5, 6, 17, 23, 26, 27, 28

## INTRODUCTION

Meta's execution of its pre-acquisition plan for integration and growth transformed Instagram, delivering massive benefits for consumers.  At the time of its acquisition in 2012, Instagram was a nascent mobile photo-sharing app with a modest 3.9 million U.S. monthly active users, plagued by spam, with a small team of 13 employees and no monetization strategy. Its future was uncertain, and its capacity for sustained feature development was constrained by lack of resources.  Meta infused Instagram with capital, engineering talent, and a robust infrastructure, enabling it to overcome its early challenges and flourish.

This investment led to exponential user growth, with Instagram's U.S. user base skyrocketing to more than 230 million as of trial.  Meta's resources facilitated the development and integration of myriad important features, from Stories and Reels to direct messaging and best-in-class advertising.  These enhancements, driven by Meta's strategic vision and investment, have created immense value for consumers, generating tens of billions of dollars in consumer surplus annually.  Instagram's journey under Meta's stewardship from a small startup to a multi-faceted platform enjoyed by hundreds of millions of Americans stands as a testament to Meta's strategic acquisition, which fostered innovation, benefited consumers, and delivered a grand slam homerun for everyone.

Meta worked similar magic with its 2014 acquisition of WhatsApp, again achieving transformative growth and consumer benefits.  Prior to the acquisition, WhatsApp was a lightly used paid messaging service in the United States.  Meta, executing again on its pre-acquisition strategic vision, made WhatsApp free for all users, dramatically increasing its accessibility and appeal.  Meta's investment extended beyond simply making the service free; it also created features like Status and Channels, further enhancing the platform's utility and value for consumers.

These pivotal changes, facilitated by Meta's resources and strategic guidance, fueled explosive user growth, propelling WhatsApp to more than 100 million U.S. users (with an astounding 3 billion worldwide) and generating billions of dollars in annual consumer surplus.

These facts – fully supported by the record and hardly disputed by the FTC – preclude the Section 2 claim because the FTC offers no basis to question that these transactions made American consumers better off, not worse off, which is the fundamental purpose of the Sherman Act. The parties dispute the legal standard, but this is a Section 2 case under the Sherman Act, not a Section 7 case under the Clayton Act, and *Microsoft* imposes on the FTC the initial burden of demonstrating that Meta's conduct *actually* harmed consumers to make out a *prima facie* case; the FTC does not even argue that it can meet that burden and instead seeks a presumption of harm without any showing of effects.

And even if the FTC is correct that it can make out a *prima facie* case without any evidence of harm, Meta rebutted it by showing its investments in Instagram and WhatsApp have enormously benefited consumers. Meta's evidence of massive procompetitive benefits shifts the burden back to the FTC to prove that these benefits could have been achieved with comparable, if not superior, speed and efficacy without Meta's acquisitions. But because the FTC cannot prove this, it argues that Meta *also* bears the burden of demonstrating that these benefits could not otherwise have been achieved. Although the FTC is again wrong on the law, Meta can show that as well. The FTC's argument that Instagram today might at best look like Snapchat or Twitter – which offer only a fraction of the value to consumers that Instagram provides – confirms that the FTC failed to prove its case. And the FTC does not even venture any such speculative comparison for WhatsApp.

This Court heard the evidence at trial. No one in the courtroom could have any doubt

that Meta – with its relentless focus on delivering to consumers the services they demand, in a crowded and fiercely competitive online space for social apps where norms of use constantly evolve – succeeded in making Instagram and WhatsApp great.  Few companies have come close to that feat even once, let alone twice.  Meta is no monopolist; on the contrary, it is a fierce competitor that the FTC has now "turned upon" for its legitimate success.  *United States v. Alcoa*, 148 F.2d 416, 430 (2d Cir. 1945).  The Sherman Act forbids that result.

The Court should reject the FTC's Section 2 claim even *if* the FTC has proved a relevant U.S. product market consisting only of Meta's apps, Snapchat, and MeWe (it hasn't), even *if* it has proved that Meta *today* has the power to charge supracompetitive prices in such a market (it doesn't), and even *if* Meta "maintained" that monopoly power in 2012 and 2014 by acquiring two apps without objection from the FTC itself (it didn't).  The indisputable benefits from those acquisitions compel the conclusion that Meta did not violate Section 2.

## LEGAL STANDARD

Recognizing that it cannot win on the evidence, the FTC struggles to articulate a legal standard under which it cannot lose.  Such is the state of the trial record that the FTC's claim fails under any standard – even the one it invents – but the FTC is also wrong on the law, seeking to turn Section 2 into a strict-liability prohibition on acquisitions, a standard even more restrictive than Section 7's prophylactic screen.

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), supplies the governing standard, which seeks to "distinguish[ ] between exclusionary acts, which reduce social welfare, and competitive acts, which increase it."  *Id.* at 58.  The essential first step for any Section 2 plaintiff is to "demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect."  *Id.* at 58-59 (citing *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S.

209, 225-26 (1993)); *see also id.* at 59 ("[N]o less in a case brought by the Government, it must demonstrate that the monopolist's conduct harmed competition, not just a competitor.").

The FTC's reply gives up the argument that there is any evidence the actual world is worse for consumers by the standard measure of consumer welfare – output, *see* Meta Br. 6, 48-49 – compared to a but-for world in which the acquisitions never happened, *see* Meta FOF ¶ 221 (Hemphill concessions). On the contrary, the FTC insists (at 32) that it need not offer *any* empirical evidence of consumer harm, effectively conceding that it cannot do so. The FTC relies instead on the argument that, because Instagram and WhatsApp were allegedly "nascent" competitors more than a decade ago in the FTC's contrived "PSNS" market, it is entitled to a *presumption* of anticompetitive harm. Meta has explained why such a presumption is inconsistent with *Microsoft* and why, even if that legal proposition is accepted, it does not apply to Instagram (a complement to Facebook in 2012) or WhatsApp (a lightweight messenger in 2014 that charged users and would not run ads). *See* Meta Br. 53-58.

But even on the assumption the FTC met its *prima facie* burden, *Microsoft* holds that Meta "may proffer a 'procompetitive justification' for its conduct," 253 F.3d at 59 – this brief's focus. A procompetitive justification is evidence that "conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *Id.* Accordingly, evidence that Meta, through the challenged acquisitions, enabled Instagram and WhatsApp to grow more – or more quickly – than they would likely have grown on their own is a quintessential procompetitive justification. *See FTC v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 68 (D.D.C. 2024) ("[A] merger might have a procompetitive justification if it increased output, decreased prices, improved service or quality, spurred greater innovation, or the like.").

Once Meta has made that showing with evidence, "the burden shifts back to the plaintiff

to rebut that claim." *Microsoft*, 253 F.3d at 59.  The D.C. Circuit clarified that this is like the approach courts take in Section 1 cases "under . . . the rule of reason."  *Id.*; *see also* FTC Reply 33 (citing rule-of-reason cases under Section 1 for the applicable standards).  As the Supreme Court subsequently explained in *Ohio v. American Express Co.*, 585 U.S. 529 (2018), that burden-shifting framework means, in practice, "[i]f the defendant [shows a procompetitive benefit], then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."  *Id.* at 542.

The FTC does not explain why Section 1's burden shifting would deviate from Section 2's burden shifting at this step; *Microsoft* is clear that the burden shifting is similar under both parts of the statute.  And the notion that the Supreme Court in *American Express* was just restating the parties' agreed standard ignores that many courts post-*American Express* have applied this rule-of-reason burden shifting, including to claims under Section 2.  *See* Meta Pretrial Br. 25 (collecting cases).  Accordingly, once Meta proffers evidence that the acquisitions yielded procompetitive benefits, the burden shifts back to the FTC to show the benefits would have been achieved through "less-restrictive means," i.e., without Meta's acquisitions.  Notably, in *Microsoft*, when the defendant proffered legitimate justifications for challenged restrictions, those restrictions were upheld.  *See*, *e.g.*, 253 F.3d at 67.

The FTC's argument (at 35) that the Court should discard this burden-shifting framework in favor of a different legal framework that "tracks merger review under Section 7" invites legal error.  Section 7 sets a prophylactic standard that restricts mergers based on the *possibility* of harm rather than the fact of it.  *See* 15 U.S.C. § 18 (barring certain transactions where "the effect . . . *may be* substantially to lessen competition, or to *tend* to create a monopoly" (emphases added)).  By contrast, in this retrospective Section 2 case, the question is whether Meta's

acquisitions were competition on the merits that increased "social welfare." *Microsoft*, 253 F.3d at 58. Meta is accordingly entitled to full credit for the benefits that its acquisitions in fact delivered, and – under *Microsoft* and *American Express* – the FTC must show that they can be disregarded because they would likely have been achieved otherwise. *See Meta Platforms*, 775 F. Supp. 3d at 66-67 ("[The FTC's claim] is not prospective; Meta can point to actual consumer benefits that it contends have flowed from the acquisition. Merger law's traditional concern with speculative efficiencies therefore has less purchase here.").

Contrary to its arguments, the FTC gets no shortcut. The FTC allowed the acquisitions to go forward, and it knows what happened; it must reckon with those facts. As this Court put it, "having made its bed with [Section 2], the FTC must lie in it." *Id.* at 67. The fact that the FTC so openly retreats to Section 7 demonstrates that it cannot meet its burdens under Section 2. *Cf. NCAA v. Alston*, 594 U.S. 69, 100-01 (2021) (plaintiff raising a rule-of-reason claim faces a "demanding standard" in rebutting demonstrable benefits); *see also Meta Platforms*, 775 F. Supp. 3d at 67 ("[C]ourts' treatments of procompetitive justifications under the Sherman Act's rule-of-reason framework are notably more forgiving than their evaluations of merger efficiencies under the Clayton Act.").

I.      **Meta Proved Overwhelming Procompetitive Justifications For Both Acquisitions**

    A.      **The Acquisitions Generated Tremendous Consumer-Welfare Benefits**

       1.      ***The acquisitions led to more output, innovation, and quality improvements.***

       a.      **Instagram:** The acquisition generated hundreds of billions of dollars' worth of consumer surplus (not Meta profit, but benefits to consumers) based on (a) Meta's growth of the app and its distribution to more U.S. consumers, and (b) Meta's release of new features on an even faster service. Meta FOF ¶ 219. The FTC claims (at 37) that Meta failed to show it was responsible for Instagram's growth, but *everything* that happened with Instagram after 2012 was

the work of Meta's employees (including Kevin Systrom) and the fruit of Meta's deployment of financial and technical resources. Meta FOF ¶ 203. Professor Carlton explained in *unchallenged* trial testimony that the astronomical value of Instagram today relative to its $1 billion purchase price – a ceiling on what the market expected Instagram to accomplish without Meta's resources and distribution (pre-acquisition it raised money at a valuation of $500 million) – is economic proof that Meta grew Instagram more than anyone expected, while making it a faster and more feature-rich service. Meta FOF ¶ 220; *see also id*. ¶¶ 205-206.

The trial record confirms that Meta did not purchase a lucky lottery ticket. Meta achieved staggering results for Instagram through massive investment and relentless focus on growth, pushed by "the best growth team in the world." Meta FOF ¶ 207. When Meta announced the acquisition, Instagram had about 3.9 million U.S. monthly active users, according to Professor Hemphill's calculations. Meta FOF ¶¶ 9, 26(b). Meta provided Instagram with growth resources, including personnel, cross-app data, distribution, and cross-app promotions. Meta FOF ¶ 207. Meta improved Instagram's friend-related content through the connections pivot and developed an algorithmic ranking system to deliver the most enjoyable content – never disputed at trial. Meta FOF ¶¶ 208-209. All of this enabled Instagram to grow by orders of magnitude, with more than 230 million U.S. monthly active users as of trial. Meta FOF ¶¶ 9, 204.

The FTC observes (at 36) that Instagram was growing quickly before the acquisition. But that early growth from zero to a few million pales in comparison to Instagram's Meta-fueled growth from 3.9 million to 230 million, as even Mr. Systrom recognized. Meta FOF ¶¶ 194, 222. Nor does Instagram's initial growth indicate that Instagram would have continued to grow, as a graveyard of once-growing startups confirms. Meta FOF ¶¶ 223-234. In fact, in 2015, Instagram's growth rate dipped (in part because Mr. Systrom resisted some of the strategies that

Meta's growth team proposed), after which Meta succeeded in recharging Instagram's growth. *See* 5/12 Trial Tr. 11:9-15:17 (Schultz); *see also id.* 16:15-24:8 (testifying about DX321, documenting this dip in Instagram's growth and Meta's efforts to reverse it), 29:3-30:16 (explaining Instagram's early struggle with retention). The single statement by Mr. Schultz that the FTC highlights (at FTC PF ¶ 382) regarding Instagram's "product market fit" – from a 2018 email, by which time "Instagram was very widely adopted in the United States" (thanks to Meta), *see* Meta FOF ¶ 231 – does not undermine the mountain of evidence showing specific ways Meta grew the app. Meta FOF ¶¶ 207-210, 215.

Mr. Systrom acknowledged that Instagram grew faster with Meta than it would have without Meta. Meta FOF ¶¶ 204-205. No witness (not even the FTC's paid experts) testified that it could have done as well on its own, let alone as quickly. Meta FOF ¶ 221. And no such opinion would have been plausible, when Mr. Systrom himself testified that Meta enabled Instagram to leapfrog "***several years***" of development, innovation, and growth. Meta FOF ¶ 205. Meta also presented evidence of the but-for world. Meta FOF ¶ 194. Without the acquisition, Instagram would have had to find its own way, with no tools and guidance from Meta, and no guaranteed distribution over Facebook. Meta FOF ¶ 193. Everything would have been different and not for the better, e.g., Instagram would have rolled out ads – undisputably increasing its ad load, *cf.* FTC Reply 40 – but of a lower quality without Meta. Meta FOF ¶¶ 211-214; *cf. id.* ¶ 15.

The FTC speculates (at 36) that, in the but-for world, Instagram perhaps *might* have grown to the size of Twitter or Snapchat (its only evidence is a speculative email involving Mr. Zuckerberg that it conspicuously declined to ask him about). That only proves Meta's point. Those apps are ▮▮▮▮▮ of Instagram's size; according to the FTC's own estimates, Snapchat (which ▮▮▮▮▮ Twitter) had ▮▮▮▮▮ the number of monthly active users and time spent

that Instagram had in 2022.  Meta FOF ¶ 26(c).  In the FTC's best-case but-for world, ███

███ fewer Americans would enjoy Instagram's free service.  As Professor Carlton explained,

Instagram's growth reflects consumer surplus; that implies the FTC's but-for world (Instagram

could have been Twitter) represents a loss ███ the consumer surplus Meta delivers each year

to U.S. users.  *See* 5/21 Trial Tr. 170:8-171:9 (Carlton).  The evidence the FTC highlights thus

compels the conclusion that the acquisition of Instagram made consumers better off – by a lot.

Meta also improved Instagram's service quality for U.S. consumers in other ways:

*Features*:  Meta made Instagram better and more innovative for consumers.  The FTC

does not dispute that Meta released scores of new features on Instagram.  Meta FOF ¶ 210.

Professor Hemphill conceded that these are quality improvements.  Meta FOF ¶ 24.  Meta even

prioritized feature development on Instagram, e.g., launching Stories *and* Reels on Instagram

before Facebook.  Contrary to the FTC's claim (at 39), these new features are a result of the

acquisition:  Instagram pre-acquisition lacked the engineering resources to develop significant new

features, as Mr. Systrom testified.  Meta FOF ¶ 195.  Meta provided Instagram resources and

personnel necessary to develop features such as Reels, Stories, Instagram Direct, video sharing,

an algorithmic content feed, and more.  Meta FOF ¶ 210.

The point is not that Instagram could *never* have developed features on its own; it is

rather that, with Meta's know-how, Instagram was able to do so much more quickly and

effectively.  Peter Deng, the head of product at Instagram from 2013 to 2015, testified that being a

part of Meta was a "huge accelerant" to Instagram's feature development, and the resources

Meta provided to Instagram facilitated building, e.g., video, more filters, and direct messaging.

5/5 Trial Tr. 72:19-73:24.  He explained that "there's no chance" Instagram would have been

able to hire as many employees to help build these features on its own.  *Id.* 64:2-65:1.  Mr.

Systrom agreed – consistent with other percipient witnesses – that the acquisition accelerated Instagram's development and innovation relative to what would have happened without Meta. *See*, *e.g.*, 4/22 Trial Tr. 242:9-243:3, 271:25-272:2.

The FTC's claim (at 39) that Meta "hindered" feature development relies entirely on Mr. Systrom's testimony about a single instance of jockeying over *additional* engineering headcount to develop Stories. *See* FTC PF ¶ 415. In all events, Mr. Systrom testified that Meta in fact paid to develop Stories and that Instagram "ended up getting" the engineers he wanted. *See* 4/22 Trial Tr. 247:17-248:24. The FTC's argument that other apps now have similar features does not rebut undisputed testimony that Instagram was able to develop these features on an accelerated timeline, *see* Meta FOF ¶ 210, nor does it show Instagram would have developed these features as well without Meta.

The FTC asserts (at 7-8) that Meta's R&D spending "lagged" other large tech companies. But to support that claim it cites a proposed finding (FTC PF ¶ 332) that does not mention R&D spending and Professor Hemphill's testimony about a demonstrative showing that even with an unwarranted adjustment – *see* 4/16 Trial Tr. 114:16-116:11 (Zuckerberg discussing future technology R&D) – Meta still ranks ahead of Apple (and slightly behind Microsoft) for R&D spending as a percentage of profit. That does not dispute that Meta's spending is astronomical, *see* Meta FOF ¶ 23, nor does it show that Instagram would have invested even more in R&D on its own (the FTC does not claim Meta lags Snap, Twitter, TikTok, Apple, or many others).

*Infrastructure*: Meta improved the user experience on Instagram by making it more reliable and faster. This started with software fixes that no FTC witness, expert or otherwise, ever rebutted. Meta FOF ¶ 215. Meta then plugged Instagram into its world-class infrastructure, one of the only proprietary hyperscale infrastructures on earth, making Instagram faster.

10

Meta FOF ¶¶ 25, 215.  The FTC claims (at FTC PF ¶¶ 450-459) that Meta's infrastructure is

not unique, but it has not identified a single other app that was able to scale as effectively or as

quickly as Instagram did on Meta's infrastructure – especially not a decade ago (the FTC has

no evidence showing the type of technology YouTube and TikTok use today was available to

Instagram in 2012 without Meta).  For instance, Snapchat had considerable difficulty scaling

on Google's cloud infrastructure.  Meta FOF ¶ 216; *see also* 5/15 Trial Tr. 220:24-221:1 (Jain

agreeing "Snap's inability to scale posed substantial risks to its business").

      Conversely, there is ample evidence that Instagram was struggling to scale on Amazon

Web Services ("AWS") and that Meta's customized hardware and software improved Instagram's

performance compared to AWS.  Meta FOF ¶¶ 195, 215.  The very reason Instagram chose to

go through the complex process of migrating onto Meta's infrastructure was because the team

studied the issue and determined Meta's infrastructure would unlock more benefits than staying

on AWS.  *See* 5/20 Trial Tr. 247:12-248:6 (Shortway); 4/15 Trial Tr. 76:14-77:10 (Zuckerberg).

The data from before and after this migration confirms the significant performance benefits.

Meta FOF ¶ 215 (Shortway discussing DX1144 & DX1145); *contra* FTC PF ¶¶ 460-469.

DX1144 presents the most relevant apples-to-apples data – a before-and-after just as Instagram

transitioned to Meta's infrastructure – and it shows significantly lower latency after the transition.

*See* 5/20 Trial Tr. 257:2-258:22 (Shortway discussing DX1144).

      Minor latency in the decade following does not show decreased performance (let alone

that Instagram would have been better off on its own), but instead that Instagram had grown

dramatically and enabled hundreds of millions more U.S. users to retrieve 10-25 times more data

on Instagram than in 2012.  *See* 5/21 Trial Tr. 10:4-11:9 (Shortway).  Regarding outages, in the

only document the FTC cites on this issue that was discussed at trial (PX10798), Mr. Shortway

explained it showed a "relatively minor" "regression" during a narrow window where the overall trend was "really, really high levels of reliability." *Id.* 39:21-40:3.

*Advertising*: The FTC does not dispute that, by plugging Instagram into Meta's ad platform, Meta allowed Instagram to show advertising that was higher quality for users and advertisers – a huge improvement over Mr. Systrom's initial efforts. Meta FOF ¶¶ 211-212. Moreover, the only modeling of the but-for world shows an independent Instagram without Meta would likely have higher ad load, not lower, *see* Meta FOF ¶ 31 – the FTC's briefing is silent on that evidence. The FTC's argument that the excellence of Meta's ad business does not benefit Instagram's users ignores the evidence that Meta made ads on Instagram better *for users*. Meta FOF ¶ 212; *see also id.* ¶¶ 14-16. It also ignores that making Instagram's ad business sustainable and successful is a benefit in the alleged market because it pays for Meta's user-benefiting investments in Instagram, including feature development. Meta FOF ¶ 212. The FTC cannot assert that ads are a dimension of product quality in the alleged market and simultaneously claim that making Instagram's ads more relevant and higher quality is not a relevant consumer benefit.

*Spam & Integrity*: The trial evidence established that, before the Instagram acquisition, "[s]pam was a big problem" on Instagram and "no one" on the Instagram team had expertise fighting it. 5/20 Trial Tr. 244:16-245:2 (Shortway); *see also* Meta FOF ¶¶ 217-218. Shortly after the acquisition closed, Meta provided Instagram with access to Meta's integrity expertise and cutting-edge spam-fighting tools, *see* Meta FOF ¶ 217 – which had "remarkable" capabilities and were not available outside of Meta, *see* Bejar Dep. Tr.* 34:23-35:8, 245:5-12 – and made Instagram's spam-fighting "a ton better," faster than Instagram could have done on its own, as Mr. Systrom acknowledged, *see* Meta FOF ¶¶ 217-218.

The FTC fixates on out-of-context statements in documents, mostly from 2017 to 2019,

that address policy-violating content, referred to as "integrity" issues, not spam. *See*, *e.g.*, FTC PF ¶ 426 (quoting 2018 document PX15147). But the FTC makes no mention of Mr. Zuckerberg's contemporaneous clarification that "[o]f course we need to address basic integrity risks across Instagram," PX15147 at -005, when the entire industry was in the "very early" stages of building out modern integrity programs, *see* 5/6 Trial Tr. 153:10-12 (Rosen). And the FTC cannot dispute evidence of Meta's massive investments since 2017, *see* Meta FOF ¶ 32, other than to imply Mr. Rosen was making up figures under oath – a brazen claim with zero support.

The evidence the FTC *does* cite – including exhibits not used at trial – shows that Meta invests substantial resources to address these industry-wide problems. *See* PX10940 at -013 ("integrity became the number one area of growth in 2017 and 2018"); PX3618 at -001 ("Our long term goal is to make . . . Instagram Direct the safest private messaging app."). Neither the FTC nor its experts have identified a single company that has invested more in integrity than Meta. Meta FOF ¶ 34; *see also id.* ¶¶ 217-218. The FTC's expert witness instead acknowledged that Meta is an industry leader in integrity. Meta FOF ¶ 34.

*                *                *

Mr. Systrom agreed that Meta's acquisition and investment made Instagram "better and better and better" for consumers than it would have been without Meta. Meta FOF ¶ 205. He was the FTC's key witness, and he testified that Meta accelerated Instagram's development by *years*. Meta FOF ¶ 205. By contrast, Professor Hemphill admitted, repeatedly, that he simply had no idea what Instagram would have been without Meta. Meta FOF ¶ 221.

    **b.**    **WhatsApp:**  Meta's acquisition delivers tens of billions of dollars' worth of consumer surplus *annually* to U.S. consumers. Meta FOF ¶ 257. It accomplished this in ways that antitrust law encourages and applauds. To start, Meta made WhatsApp *free*; it was formerly a subscription service for U.S. consumers, with plans to increase prices, but Meta reduced the

price to zero.  Meta FOF ¶¶ 241, 243, 251.  Meta also invested heavily in U.S. marketing and growth – e.g., partnerships with Formula 1; lighting up the Empire State Building; showing ads on television – which, with the price cuts, unleashed U.S. growth from fewer than 20 million U.S. users (or even less) to more than 100 million today.  Meta FOF ¶¶ 252-253.  That makes the service *better* for U.S. consumers, who can connect with more users and who have more choices for friends-and-family connections that occur primarily via messaging.  Meta FOF ¶¶ 157-158.

Meta also placed WhatsApp on its hyperscale infrastructure so that it could handle that added growth.  Meta FOF ¶ 253.  WhatsApp co-founder Mr. Acton testified that Meta's infrastructure, including its Content Delivery Network and Everstore media storage – to which WhatsApp began transitioning well before 2019, *see* 5/20 Trial Tr. 150:3-14, 151:19-22 (*contra* FTC PF ¶ 469) – improved WhatsApp's performance and reliability, helped WhatsApp leapfrog work it would otherwise have had to do, and contributed to WhatsApp's growth.  Meta FOF ¶ 253; *see also* 5/20 Trial Tr. 150:3-151:18 (Acton).

Meta also invested heavily in new features for WhatsApp.  Meta FOF ¶ 254.  Some of those features improved WhatsApp's messaging, e.g., allowing video sharing, introducing expansive group messaging, and making all messages end-to-end encrypted (not the case before the acquisition).  Meta FOF ¶ 254.  Other feature innovations enhanced WhatsApp's capabilities beyond messaging.  Meta introduced an ephemeral Stories feature on WhatsApp (called Status), like those on Snapchat, TikTok, Telegram, Signal, and others.  Meta FOF ¶¶ 12, 46(a).  Meta also launched a feature called Channels, which allows users to follow accounts – influencers, news outlets, and more – and view a feed of content those accounts post.  Meta FOF ¶ 254.

    **2.**    ***Meta's growth and improvement of Instagram and WhatsApp are cognizable procompetitive benefits.***  As this Court has recognized, cognizable merger benefits include

"increased output, decreased prices, improved service or quality, [and] greater innovation." *Meta Platforms*, 775 F. Supp. 3d at 68; *see also FTC v. Lab. Corp. of Am.*, 2011 WL 3100372, at *20 (C.D. Cal. Feb. 22, 2011) (same). The FTC itself has stated that "[c]ognizable justifications are typically those that reduce cost, increase output or improve product quality, service, or innovation." *In re McWane, Inc.*, 2014 WL 556261, at *30 (F.T.C. Jan. 30, 2014), *aff'd*, 783 F.3d 814 (11th Cir. 2015). That is consistent with decades of precedent recognizing that increased output and innovation are heartland procompetitive justifications. *See NCTA v. Broad. Music, Inc.*, 772 F. Supp. 614, 644 (D.D.C. 1991) (describing "maximiz[ing] output" as a "procompetitive effect"); *see also Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1287 (S.D. Fla. 2015) ("Procompetitive benefits include effects like increased output, reduced costs, and other operating efficiencies."), *aff'd*, 845 F.3d 1072 (11th Cir. 2016); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 478 (7th Cir. 2020) (recognizing the same).

Ignoring this precedent, the FTC argues (at 32-33) that simply increasing "raw" output is not enough. But the evidence shows not simply that Instagram grew in absolute terms, but also that it grew *more* – much more – than it would have been able to without Meta. There is no contrary evidence, just FTC speculation that anything is possible. For this reason, *NCAA v. Board of Regents*, 468 U.S. 85 (1984), hardly supports the FTC: there, the Court found that, as a result of the challenged restraint, "production has been limited, not enhanced." *Id.* at 114. The FTC makes no such claim here. *Cf.* Meta FOF ¶ 221 (Hemphill admissions).

Likewise, *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024), has nothing to do with whether greater output is a procompetitive benefit. The court there simply observed that an increase in output is not inconsistent with monopoly power (not at issue in evaluating whether *conduct* is anticompetitive). And the court rejected asserted procompetitive benefits (of an

exclusive-dealing arrangement) because "*the record does not sufficiently support*" Google's claims that the challenged agreement (among other things) "enhance[d] the user experience, quality, and output." *Id.* at 171 (emphasis added). The court did not question that an increase in output would be a cognizable benefit, and here the record amply supports it is just that.

The FTC says (at 32) that smartphone proliferation is an "obvious" explanation for Meta's output increase. If this was a tide that lifted all boats, where are the other boats? The supporting "fact" statement (at FTC PF ¶ 378) identifies just YouTube – backed by powerful Google (after an acquisition), which is one of Meta's two fiercest rivals (along with TikTok). Meta FOF ¶ 88. The FTC is silent on Path, Vine, Viddy, Tumblr (and more) and ignores the MeWe founder's testimony that ███████ social apps entered after the acquisitions, *see* Meta FOF ¶ 144, but failed to achieve growth on Instagram's timeline or scale. Professor Hemphill did not opine that smartphone proliferation accounts for Meta's output, as the FTC merely cites (at FTC PF ¶ 378; 5/13 Trial Tr. 61:19-62:23) his testimony on the "shift to mobile" as background for the acquisitions. And the FTC cites (at FTC PF ¶ 378) Mr. Schultz's testimony that "the entire industry" has grown, where he was describing the growth of *short-form video* and how Meta has "lost share of social to TikTok through that period." 5/12 Trial Tr. 62:14-63:4.

Most fundamentally, the question is not whether Instagram would have grown – it is whether Meta proved that Instagram grew *more* (or more rapidly) because of Meta's investments and managerial skill. The evidence on *that* question is 100% on Meta's side. Moreover, Instagram's growth benefits competition and consumers *generally* because of the nature of competition in this industry. The competitive imperative is to fight for *marginal* usage, increasing revenues by showing incremental ads. Meta FOF ¶¶ 45-46, 74, 82, 165. Social apps compete for that marginal usage by developing new features that attract user engagement, and

then other apps respond by adopting and improving on similar features – a cycle that delivers better free services to consumers.  Meta FOF ¶ 46.  Meta devoted billions of dollars to feature development and growth for Instagram and WhatsApp, and these efforts were remarkably successful.  Meta's innovations spurred other social apps – ███████████████████████████ ███████████████████ – to further innovate.  Meta FOF ¶¶ 91, 106, ███; *see also id.* ¶ 24.

### B.    The FTC Cannot Justify Disregarding the Procompetitive Benefits

**1.    *The "pretext" argument contradicts <u>Microsoft</u> and the trial evidence.*  The FTC's** claim (at 33-34) that the Court can disregard the acquisition benefits because they were not the "genuine reason" for the acquisitions directly contradicts the D.C. Circuit's holding – which the FTC never addresses – that, in this Section 2 case, "our focus is upon the effect of [challenged] conduct, *not upon the intent behind it*."  *Microsoft*, 253 F.3d at 59 (emphasis added).  "Evidence of the intent behind the conduct of a monopolist is relevant *only* to the extent it helps us understand the likely effect of the monopolist's conduct."  *Id.* (emphasis added).

**a.**    This legal rule forecloses the FTC's argument.  The FTC's position is that *even if* Meta's acquisitions delivered a bonanza of cognizable and procompetitive consumer benefits – even if consumers are unquestionably better off because Meta acquired Instagram than they would have been in the but-for world – the acquisitions *still* can be condemned under Section 2 as anticompetitive because Meta's motives were impure.  That argument is *exactly* what *Microsoft* precludes:  if conduct enhances consumer welfare, it cannot be condemned under Section 2; such conduct is competition on the merits.  *See* Meta Br. 53 (arguing that acquiring and investing in a small firm *is* competition on the merits, which the FTC *does not dispute* in its reply).

Rather than address this legal point, the FTC plays word games, arguing that, because *Microsoft* notes cognizable procompetitive justifications are "nonpretextual," Meta should not be able to defend its conduct if the Court concludes that Meta's true intention was to eliminate threats.

17

The FTC's interpretation would effectively nullify *Microsoft*'s core holding that effects, not intent, are paramount in evaluating procompetitive justifications. The "nonpretextual" language is meant to screen out claimed benefits that have not materialized and do not follow from the challenged conduct, which is irrelevant here. The FTC's assertion (at 34) that it would be "unwarranted" to take the desire "to grow a rival *after acquiring it* as evidence that the acquisition was made for a procompetitive purpose" is self-defeating. An investment in a rival or potential rival that realizes procompetitive efficiencies meets the very definition of procompetitive conduct. *See United States v. Syufy Enters.*, 903 F.2d 659, 673 (9th Cir. 1990).

The FTC's citation (at 33) to *McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015), its *only* case, is misplaced. That case has nothing to do with disregarding actual proof of effects; it instead illustrates that a merely *hypothesized* benefit cannot justify conduct that causes actual harm. Relevant here, the Eleventh Circuit found that, while the challenged arrangement "could result in increased efficiency in the right market conditions," there was "no reason[ ] to think that such conditions exist in this case" – a conclusion reinforced by internal documents that demonstrated the arrangement was not designed to achieve efficiencies (it did not, in fact, achieve any) but to foreclose a competitor. *Id.* at 841. By contrast, Meta demonstrably achieved welfare-enhancing increases in output that would not have been realized otherwise. Meta FOF ¶¶ 219-220. There is no doubt about that; Professor Hemphill *admitted* it. Meta FOF ¶ 206.

**b.** The FTC's argument also fails on the trial evidence. Investment and growth *was* the plan, and that is confirmed by contemporaneous written evidence. Meta FOF ¶¶ 196-201. There is no inconsistency between viewing Instagram as a potential competitor and recognizing that it could grow much more and more quickly with the benefit of Meta's resources and distribution. At summary judgment, the Court identified a factual dispute over whether Meta,

as it contended, acquired Instagram with an intent to "offer" its "scale and expertise to address [Instagram's] challenges while incorporating into its product offering a platform that was, from the consumer's perspective, highly successful." *Meta Platforms*, 775 F. Supp. 3d at 71. That is *exactly* what the trial evidence showed: Meta's intent going into the acquisition was to grow Instagram (and WhatsApp), and the outcome of the acquisitions was astonishingly successful from that perspective. Meta FOF ¶¶ 204-206, 219-220.

The FTC focuses (at 33-34) on Mr. Systrom describing Mr. Zuckerberg's emails as "negotiation tactics." What Mr. Systrom testified about is Mr. Zuckerberg's promises to keep Instagram as a "separate product and brand" with Facebook's "distribution firepower" behind it. 4/22 Trial Tr. 198:16-199:24 (Systrom discussing DX261). These "promises" were important to Mr. Systrom and a "big selling point[ ]." *Id.* Mr. Systrom never suggested these promises were false. Mr. Zuckerberg's testimony confirmed he was genuine in his desire to grow Instagram by combining its founders' talents with Meta's resources and capabilities. Meta FOF ¶ 199. Meta did exactly that. Meta FOF ¶¶ 204, 207. Mr. Zuckerberg testified credibly; the FTC offers no substantiated claim otherwise. The subsequent 12 years prove that these were not mere "negotiation tactics," but that Mr. Zuckerberg said what he meant and meant what he said.

The FTC also cites (at 34) emails from February 2012, which Mr. Zuckerberg testified were from before he had solidified his plans for Instagram. Meta FOF ¶ 197. To the extent those emails suggest an earlier plan to incorporate Instagram's functionality into the Facebook app, there is nothing wrong with that; more important, that was not the plan by the time the acquisition happened; most important, that is not what happened. Meta FOF ¶ 204. Meta did not leave Instagram to the side as insurance. Meta, at Mr. Zuckerberg's direction, flooded Instagram with billions of dollars of post-acquisition investment, personnel, features, growth

19

bridges, infrastructure, and more.  Meta FOF ¶¶ 207, 215, 217.  The outcome speaks for itself.

      **c.**      The FTC's "intent" evidence is equally flawed for WhatsApp.  As this Court has recognized, if Meta believed before the acquisition that WhatsApp did not intend to become a so-called "PSNS," then Meta's intent in acquiring it could not have been to squash a potential "PSNS" app.  *See Meta Platforms*, 775 F. Supp. 3d at 72.  The trial evidence confirmed that Meta understood WhatsApp would not pivot because the founders told Mr. Zuckerberg as much during a 2012 meeting that Mr. Zuckerberg recorded contemporaneously in an email to his team.  Meta FOF ¶ 244.  Meta's internal documents reflect the known fact that WhatsApp was not going to pivot and was not similarly situated to other messaging apps (e.g., LINE, Kakao, WeChat).  Meta FOF ¶ 245.  And the WhatsApp founders told Mr. Zuckerberg not to worry about other acquirers because WhatsApp was not interested.  Meta FOF ¶ 258.

      The FTC claims (at 34) that Meta "articulated no deal synergies to its Board," but the very documents the FTC cites (PX10858, PX1266, and PX10857, which was not used at trial) demonstrate the exact opposite.  The contemporaneous Board deck even contains a section discussing "synergies and efficiency opportunities" that states, among other things, Meta's plan to "help [WhatsApp] grow using our distribution [and] infrastructure."  PX10858 at -005.  The FTC retreats again to the argument that the acquisition price proves pretext.  That ignores Meta's industry-standard valuation methodology – which produced a lower purchase price than Google's contemporaneous valuation of WhatsApp – and transformation of WhatsApp into its current form.  Meta FOF ¶¶ 248-249.  The FTC is through the looking glass, attempting to penalize Meta because it *cut prices* and then spent a decade innovating ways to make WhatsApp a revenue leader without showing ads.  Meta FOF ¶¶ 255-256.  That is the definition of consumer benefit.

      **2.**      ***Meta showed it caused the benefits, making them merger specific.***

      **a.**      Merger specificity in this setting means showing the acquisitions caused the

benefits.  The FTC agrees, stating (at 35) that merger specificity entails demonstrating the benefits were "the result of" the challenged conduct (citing *Viamedia*) and that there is a "causal link between the conduct and the purported benefits" (citing *NorthShore*).  Unlike a prospective merger challenge, that standard is easily satisfied in this retrospective case:  Meta would not have invested in growing and innovating Instagram and WhatsApp had it not acquired those apps.  Mr. Systrom himself testified that Meta's investments made Instagram better (faster) in these ways.  Meta FOF ¶¶ 204-205.  The FTC presented no evidence that Instagram would have, for example, built a hyperscale infrastructure (or managed growth as well on another company's infrastructure) or succeeded in scaling an ad business or developed Reels with an AI-powered Modern Recommendation System, or done these things as well or as quickly, without Meta.

It instead speculates that perhaps Instagram could have rented infrastructure elsewhere, but that does not dispute that Meta *caused* the benefits observed.  Professor Hemphill acknowledged he did not attempt to figure out how Instagram would have developed on its own – testimony that gives away the game.  Meta FOF ¶ 221.  He even admitted that, as a result, he does not "know" whether "competition and consumers" were even "harmed."  Meta FOF ¶ 221.  "[M]erely theoretical" speculation that the benefits could have been achieved another way is forbidden by courts as an attack on merger specificity.  *Meta Platforms*, 775 F. Supp. 3d at 74.

Meta's evidence distinguishes *In re NorthShore University HealthSystem Antitrust Litigation*, 657 F. Supp. 3d 1077 (N.D. Ill. 2023), where the defendant did not put forward *any* evidence connecting the claimed benefit to the acquisition (challenged under Section 7).  *See id.* at 1102-03 ("NorthShore's briefing [does not] provide *any* kind of causation explanation") (emphasis added).  The FTC also cites (at 35) the *Google* ad-tech case, but the finding there was that Google's claimed benefit did not materialize – not that it was not merger specific.  The court

found the conduct did not have the claimed effect "of reducing spam, fraud, and malware for its customers" but simply prevented customers from using other ad exchanges that had comparable quality. *United States v. Google LLC*, 778 F. Supp. 3d 797, 868-69 (E.D. Va. 2025).

The FTC's true argument is not that the acquisitions did not cause benefits, but that some of them could perhaps have been achieved regardless of the acquisitions. That speculation does not refute Meta's showing that the acquisitions caused the claimed benefits. The analysis in the *Google* search case provides a contrast. *See* FTC Reply 35 (relying on that decision). In that case, Google pointed to the quality of Apple's products as a justification for their exclusive default-search arrangement. But Google failed to explain why that agreement gave Apple any greater incentive to design quality smartphone features; the challenged agreement did not *cause* Apple to invest in its products. *See Google*, 747 F. Supp. 3d at 172. Here, by contrast, Meta *caused* everything that happened at Instagram after 2012 and at WhatsApp after 2014.

Of course, anything is possible: had Don Larsen slipped in the shower on the morning of October 8, 1956, perhaps his replacement would have thrown a perfect game in his stead. But that does not change what actually happened that afternoon in the Bronx or suggest that the "anything is possible" alternative was likely. The results Meta achieved, by virtue of the choices Meta made and the resources it invested, are as extraordinary as Larsen's feat. No other social app besides YouTube and Facebook has gained as many users as Instagram. No other social app besides YouTube and TikTok attracts as much engagement as Meta's apps. And other than iMessage – the default messaging app on Apple's smartphones – no messaging app has been as successful as WhatsApp following the Meta acquisition. No one gets that lucky that often.

**b.** Independently, the FTC says *nothing* about the *speed* with which Meta grew and added features to Instagram and WhatsApp. Meta put forward evidence that its investments

accelerated Instagram's development – specifically its growth and feature innovation – by multiple years.  Meta FOF ¶¶ 204-205.  Mr. Systrom acknowledged that every improvement Meta built on Instagram happened faster than what Instagram could have accomplished on its own and that Meta accelerated Instagram by years and years.  *E.g.*, Meta FOF ¶¶ 205, 213, 217.  Mr. Acton said the same for WhatsApp.  Meta FOF ¶ 253.  Accomplishing these improvements faster than what either app could have done on its own is an independent merger-specific benefit.  *See United States v. Anthem, Inc.*, 855 F.3d 345, 358 (D.C. Cir. 2017) (stating a "benefit" would be the defendant "integrating [a competitor's] product faster than it could develop . . . its own");  *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 211-13 (S.D.N.Y. 2020) (holding that a benefit is merger specific if the post-merger entity can achieve it faster).  The FTC's failure to address how Meta improved Instagram and WhatsApp *faster* is fatal to its Section 2 case.

The FTC instead cites (at 35) *Microsoft* for the proposition that a defendant "is made to suffer the uncertain consequences" of its conduct.  That statement has nothing to do with procompetitive benefits; Microsoft offered no justifications for the anticompetitive conduct at issue before the D.C. Circuit.  *See*, *e.g.*, *Microsoft*, 253 F.3d at 74.  The court's caution was instead about whether conduct that is anticompetitive – that is, actually harms consumers – can be the basis for liability under Section 2 without proof that the conduct was the but-for *cause* of maintaining monopoly.  Microsoft argued that "plaintiffs must present direct proof that a defendant's continued monopoly power is precisely attributable to its anticompetitive conduct."  *Id.* at 79.  The court rejected that "causation" argument because it "would only encourage monopolists to take more and earlier anticompetitive action," e.g., squash Java early to claim that the government cannot prove whether Microsoft is big because of that or some other reason.  *Id.*  That has nothing to do with determining whether *conduct* is anticompetitive based on

procompetitive benefits that were actually realized. *See*, *e.g.*, *Viamedia*, 951 F.3d at 484-85 (explaining this *Microsoft* statement is about causation); *McWane*, 783 F.3d at 836-37 (same).

     **3.**     ***Meta's improvements to WhatsApp – price cuts, output expansions, and more-social feature innovations – are legally cognizable acquisition benefits.***  The FTC's final brief signals it does not believe in its WhatsApp claim:  Mr. Acton's testimony that WhatsApp would not pivot is *unanswered*, *see* Meta Br. 56-57, and the FTC disputes Meta's improvements to WhatsApp as "out-of-market" in a single sentence, *see* FTC Reply 37.  This one-sentence argument presupposes the FTC is right about the boundaries of its "PSNS" market, despite evidence that WhatsApp and other messengers (including iMessage) have added features to satisfy changing norms of use pulling friend sharing to messaging.  Meta FOF ¶¶ 108, 111, 155, ▉.  And even if the FTC gets out of the starting gate at all, it is wrong on the law and the facts.

     To start, the Supreme Court rejected the FTC's position when it considered out-of-market benefits in *NCAA v. Board of Regents*, 468 U.S. at 117, which postdates the case the FTC cites (at 37), *United States v. Philadelphia National Bank*, 374 U.S. 321, 370 (1963) – a case about Section 7 specifically and its lower bar for showing that a merger "may" lessen competition in "*any line of commerce*" (which confines the analysis to a single line of commerce in the text of the statute), 15 U.S.C. § 18 (emphasis added).  The Supreme Court has applied the *NCAA* rule (and not *Philadelphia National Bank*) in cases brought under the Sherman Act.  For instance, in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 482-84 (1992), the Court considered potential procompetitive benefits in the market for interbrand equipment sales even though the alleged relevant market was for service of Kodak-brand copiers.  *See also*, *e.g.*, *Sullivan v. NFL*, 34 F.3d 1091, 1112 (1st Cir. 1994) (collecting cases).

     Further, in this case specifically, it makes no sense to discount massive consumer benefits

including a *price cut*, output expansion, and feature innovations that are necessarily intertwined with the conduct the FTC challenges and easily quantified.  The concern with out-of-market effects is that claimed benefits may be only tangentially related (or unrelated) to the conduct causing the anticompetitive effect or difficult to quantify.  *See id.* ("[C]ourts should generally give a measure of latitude to antitrust defendants in their efforts to explain the procompetitive justifications for their policies and practices; however, courts should also maintain some vigilance by excluding justifications that are so unrelated to the challenged practice that they amount to a collateral attempt to salvage a practice that is decidedly in restraint of trade."); *see also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 989 (9th Cir. 2023) (similar; collecting cases), *cert. denied*, 144 S. Ct. 681 & 682 (2024).  But here the FTC does not dispute that the WhatsApp benefits are hand in glove with the very conduct the FTC challenges – the acquisition itself.

Moreover, many of those benefits *are* within the market even as the FTC has defined it: Meta improved WhatsApp not only by making it free (which benefits all WhatsApp users) but also by, e.g., adding new features to make WhatsApp more like the social apps the FTC claims are in the alleged market (including Stories and a feed of follower content).  Meta FOF ¶¶ 12, 254.  That is dispositive because the FTC claims Snapchat transformed from a messaging app to a "PSNS" when it added Stories.  The FTC cannot maintain that position while excluding consideration of the benefits that WhatsApp's improvements delivered to consumers once Meta gave that app a Stories feature too.  Finally, here, the benefits to consumers are both undisputed and easily quantified:  millions of U.S. consumers of WhatsApp benefited from a price cut.

**4.    *There is no support for a standardless "extraordinary" benefits requirement – which Meta would satisfy anyway.***  The FTC's final argument betrays the weakness of its case. Citing Professor Hovenkamp's opinion about what the law should be (not what it is), it claims

(at 39-40) that Meta's benefits are not "extraordinary" enough. That unadministrable standard is not the law under *Microsoft* or any other Section 2 or rule-of-reason case; no court weighing such claims has ever dismissed procompetitive benefits because they were too "ordinary" to count. *Cf. FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720 (D.C. Cir. 2001) (describing need for strong evidence of efficiencies in a *Section 7 case* in which merger caused large increase in concentration); *Viamedia*, 951 F.3d at 478 (stating, in footnote dicta, that evidence of "much greater" procompetitive benefits could avoid liability despite competition-harming conduct).

In any event, Meta's improvements to Instagram and WhatsApp *are* undeniably extraordinary. The FTC and its paid expert witnesses identify exactly zero apps that have ever grown faster than Instagram after Meta acquired it in 2012 with 3.9 million U.S. monthly active users; TikTok is the only possible exception. *Cf.* Meta FOF ¶ 221. And the FTC cites exactly zero cases that have ever condemned an acquisition like WhatsApp where the acquiring firm implemented a permanent price cut followed by a dramatic increase in output. Meta is unaware of any Section 2 (or Section 7) case in which a defendant quantified consumer benefits to be in the hundreds of billions of dollars, as Meta has here, supported by the testimony of Professor Carlton; the FTC's quibbles with that study do not dispute the order of magnitude.

The FTC's flummoxing last word (at 40) is that Meta's benefits are "nonspecific." Meta identified *specific* growth, marketing, and promotional measures for its acquisitions. Meta FOF ¶¶ 207-208. Meta offered days of testimony about *specific* feature innovations. Meta FOF ¶ 210; *see also id.* ¶ 40. Meta's witnesses discussed *specific* tools that improved monetization. Meta FOF ¶ 212; *see also id.* ¶ 21. Meta presented evidence on many *specific* integrity measures and AI tools. Meta FOF ¶¶ 217-218; *see also id.* ¶¶ 32-33. Meta presented evidence of numerous *specific* infrastructure improvements. Meta FOF ¶ 215. Meta told the Court it would show the

specific measures it took to scale Instagram and WhatsApp.  And that is what the trial did.

## II.    The FTC Failed To Argue – Let Alone Prove – Its Rebuttal Case

Under the framework articulated in *Microsoft*, detailed further by the Supreme Court in *American Express*, the FTC can try to show that the benefits Meta achieved through the acquisitions would have happened anyway and that the "but-for" world would have been just as good because there were "less-restrictive means" for doing just as well (or better) just as fast (or faster).  Under those cases, however, that is the FTC's burden to prove, not Meta's burden to rule out.  *See supra* pp.3-6 (discussing burden-shifting framework); *see also* Meta Pretrial Br. 22-25.

But Professor Hemphill admitted he had no opinion on how Instagram would have developed without Meta, acknowledging it might have been smaller and expressing uncertainty about consumer harm.  Meta FOF ¶ 221.  And now the FTC relies on Mr. Zuckerberg's speculation in 2018 that Instagram might have become Twitter or Snapchat without Meta, highlighting that the FTC has *no evidence* to show that Instagram would have been as big or innovative as it is today (it has surpassed those apps in output and features).  Notably, the FTC simply ***abandons*** its argument that *Meta* could have achieved these benefits through alternative means.  Before trial, the FTC argued that Meta could have accomplished the same benefits by investing in its own services without the acquisitions.  *See Meta Platforms*, 775 F. Supp. 3d at 72-74.  But the FTC makes no mention of Facebook Camera or Messenger in its reply brief.

The FTC's view of the law effectively imposes a *prima facie* presumption of liability at step one, without requiring a showing of effects.  Under this mistaken view, Meta must then prove not only procompetitive benefits from the acquisitions but also the negative:  there was no other way to achieve the same outcome.  That framework not only is inconsistent with binding authority – *Microsoft* and *American Express* – but also seeks to impose effectively strict liability whenever the government retrospectively challenges, under Section 2, successful mergers by

large firms. No case in the history of the Sherman Act has ever held past acquisitions – even by large-share firms – to such a strict-liability standard under Section 2. *See*, *e.g.*, *Sterling Merch., Inc. v. Nestlé, S.A.*, 656 F.3d 112, 126 (1st Cir. 2011) (rejecting Section 2 claim challenging large firm's past merger of a smaller competitor for failure to show effects).

Furthermore, this case does not justify easing the FTC's burden. *See Ass'n of Retail Travel Agents, Ltd. v. Air Transp. Ass'n of Am.*, 623 F. Supp. 893, 899-900 (D.D.C. 1985) (reasoning that prior DOJ review "should caution us against too easily finding the practice at issue subject to *per se* invalidation") (cleaned up); *see also* Meta Pretrial Br. 24-25 (discussing the government's burden when challenging acquisitions with vertical components, like these). Instead, the FTC's "novel approach" – the only instance it has *ever* litigated a retrospective acquisition challenge under Section 2 a decade after the fact and following FTC review at the time – "makes its burden to establish anticompetitive effects in the post-merger . . . market more difficult." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 132 (D.D.C. 2004); *see also FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 32 (D.D.C. 2021) ("Section 2 analysis of a claim involving a long-ago merger" might warrant "adjustment in certain burdens of proof").

## III.    The FTC's One-Paragraph Attempted Balancing Fails

As a final step, *Microsoft* says that "if the monopolist's procompetitive justification stands unrebutted" – and *American Express* explains how the FTC should have rebutted those benefits here – "the plaintiff *must* demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Microsoft*, 253 F.3d at 59 (emphasis added); *cf. Epic Games*, 67 F.4th at 990, 994 (explaining that this step is largely perfunctory for *the defendant* where the plaintiff cannot prove "substantially" less-restrictive means). Just as the Court observed that the FTC made its bed in Section 2 and must lie in it, here the FTC made its bed by seeking a *prima facie* presumption and must lie in that too. Specifically, having relied on

a presumption of harm (rather than evidence of it), it has no evidence comparing the claimed

harms of the acquisitions against Meta's quantifiable and demonstrated procompetitive benefits.

Meta showed for its side of the ledger that the acquisitions generated hundreds of billions

of dollars in consumer surplus, expanded output by hundreds of millions of users, unleashed

scores of new features, and more.  Meta FOF ¶¶ 9, 210, 219-220.  By contrast, Professor Hemphill

admitted that he does not know whether the Instagram acquisition caused any "consumer harm"

at all.  Meta FOF ¶ 221.  The FTC incants (in a single sentence at 40) "higher ad load, lower

quality, reduced consumer choice."  But higher and lower than what?  The FTC has never offered

a benchmark for quality and cannot point to any *evidence* that the "but-for" world would feature

fewer ads or higher quality.  Meta FOF ¶ 28; *see also id.* ¶¶ 31, 34, 37.

Aside from the truism that Instagram and WhatsApp are part of Meta as a result of the

acquisitions and are therefore not independent "choices," the FTC has no evidence that the

acquisitions resulted in any effect that could even be argued as less beneficial for consumers

relative to the but-for world.  And while the FTC claims more choices are always better for

consumers – which no court has held, *see In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*,

44 F.4th 959, 984-85 (10th Cir. 2022) (rejecting this "choice" over "welfare" framework) – such

a holding would amount to a ban on acquisitions.  The FTC might wish for such a sweeping

prohibition, but American consumers would be the worse for it.

The FTC's reliance on presumptions stands in stark contrast to DOJ's approach in the

*Google* ad-tech decision, the sole case cited by the FTC in its balancing paragraph.  In *Google*

ad-tech, DOJ did not rely on a presumption at step one.  *Cf. Google*, 778 F. Supp. 3d at 858-59

(rejecting claim as to two past acquisitions for want of proof as to that conduct specifically).

Instead, it presented evidence that Google's tying foreclosed the ability of new firms to emerge

in the "ad exchange market" and empowered Google to charge "supracompetitive prices." *Id.* at 862-63. Accordingly, when it came time for balancing, DOJ could weigh *something* against the claimed (but there unproved) procompetitive benefits. *See id.* at 868. Conversely, the FTC has sought so many assumptions and presumptions that now it has nothing to weigh.

*    *    *

The FTC invites legal error at every step. It seeks a *prima facie* presumption at step one, demands Meta to prove "extraordinary" procompetitive justifications at step two, completely bypasses its obligation at step three, and requests yet *another* presumption at step four. This is not the law. Yet, even under the FTC's incorrect view, Meta would still prevail. The acquisitions of Instagram and WhatsApp are unprecedented, leading to significant increases in output, an explosion of innovation, and even a permanent price cut. Meta's acquisitions delivered hundreds of billions of dollars' worth of benefits to consumers *above and beyond* what would have existed in a world without them. Meta FOF ¶¶ 205-206, 219-220. Those verifiable and eye-popping numbers are orders of magnitude greater than any benefits claimed in any antitrust or merger case the FTC has cited in the many years it has litigated this case. These achievements reflect tangible consumer benefits, not mere abstractions. Consumers now enjoy more features (like Reels), faster service (with less interruption), cutting-edge innovations (like the AI-powered Modern Recommendation System), and lower prices (for WhatsApp). This all contributes to an explosion of output, allowing Meta to reinvest in further innovation, which spurs other social apps to follow suit. Meta FOF ¶ 46; *see also id.* ¶¶ 91, 106, 115. These acquisitions were remarkably successful for Meta, the acquired apps, and consumers alike. To condemn either acquisition would contradict the purpose of antitrust law and harm consumer welfare.

**CONCLUSION**

Meta respectfully requests that the Court enter judgment in Meta's favor.

30

Dated:  September 10, 2025                    Respectfully submitted,

/s/ *Mark C. Hansen*

Mark C. Hansen (D.C. Bar No. 425930)
Aaron M. Panner (D.C. Bar No. 453608)
Geoffrey M. Klineberg (D.C. Bar No. 444503)
Leslie V. Pope (D.C. Bar No. 1014920)
Lillian V. Smith (D.C. Bar No. 252516)
Alex A. Parkinson (D.C. Bar No. 166695)
Ana Nikolic Paul (D.C. Bar No. 1531904)
Aaseesh P. Polavarapu (D.C. Bar No. 1740414)
Hilary M. Weaver (D.C. Bar No. 90013222)
Andrew Skaras (D.C. Bar No. 90004011)
KELLOGG, HANSEN, TODD,
    FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com

*Counsel for Defendant Meta Platforms, Inc.*